1819.

Dartmouth
College
v.
Woodward.

(CONSTITUTIONAL LAW.)

## The TRUSTEES OF DARTMOUTH COLLEGE v. WOODWARD.

The charter granted by the British crown to the trustees of Dartmouth College, in New-Hampshire, in the year 1769, is a contract within the meaning of that clause of the constitution of the United States, (art. 1. s. 10.) which declares that no State shall make any law impairing the obligation of contracts. The charter was not dissolved by the revolution.

An act of the State legislature of New-Hampshire, altering the charter, without the consent of the corporation, in a material respect, is an act impairing the obligation of the charter, and is unconstitutional and void.

Under its charter, Dartmouth College was a private and not a public corporation. That a corporation is established for purposes of general charity, or for education generally, does not, *per se*, make it a public corporation, liable to the control of the legislature.

ERROR to the Superior Court of the State of New-Hampshire.

This was an action of trover brought in the State Court, in which the plaintiffs in error declared for

two books of records, purporting to contain the records of all the doings and proceedings of the trustees of Dartmouth College, from the establishment of the corporation until the 7th day of October, 1816; the original charter, or letters patent, constituting the college; the common seal; and four volumes or books of account, purporting to contain the charges and accounts in favour of the college. The defendant pleaded the general issue, and at the trial the following special verdict was found:

" The said jurors, upon their oath, say, that his Majesty George the Third, King of Great Britain, &c. issued his letters patent, under the public seal of the Province, now State, of New-Hampshire, bearing date the 13th day of December, in the 10th year of his reign, and in the year of our Lord, one thousand seven hundred and sixty-nine, in the words following:

GEORGE the THIRD, by the grace of GOD, of Great Britain, France, and Ireland, KING, Defender of the Faith, and so forth.

*To all to whom these presents shall come.....*
*GREETING:*

WHEREAS it hath been represented to our trusty and well beloved John Wentworth, Esq. Governor and commander in chief, in and over our Province of New-Hampshire in New-England in America, that the Reverend Eleazar Wheelock, of Lebanon, in the colony of Connecticut, in New-England aforesaid, now Doctor in Divinity, did, on or about the year of our Lord one thousand seven hundred and fifty-four,

1819.

Dartmouth College
v.
Woodward.

Charter of Dartmouth College.

at his own expense, on his own estate and plantation, set on foot an Indian Charity School, and for several years, through the assistance of well disposed persons in America, clothed, maintained and educated a number of the children of the Indian natives, with a view to their carrying the gospel in their own language, and spreading the knowledge of the great Redeemer, among their savage tribes, and hath actually employed a number of them as missionaries and school masters in the wilderness for that purpose: and by the blessing of God upon the endeavours of said Wheelock, the design became reputable among the Indians, insomuch that a larger number desired the education of their children in said school, and were also disposed to receive missionaries and school masters in the wilderness, more than could be supported by the charitable contributions in these American colonies.

Whereupon, the said Eleazar Wheelock thought it expedient, that endeavours should be used to raise contributions from well disposed persons in England, for the carrying on and extending said undertaking; and for that purpose the said Eleazar Wheelock requested the Rev. Nathaniel Whitaker, now doctor in divinity, to go over to England for that purpose, and sent over with him the Rev. Samson Occom, an Indian minister, who had been educated by the said Wheelock. And to enable the said Whitaker to the more successful performance of said work, on which he was sent, said Wheelock gave him a full power of attorney, by which said Whitaker solicited those worthy and generous contributors to the charity, viz.

The Right Honourable William, Earl of Dartmouth,
the Honourable Sir Sydney Stafford Smythe, Knight,
one of the Barons of his Majesty's Court of Exche-
quer, John Thornton, of Clapham, in the county of
Surrey, Esquire, Samuel Roffey, of Lincoln's Inn-
fields, in the county of Middlesex, Esquire, Charles
Hardy, of the parish of Saint Mary-le-bonne, in said
county, Esquire, Daniel West, of Christ's church,
Spitalfields, in the county aforesaid, Esquire, Samuel
Savage, of the same place, Gentleman, Josiah Ro-
berts, of the parish of Saint Edmund, the King,
Lombard Street, London, Gentleman, and Robert
Keen, of the parish of Saint Batolph Aldgate, Lon-
don, Gentleman, to receive the several sums of mo-
ney which should be contributed, and to be trustees
for the contributors to such charity, which they cheer-
fully agreed to.

Whereupon, the said Whitaker did, by virtue of
said power of attorney, constitute and appoint the
said Earl of Dartmouth, Sir Sydney Stafford Smythe,
John Thornton, Samuel Roffey, Charles Hardy, and
Daniel West, Esquires, and Samuel Savage, Josiah
Roberts, and Robert Keen, Gentlemen, to be trustees
of the money which had then been contributed, and
which should, by his means, be contributed for said
purpose; which trust they have accepted, as by their
engrossed declaration of the same, under their hands
and seals well executed, fully appears, and the same
has also been ratified, by a deed of trust, well exe-
cuted, by the said Wheelock.

And the said Wheelock further represents, that he
has, by power of attorney, for many weighty reasons,

given full power to the said trustees, to fix upon and determine the place for said school, most subservient to the great end in view; and to enable them under- standingly to give the preference, the said Wheelock has laid before the said trustees, the several offers which have been generously made in the several go- vernments in America, to encourage and invite the settlement of said school among them, for their own private emolument, and the increase of learning in their respective places, as well as for the furtherance of the general design in view.

And whereas a large number of the proprietors of lands in the western part of this our province of New- Hampshire, animated and excited thereto, by the ge- nerous example of his excellency their governor, and by the liberal contributions of many noblemen and gentlemen in England, and especially by the consi- deration, that such a situation would be as convenient as any for carrying on the great design among the Indians ; and also, considering, that without the least impediment to the said design, the same school may be enlarged and improved to promote learning among the English, and be a means to supply a great num- ber of churches and congregations, which are likely soon to be formed in that new country, with a learn- ed and orthodox ministry ; they, the said proprietors, have promised large tracts of land, for the uses afore- said, provided the school shall be settled in the wes- tern part of our said province. And they, the said right honourable, honourable, and worthy trustees, before mentioned, having maturely considered the reasons and arguments, in favour of the several places

proposed, have given the preference to the western part of our said province, lying on Connecticut river, as a situation most convenient for said school.

And the said Wheelock has further represented a necessity of a legal incorporation, in order to the safety and well being of said seminary, and its being capable of the tenure and disposal of lands and bequests for the use of the same.

And the said Wheelock has also represented, that for many weighty reasons, it will be expedient, at least in the infancy of said institution, or till it can be accommodated in that new country, and he and his friends be able to remove and settle by and round about it, that the gentlemen, whom he has already nominated in his last will, (which he has transmitted to the aforesaid gentlemen of the trust in England,) to be trustees in America, should be of the corporation now proposed. And, also, as there are already large collections for said school, in the hands of the aforesaid gentlemen of the trust in England, and all reason to believe, from their singular wisdom, piety, and zeal to promote the Redeemer's cause, (which has already procured for them the utmost confidence of the kingdom,) we may expect they will appoint successors in time to come, who will be men of the same spirit, whereby great good may and will accrue many ways to the institution, and much be done by their example and influence to encourage and facilitate the whole design in view; for which reason, said Wheelock desires, that the trustees aforesaid may be vested with all that power therein, which can consist with their distance from the same.

*Know ye, therefore,* That We, considering the premises, and being willing to encourage the laudable. and charitable design of spreading christian knowledge among the savages of our American wilderness, and also that the best means of education be established in our province of New-Hampshire, for the benefit of said province, do, of our special grace, certain knowledge, and mere motion, by and with the advice of our counsel for said province, by these presents, will, ordain, grant, and constitute, that there be a college erected in our said province of New-Hampshire, by the name of *Dartmouth College,* for the education and instruction of youth of the Indian tribes in this land, in reading, writing, and all parts of learning, which shall appear necessary and expedient, for civilizing and christianizing children of pagans, as well as in all liberal arts and sciences, and also of English youth and any others. And the trustees of said college may and shall be one body corporate and politic, in deed, action, and name, and shall be called, named, and distinguished, by the name of the *Trustees of Dartmouth College.*

And further, we have willed, given, granted, constituted, and ordained, and by this our present charter, of our special grace, certain knowledge, and mere motion, with the advice aforesaid, do, for us, our heirs and successors forever, will, give, grant, constitute, and ordain, that there shall be in the said Dartmouth College, from henceforth and forever a body politic, consisting of Trustees of said Dartmouth College. And for the more full and perfect erection of said corporation and body politic, consisting of trustees of Dartmouth College, we, of our special grace, cer-

tain knowledge, and mere motion, do, by these presents, for us, our heirs and successors, make, ordain, constitute, and appoint our trusty and well beloved John Wentworth, Esq. governor of our said province, and the governor of our said province of New-Hampshire for the time being, and our trusty and well beloved Theodore Atkinson, Esq. now president of our council of our said province, George Jaffrey and Daniel Peirce, Esqrs. both of our said council, and Peter Gilman, Esq. now speaker of our house of representatives in said province, and William Pitkin, Esq. one of the assistants of our colony of Connecticut, and our said trusty and well beloved Eleazar Wheelock, of Lebanon, doctor in divinity, Benjamin Pomroy, of Hebron, James Lockwood, of Weathersfield, Timothy Pitkin and John Smalley, of Farmington, and William Patten, of Hartford, all of our said colony of Connecticut, ministers of the gospel, (the whole number of said trustees consisting, and hereafter forever to consist, of twelve, and no more,) to be trustees of said Dartmouth College, in this our province of New-Hampshire.

And we do further, of our special grace, certain knowledge, and mere motion, for us, our heirs and successors, will, give, grant, and appoint, that the said trustees and their successors shall forever hereafter be, in deed, act, and name, a body corporate and politic, and that they, the said body corporate and politic, shall be known and distinguished, in all deeds, grants, bargains, sales, writings, evidences, or otherwise howsoever, and in all Courts forever hereafter plead and be impleaded by the name of The Trustees of Dartmouth College ; and that the said corporation,

by the name aforesaid, shall be able, and in law capable, for the use of said Dartmouth College, to have, get, acquire, purchase, receive, hold, possess, and enjoy, tenements, hereditaments, jurisdictions, and franchises, for themselves and their successors, in fee simple, or otherwise howsoever, and to purchase, receive, or build, any house or houses, or any other buildings, as they shall think needful and convenient, for the use of said Dartmouth College, and in such town in the western part of our said province of New-Hampshire, as shall, by said trustees, or the major part of them, be agreed on; their said agreement to be evidenced by an instrument in writing, under their hands, ascertaining the same—And also to receive and dispose of any lands, goods, chattels, and other things, of what nature soever, for the use aforesaid—And also to have, accept, and receive any rents, profits, annuities, gifts, legacies, donations, or bequests of any kind whatsoever, for the use aforesaid; so, nevertheless, that the yearly value of the premises do not exceed the sum of six thousand pounds sterling; and therewith, or otherwise, to support and pay, as the said trustees, or the major part of such of them as are regularly convened for the purpose, shall agree, the President, Tutors, and other officers and ministers of said Dartmouth College; and also to pay all such missionaries and school masters as shall be authorized, appointed, and employed by them, for civilizing, and christianizing, and instructing the Indian natives of this land, their several allowances; and also their respective annual salaries or allowances, and all such necessary and

contingent charges, as from time to time shall arise and accrue, relating to the said Dartmouth College: And also, to bargain, sell, let, or assign, lands, tenements, or hereditaments, goods or chattels, and all other things whatsoever, by the name aforesaid, in as full and ample a manner, to all intents and purposes, as a natural person, or other body politic or corporate, is able to do by the laws of our realm of Great-Britain, or of said province of New-Hampshire.

And further, of our special grace, certain knowledge, and mere motion, to the intent that our said corporation, and body politic, may answer the end of their erection and constitution, and may have perpetual succession and continuance forever, we do, for us, our heirs and successors, will, give, and grant, unto the Trustees of Dartmouth College, and to their successors forever, that there shall be, once a year, and every year, a meeting of said trustees, held at said Dartmouth College, at such time as by said trustees, or the major part of them, at any legal meeting of said trustees, shall be agreed on; the first meeting to be called by the said Eleazar Wheelock, as soon as conveniently may be, within one year next after the enrollment of these our letters patent, at such time and place as he shall judge proper. And the said trustees, or the major part of any seven or more of them, shall then determine on the time for holding the annual meeting aforesaid, which may be altered as they shall hereafter find most convenient. And we farther order and direct, that the said Eleazar Wheelock shall notify the time for holding said first meeting, to be called as aforesaid, by sending a letter

1819.

Dartmouth College
v.
Woodward.

1819.

Dartmouth
College
v.
Woodward.

to each of said trustees, and causing an advertisement thereof to be printed in the New-Hampshire Gazette, and in some public newspaper printed in the colony of Connecticut. But in case of the death or incapacity of the said Wheelock, then such meeting to be notified in manner aforesaid, by the governor or commander in chief of our said province for the time being. And we do also, for us, our heirs and successors, hereby will, give, and grant, unto the said Trustees of Dartmouth College, aforesaid, and to their successors forever, that when any seven or more of the said trustees, or their successors, are convened and met together, for the service of said Dartmouth College, at any time or times, such seven or more shall be capable to act as fully and amply, to all intents and purposes, as if all the trustees of said College were personally present—and all affairs and actions whatsoever, under the care of said trustees, shall be determined by the majority or greater number of those seven or more trustees so convened and met together.

And we do further will, ordain, and direct, that the president, trustees, professors, tutors, and all such officers as shall be appointed for the public instruction and government of said college, shall, before they undertake the execution of their offices or trusts, or within one year after, take the oaths and subscribe the declaration provided by an act of Parliament made in the first year of King George the First, entitled, "An act for the further security of his Majesty's person and government, and the succession of the crown in the heirs of the late Princess Sophia, being

protestants, and for the extinguishing the hopes of the pretended Prince of Wales, and his open and secret abettors;" that is to say, the President, before the Governor . of our said Province for the time being, or by one by him empowered to that service, or by the president of our said council, and the trustees, professors, tutors, and other officers, before the president of said college for the time being, who is hereby empowered to administer the same; an entry of all which shall be made in the records of said college.

And we do, for us, our heirs, and successors, hereby will, give, and grant, full power and authority to the president hereafter by us named, and to his successors, or, in case of his failure, to any three or more of the said trustees, to appoint other occasional meetings, from time to time, of the said seven trustees, or any greater number of them, to transact any matter or thing necessary to be done before the next annual meeting, and to order notice to the said seven, or any greater number of them, of the times and places of meeting for the service aforesaid, by a letter under his or their hands, of the same, one month before said meeting—Provided always, that no standing rule or order be made or altered, for the regulation of said college, nor any president or professor be chosen or displaced, nor any other matter or thing transacted or done, which shall continue in force after the then next annual meeting of the said trustees, as aforesaid.

And, further, we do, by these presents, for us, our heirs and successors, create, make, constitute, nominate, and appoint our trusty and well beloved Eleazar Wheelock, Doctor in Divinity, the founder of said

1819.
Dartmouth
College
v.
Woodward.

college, to be President of said Dartmouth College, and to have the immediate care of the education and government of such students as shall be admitted into said Dartmouth College for instruction and education; and do will, give, and grant, to him, in said office, full power, authority, and right, to nominate, appoint, constitute, and ordain, by his last will, such suitable and meet person or persons as he shall choose to succeed him in the presidency of said Dartmouth College; and the person so appointed, by his last will, to continue in office, vested with all the powers, privileges, jurisdiction, and authority, of a President of said Dartmouth College; that is to say, so long and until such appointment by said last will shall be disapproved by the Trustees of said Dartmouth College.

And we do also, for us, our heirs, and successors, will, give, and grant to the said trustees of said Dartmouth College, and to their successors forever, or any seven or more of them convened as aforesaid, that in the case of the ceasing or failure of a president by any means whatsoever, that the said trustees do elect, nominate, and appoint such qualified person as they, or the major part of any seven or more of them, convened for that purpose as above directed, shall think fit, to be president of said Dartmouth College, and to have the care of the education and government of the students as aforesaid; and in case of the ceasing of a president as aforesaid, the senior professor or tutor, being one of the trustees, shall exercise the office of a president, until the trustees shall make choice of, and appoint, a president as afore-

said; and such professor or tutor, or any three or more of the trustees, shall immediately appoint a meeting of the body of the trustees for the purpose aforesaid. And also we do will, give, and grant to the said trustees convened as aforesaid, that they elect, nominate, and appoint so many tutors and professors to assist the president in the education and government of the students belonging thereto, as they the said trustees shall, from time to time, think needful and serviceable to the interests of said Dartmouth College. And also, that the said trustees or their successors, or the major part of any seven or more of them convened for that purpose as above directed, shall at any time displace and discharge from the service of said Dartmouth College any or all such officers, and elect others in their room and stead as before directed. And also that the said trustees, or their successors, or the major part of any seven of them which shall convene for that purpose as above directed, do, from time to time, as occasion shall require, elect, constitute, and appoint a treasurer, a clerk, an usher, and a steward for the said Dartmouth College, and appoint to them and each of them their respective businesses and trust; and displace and discharge from the service of said College, such treasurer, clerk, usher or steward, and to elect others in their room and stead; which officers so elected, as before directed, we do for us, our heirs and successors, by these presents, constitute and establish in their respective offices, and do give to each and every of them full power and authority to exercise the same in said Dartmouth College, according to the

directions, and during the pleasure of said trustees, as fully and freely as any like officers in any of our universities, colleges, or seminaries of learning in our realm of Great-Britain, lawfully may or ought to do. And also, that the said trustees and their successors, or the major part of any seven or more of them, which shall convene for that purpose as is above directed, as often as one or more of said trustees shall die, or by removal or otherwise shall, according to their judgment, become unfit or incapable to serve the interests of said College, do, as soon as may be after the death, removal, or such unfitness or incapacity of such trustee or trustees, elect and appoint such trustee or trustees as shall supply the place of him or them so dying, or becoming incapable to serve the interests of said College; and every trustee so elected and appointed shall, by virtue of these presents and such election and appointment, be vested with all the powers and privileges which any of the other trustees of said College are hereby vested with. And we do further will, ordain, and direct, that from and after the expiration of two years from the enrolment of these presents, such vacancy or vacancies as may or shall happen, by death or otherwise, in the aforesaid number of trustees, shall be filled up by election as aforesaid, so that when such vacancies shall be filled up unto the complete number of twelve trustees, eight of the aforesaid whole number of the body of trustees shall be resident, and respectable freeholders of our said Province of New-Hampshire, and seven of said whole number shall be laymen.

1819.

Dartmouth
College
v.
Woodward.

And we do further, of our special grace, certain knowledge, and mere motion, will, give, and grant, unto the said Trustees of Darmouth College, that they, and their successors, or the major part of any seven of them which shall convene for that purpose as is above directed, may make, and they are hereby fully impowered, from time to time, fully and lawfully to make and establish such ordinances, orders, and laws, as may tend to the good and wholesome government of the said college, and all the students and the several officers and ministers thereof, and to the public benefit of the same, not repugnant to the laws and statutes of our realm of Great Britain, or of this our province of New-Hampshire, and not excluding any person of any religious denomination whatsoever, from free and equal liberty and advantage of education, or from any of the liberties and privileges or immunities of the said college, on account of his or their speculative sentiments in religion, and of his or their being of a religious profession different from the said trustees of the said Dartmouth College. And such ordinances, orders, and laws, which shall as aforesid be made, we do for us, our heirs and successors, by these presents ratify, allow of, and confirm, as good and effectual to oblige and bind all the students, and the several officers and ministers of the said college. And we do hereby authorize and impower the said Trustees of Dartmouth College, and the president, tutors, and professors, by them elected and appointed as aforesaid, to put such ordinances, orders, and laws, in execution, to all proper intents and purposes.

1819.

Dartmouth
College
v.
Woodward.

And we do further, of our special grace, certain knowledge, and mere motion, will, give, and grant unto the said Trustees of said Dartmouth College, for the encouragement of learning, and animating the students of said college to diligence and industry, and a laudable progress in literature, that they, and their successors, or the major part of any seven or more of them, convened for that purpose as above directed, do, by the president of said college, for the time being, or any other deputed by them, give, and grant any such degree or degrees to any of the students of the said college, or any others by them thought worthy thereof, as are usually granted in either of the universities, or any other college in our realm of Great Britain; and that they sign and seal diplomas or certificates of such graduations, to be kept by the graduates as perpetual memorials and testimonials thereof.

And we do further, of our special grace, certain knowledge, and mere motion, by these presents, for us, our heirs and successors, give and grant unto the Trustees of said Dartmouth College, and to their successors, that they and their successors shall have a common seal, under which they may pass all diplomas or certificates of degrees, and all other affairs and business of, and concerning the said college; which shall be engraven in such a form, and with such an inscription as shall be devised by the said trustees, for the time being, or by the major part of any seven or more of them convened for the service of the said college as is above directed.

·And we do further, for us, our heirs and successors, give and grant unto the said trustees of the said Dartmouth College, and their successors, or to the major part of any seven or more of them convened for the service of the said college, full power and authority, from time to time, to nominate and appoint all other officers and ministers, which they shall think convenient and necessary for the service of the said college, not herein particularly named or mentioned; which officers and ministers we do hereby impower to execute their offices and trusts, as fully and freely as any of the officers and ministers in our universities or colleges in our realm of Great Britain lawfully may or ought to do.

And further, that the generous contributors to the support of this design of spreading the knowledge of the only true God and Saviour among the American savages, may, from time to time, be satisfied that their liberalities are faithfully disposed of, in the best manner, for that purpose, and that others may, in future time, be encouraged in the exercise of the like liberality for promoting the same pious design, it shall be the duty of the President of said Dartmouth College, and of his successors, annually, or as often as he shall be thereunto desired or required, to transmit to the right honourable, honourable, and worthy gentlemen of the trust in England before mentioned, a faithful account of the improvements and disbursements of the several sums he shall receive from the donations and bequests made in England, through the hands of said trustees, and also advise them of the general plans laid, and prospects exhibited, as well as a faith-

1819.

Dartmouth
College
v.
Woodward.

ful account of all remarkable occurrences, in order, if they shall think expedient, that they may be published. And this to continue so long as they shall perpetuate their board of trust, and there shall be any of the Indian natives remaining to be proper objects of that charity. And, lastly, our express will and pleasure is, and we do, by these presents, for us, our heirs and successors, give and grant unto the said Trustees of Dartmouth College, and to their successors forever, that these our letters patent, on the enrolment thereof in the Secretary's office of our Province of New-Hampshire aforesaid, shall be good and effectual in the law, to all intents and purposes, against us, our heirs and successors, without any other license, grant, or confirmation from us, our heirs and successors, hereafter by the said trustees to be had and obtained, notwithstanding the not writing or misrecital, not naming or misnaming the aforesaid offices, franchises, privileges, immunities, or other the premises, or any of them, and notwithstanding a writ of ad quod damnum hath not issued forth to inquire of the premises, or any of them, before the ensealing hereof, any statute, act, ordinance, or provision, or any other matter or thing, to the contrary notwithstanding. To have and to hold all and singular the privileges, advantages, liberties, immunities, and all other the premises herein and hereby granted, or which are meant, mentioned, or intended to be herein and hereby given and granted unto them, the said Trustees of Dartmouth College, and to their successors forever. In testimony whereof, we have caused these our letters to be made patent, and the public Seal of

our said Province of New-Hampshire to be hereunto affixed.  Witness our trusty and well beloved John Wentworth, Esquire, Governor and Commander in Chief in and over our said Province, &c. this thirteenth day of December, in the tenth year of our reign, and in the year of our Lord one thousand seven hundred and sixty-nine.

N. B. The words " and such professor, or tutor, or any three or more of the trustees, shall immediately appoint a meeting of the body of the trustees, for the purpose aforesaid," between the first and second lines, also the words " or more," between the twenty-seventh and twenty-eighth lines, also the words " or more," between the twenty-eighth and twenty-ninth lines, and also the words " to all intents and purposes," between the thirty-seventh and thirty-eighth line of this sheet, were respectively interlined before signing and sealing.

And the said jurors, upon their oath, further say, that afterwards, upon the eighteenth day of the same December, the said letters patent were duly enrolled and recorded in the Secretary's office of said Province, now State, of New-Hampshire—And afterwards, and within one year from the issuing of the same letters patent, all the persons named as trustees in the same accepted the said letters patent, and assented thereunto, and the corporation therein and thereby created and erected was duly organized, and has, until the passing of the act of the legislature of the State of New-Hampshire, of the 27th of June, A. D. 1816, and ever since, (unless prevented by said act and the

1819.

Dartmouth
College
v.
Woodward.

doings under the same,) continued to be a corpo-ration.

And the said jurors, upon their oath, further say, that immediately after its erection and organization as aforesaid, the said corporation had, took, acquired, and received, by gift, donation, devise, and otherwise, lands, goods, chattels, and moneys of great value; and from time to time since have had, taken, received, and acquired, in manner aforesaid, and otherwise, lands, goods, chattels, and moneys of great value; and on the same 27th day of June, A. D. 1816, the said corporation, erected and organized as aforesaid, had, held, and enjoyed, and ever since have had, held, and enjoyed, divers lands, tenements, hereditaments, goods, chattels, and moneys, acquired in manner afore-said, the yearly income of the same, not exceeding the sum of 26,666 dollars, for the use of said Dart-mouth College, as specified in said letters patent.

And the said jurors, upon their oath, further say, that part of the said lands, so acquired and holden by the said trustees as aforesaid, were granted by (and are situate in) the State of Vermont, A. D. 1785, and are of great value; and other part of said lands, so acquired and holden as aforesaid, were granted by (and are situate in) the State of New-Hampshire, in the years 1789, and 1807, and are of great value.

And the said jurors, upon their oath, further say, that the said Trusteees of Dartmouth College, so constituted as aforesaid, on the same 27th day of June, A. D. 1816, were possessed of the goods and chattels in the declaration of the said trustees specifi-

ed, and at the place therein mentioned, as of their own proper goods and chattels, and continued so possessed until, and at the time of the demand and refusal of the same as hereinafter mentioned, unless devested thereof, and their title thereto defeated, and rendered invalid, by the provisions of the act of the State of New-Hampshire, made and passed on the same 27th day of June, A. D. 1816, and the doings under the same, as hereinafter mentioned and recited.

And the said jurors, upon their oath, further say, that on the 27th day of June, A. D. 1816, the legislature of said State of New-Hampshire made and passed a certain act, entitled, " An act to amend the charter, and enlarge and improve the corporation of Dartmouth College," in the words following :—

*An act to amend the charter, and enlarge and improve the Corporation of Dartmouth College.*

WHEREAS knowledge and learning generally diffused through a community, are essential to the preservation of a free government, and extending the opportunities and advantages of education is highly conducive to promote this end, and by the constitution it is made the duty of the legislators and magistrates, to cherish the interests of literature, and the sciences, and all seminaries established for their advancement—and as the college of the State may, in the opinion of the legislature, be rendered more extensively useful ; Therefore,

SECT. 1. *Be it enacted by the senate and house of representatives, in general court convened,* That the

*[margin: Dartmouth College v. Woodward]*

*[margin: " Act of the legislature of New-Hampshire of the 27th of June, 1816.]*

corporation, heretofore called and known by the name of the Trustees of Dartmouth College, shall ever hereafter be called and known by the name of the Trustees of Dartmouth University.—And the whole number of said trustees shall be twenty-one, a majority of whom shall form a quorum for the transaction of business.—And they and their successors in that capacity, as hereby constituted, shall respectively forever have, hold, use, exercise and enjoy all the powers, authorities, rights, property, liberties, privileges and immunities which have hitherto been possessed, enjoyed and used by the Trustees of Dartmouth College—except so far as the same may be varied or limited by the provisions of this act. And they shall have power to determine the times and places of their meetings, and manner of notifying the same ; to organize colleges in the university ; to establish an institute and elect fellows and members thereof : to appoint such officers as they may deem proper, and determine their duties and compensation, and also to displace them ; to delegate the power of supplying vacancies in any of the offices of the university, for any term of time not extending beyond their next meeting : to pass ordinances for the government of the students, with reasonable penalties, not inconsistent with the constitution and laws of this State ; to prescribe the course of education, and confer degrees ; and to arrange, invest, and employ the funds of the university.

SECT. 2. *And be it further enacted,* That there shall be a board of overseers, who shall have perpetual succession, and whose number shall be twen-

ty-five, fifteen of whom shall constitute a quorum for the transaction of business. The president of the senate, and the speaker of the house of representatives of New-Hampshire, the governor and lieutenant governor of Vermont, for the time being, shall be members of said board, ex officio. The board of overseers shall have power to determine the. times and places of their meetings, and manner of notifying the same ; to inspect and confirm, or disapprove and negative, such votes and proceedings of the board of trustees as shall relate to the appointment and removal of president, professors, and other permanent officers of the university, and determine their salaries ; to the establishment of colleges and professorships, and the erection of new college buildings, *Provided always*, that the said negative shall be expressed within sixty days from the time of said overseers being furnished with copies of such acts.—*Provided also*, that all votes and proceedings of the board of trustees shall be valid and effectual, to all intents and purposes, until such negative of the board of overseers be expressed, according to the provisions of this act.

SECT. 3. *Be it further enacted*, That there shall be a treasurer of said corporation, who shall be duly sworn, and who, before he enters upon the duties of his office, shall give bonds, with sureties, to the satisfaction of the corporation, for the faithful performance thereof; and also a secretary to each of the boards of trustees and overseers, to be elected by the said boards respectively, who shall keep a just and true record of the proceedings of the board for

which he was chosen. And it shall furthermore be the duty of the secretary of the board of trustees to furnish, as soon as may be, to the said board of over-seers, copies of the records of such votes and proceedings, as by the provisions of this act are made subject to their revision and control.

SECT. 4. *Be it further enacted,* That the president of Dartmouth University, and his successors in office, shall have the superintendence of the government and instruction of the students, and may preside at all meetings of the trustees, and do and execute all the duties devolving by usage on the president of a university. He shall render annually to the governor of this state an account of the number of students, and of the state of the funds of the university; and likewise copies of all important votes and proceedings of the corporation and overseers, which shall be made out by the secretaries of the respective boards.

SECT. 5. *Be it further enacted,* That the president and professors of the university shall be nominated by the trustees, and approved by the overseers: and shall be liable to be suspended or removed from office in manner as before provided. And each of the two boards of trustees and overseers shall have power to suspend and remove any member of their respective boards.

SECT. 6. *Be it further enacted,* That the governor and council are hereby authorized to fill all vacancies in the board of overseers, whether the same be original vacancies, or are occasioned by the death, resignation or removal of any member. And

1819.

Dartmouth
College
v.
Woodward.

the governor and council in like manner shall, by appointments, as soon as may be, complete the present board of trustees to the number of twenty-one, as provided for by this act, and shall have power also to fill all vacancies that may occur previous to, or during the first meeting of the said board of trustees. But the president of said university for the time being, shall, nevertheless, be a member of said board of trustees, ex officio. And the governor and council shall have power to inspect the doings and proceedings of the corporation, and of all the officers of the university, whenever they deem it expedient—and they are hereby required to make such inspection, and report the same to the legislature of this State, as often as once in every five years. And the governor is hereby authorized and requested to summon the first meeting of the said trustees and overseers, to be held at Hanover, on the 26th day of August next.

SECT. 7. *Be it further enacted,* That the president and professors of the university, before entering upon the duties of their offices, shall take the oath to support the constitution of the United States and of this State ; certificates of which shall be in the office of the Secretary of this State, within sixty days from their entering on their offices respectively.

SECT. 8. *Be it further enacted,* That perfect freedom of religious opinion shall be enjoyed by all the officers and students of the university ; and no officer or student shall be deprived of any honours, privileges, or benefits of the institution, on account of his religious creed or belief. The theological colleges which

may be established in the university shall be founded, on the same principles of religious freedom.; and any man, or body of men, shall have a right to endow colleges or professorships of any sect of the protestant christian religion : And the trustees shall be held and obliged to appoint professors of learning and piety of such sects according to the will of the donors.

Approved, June 27th, 1816.

And the said jurors, upon their oath, further say, that, at the annual meeting of the Trustees of Dartmouth College, constituted agreeably to the letters patent aforesaid, and in no other way or manner, holden at said college, on the 28th day of August, A. D. 1816, the said trustees voted and resolved, and caused the said vote and resolve to be entered on their records, that they do not accept the provisions of the said act of the legislature of New-Hampshire of the 27th of June, 1816, above recited, but do, by the said vote and resolve, expressly refuse to accept or act under the same.

And the said jurors, upon their oath, further say, that the said Trustees of Dartmouth College have never accepted, assented to, or acted under the said act of the 27th of June, A. D. 1816, or any act passed in addition thereto, or in amendment thereof, but have continued to act, and still claim the right of acting, under the said letters patent.

And the said jurors, upon their oath, further say, that, on the seventh day of October, A. D. 1816, and before the commencement of this suit, the said Trustees of Dartmouth College demanded of the said

William H. Woodward the property, goods, and chattels in the said declaration specified, and requested the said William H. Woodward, who then had the same in his hands and possession, to deliver the same to them, which the said William H. Woodward then and there refused to do, and has ever since neglected and refused to do, but converted the same to his own use, if the said Trustees of Dartmouth College could, after the passing of the said act of the 27th day of June, lawfully demand the same, and if the said William H. Woodward was not, by law, authorized to retain the same in his possession after such demand.

And the said jurors, upon their oath, further say, that on the 18th day of December, A. D. 1816, the legislature of said State of New-Hampshire made and passed a certain other act, entitled, " An act in addition to, and in amendment of, an act, entitled, An act to amend the charter, and enlarge and improve the corporation of Dartmouth College," in the words following :

*An act in addition to, and in amendment of, an act, entitled, " An act to amend the charter, and enlarge and improve the Corporation of Dartmouth College."*

WHEREAS the meetings of the Trustees and Overseers of Dartmouth University, which were summoned agreeably to the provisions of said act, failed of being duly holden, in consequence of a quorum of neither said trustees nor overseers attending at the

time and place appointed, whereby the proceedings of said corporation have hitherto been, and still are delayed:

SECTION 1. *Be it enacted by the senate and house of representatives, in general Court convened,* That the governor be, and he is hereby authorized and requested to summon a meeting of the Trustees of Dartmouth University, at such time and place as he may deem expedient. And the said trustees, at such meeting, may do and transact any matter or thing, within the limits of their jurisdiction and power, as such trustees, to every intent and purpose, and as fully and completely as if the same were transacted at any annual, or other meeting. And the governor, with advice of council, is authorized to fill all vacancies that have happened, or may happen in the board of said trustees, previous to their next annual meeting. And the governor is hereby authorized to summon a meeting of the overseers of said university, at such time and place as he may consider proper. And provided a less number than a quorum of said board of overseers convene at the time and place appointed for such meeting of their board, they shall have power to adjourn, from time to time, until a quorum shall have convened.

SECTION 2. *And be it further enacted,* That so much of the act, to which this is an addition, as makes necessary any particular number of trustees or overseers of said University, to constitute a quorum for the transaction of business, be, and the same hereby is repealed ; and that hereafter nine of said trustees, convened agreeably to the provisions of this act, or

1819.

Dartmouth
College
v.
Woodward.

to those of that to which this is an addition, shall be a quorum for transacting business; and that in the board of trustees six votes at least shall be necessary for the passage of any act or resolution. And provided also, that any smaller number than nine of said trustees, convened at the time and place appointed for any meeting of their board, according to the provisions of this act, or that to which this is an addition, shall have power to adjourn from time to time, until a quorum shall have convened.

SECTION 3. *And be it further enacted,* That each member of said board of trustees, already appointed or chosen, or hereafter to be appointed or chosen, shall, before entering on the duties of his office, make and subscribe an oath for the faithful discharge of the duties aforesaid ; which oath shall be returned to, and filed in the office of the secretary of state, previous to the next regular meeting of said board, after said member enters on the duties of his office, as aforesaid.

Approved, December 18, 1816.

And the said jurors, upon their oath, further say, that on the 26th day of December, A. D. 1816, the legislature of said State of New-Hampshire made and passed a certain other act, entitled, " An act in addition to an act, entitled, an act in addition to, and in amendment of, an act, entitled, an act to amend the charter and enlarge and improve the corporation of Dartmouth College," in the words following :—

1819.

Dartmouth
College
v.
Woodward.

Act of the
26th of December, 1816.

*An act in addition to an act, entitled, " an act in addition to, and in amendment of, an act, entitled, an act to amend the charter and enlarge and improve the corporation of Dartmouth College."*

*Be it enacted by the senate and house of representatives in general Court convened,* That if any person or persons shall assume the office of president, trustee, professor, secretary, treasurer, librarian, or other officer of Dartmouth University; or by any name, or under any pretext, shall, directly or indirectly, take upon himself or themselves the discharge of any of the duties of either of those offices, except it be pursuant to, and in conformity with, the provisions of an act, entitled, " an act to amend the charter and enlarge and improve the corporation of Dartmouth College," or, of the " act, in addition to and in amendment of an act, entitled, an act to amend the charter and enlarge and improve the corporation of Dartmouth College," or shall in any way, directly or indirectly, wilfully impede or hinder any such officer or officers already existing, or hereafter to be appointed agreeably to the provisions of the acts aforesaid, in the free and entire discharge of the duties of their respective offices, conformably to the provisions of said acts, the person or persons so offending shall for each offence forfeit and pay the sum of five hundred dollars, to be recovered by any person who shall sue therefor, one half thereof to the use of the prosecutor, and the other half to the use of said University.

*And be it further enacted,* That the person or persons who sustained the offices of secretary and trea-

surer of the trustees of Dartmouth College, next before the passage of the act, entitled, " an act to amend the charter and enlarge and improve the corporation of Dartmouth College," shall continue to hold and discharge the duties of those offices, as secretary and treasurer of the Trustees of Dartmouth University, until another person or persons be appointed, in his or their stead, by the trustees of said University. And that the treasurer of said University, so existing, shall in his office have the care, management, direction, and superintendance of the property of said corporation, whether real or personal, until a quorum of said trustees shall have convened in a regular meeting.

Approved, December 26, 1816.

And the said jurors, upon their oath, further say, that the said William H. Woodward, before the said 27th day of June, had been duly appointed by the said Trustees of Dartmouth College, secretary and treasurer of the said corporation, and was duly qualified to exercise, and did exercise the said offices, and perform the duties of the same; and as such secretary and treasurer, rightfully had, while he so continued secretary and treasurer as aforesaid, the custody and keeping of the several goods, chattels, and property, in said declaration specified.

And the said jurors, upon their oath, further say, that the said William H. Woodward was removed by said Trustees of Dartmouth College (if the said trustees could, by law, do the said acts) from said office of secretary, on the 27th day of August, A. D. 1816, and from said office of treasurer, on the 27th day of

September then next following, of which said remo-vals he, the said William H. Woodward, had due no-tice on each of said days last mentioned.

And the said jurors, upon their oath, further say, that the corporation, called the Trustees of Dartmouth University, was duly organized on the fourth day of February, A. D. 1817, pursuant to, and under the said recited acts of the 27th day of June, and of the 18th and 26th days of December, A. D. 1816; and the said William H. Woodward was, on the said fourth day of February, A. D. 1817, duly appointed by the said Trustees of Dartmouth University, se-cretary and treasurer of the said Trustees of Dart-mouth University, and then and there accepted both said offices.

And the said jurors, upon their oath, further say, that this suit was commenced on the eighth day of February, A. D. 1817.

But whether upon the whole matter aforesaid, by the jurors aforesaid, in manner and form aforesaid found, the said acts of the 27th of June, 18th and 26th of December, A. D. 1816, are valid in law, and binding on the said trustees of Dartmouth College, without acceptance thereof and assent thereunto by them, so as to render the plaintiffs incapable of main-taining this action, or whether the same acts are re-pugnant to the constitution of the United States, and so void, the said jurors are wholly ignorant, and pray the advice of the Court upon the premises. And if upon the said matter, it shall seem to the Court here, that the said acts last mentioned are valid in law, and binding on said trustees of Dartmouth Col-

lege, without acceptance thereof, and assent thereto, by them, so as to render the plaintiffs incapable of maintaining this action, and are not repugnant to the constitution of the United States, then the said jurors, upon their oath, say, that the said William H. Woodward is not guilty of the premises above laid to his charge, by the declaration aforesaid, as the said William H. Woodward hath above in pleading alleged. But if upon the whole matter aforesaid, it shall seem to the Court here, that the said acts last mentioned are not valid in law, and are not binding on the said trustees of Dartmouth College without acceptance thereof, and assent thereto, by them, so as render them incapable of maintaining this action, and that the said acts are repugnant to the constitution of the United States and void, then the said jurors, upon their oath, say that the said William H. Woodward is guilty of the premises above laid to his charge, by the declaration aforesaid, and in that case, they assess the damages of them, the said trustees of Dartmouth College, by occasion thereof, at twenty thousand dollars.

Judgment having been afterwards rendered upon the said special verdict by the Superior Court of the State of New-Hampshire, being the highest Court of law or equity of said State, for the plaintiff below, the cause was brought before this Court by writ of error.

Mr. *Webster*, for the plaintiffs in error. The general question is, whether the acts of the 27th of June, and of the 18th and 26th of December, 1816, are

*1819.*

Dartmouth
College
v.
Woodward.

*March 10th,
and 11th,
1818.*

valid and binding on the rights of the plaintiffs, *with-out their acceptance or assent.*

The substance of the facts recited in the preamble to the charter is, that Dr. Wheelock had founded a CHARITY, on funds owned and procured by himself; that he was, at that time, the sole dispenser and sole administrator, as well as the legal owner of these funds; that he had made his will, devising this property in trust to continue the existence and uses of the school, and appointed trustees; that, in this state of things, he had been invited to fix his school permanently in New-Hampshire, and to extend the design of it to the education of the youth of that province; that, before he removed his school, or accepted this invitation, which his friends in England had advised him to accept, he applied for a charter, to be granted, not to whomsoever the king or government of the province should please, but to such persons as he named and appointed, viz. the persons whom he had already appointed to be the future trustees of his charity by his will. The Charter, or letters patent, then proceed to create such a corporation, and to appoint twelve persons to constitute it, by the name of the " Trustees of Dartmouth College ;" to have perpetual existence, as such corporation, and with power to hold and dispose of lands and goods, for the use of the College, with all the ordinary powers of corporations. They are in their discretion to apply the funds and property of the College to the support of the president, tutors, ministers, and other officers of the College, and such missionaries and schoolmasters as they may see fit to employ among

1819.

Dartmouth
College
v.
Woodward.

the Indians. There are to be twelve trustees for-ever, *and no more;* and they are to have the right of filling vacancies occuring in their own body. The Rev. Mr. Wheelock is declared to be the FOUNDER of the College, and is, by the charter, appointed first president, with power to appoint a successor, by his last will. All proper powers of government, super-intendence, and visitation, are vested in the trustees. They are to appoint and remove all officers at their discretion; to fix their salaries, and assign their du-ties; and to make all ordinances, orders, and laws, for the government of the students. And to the end that the persons who had acted as depositaries of the con-tributions in England, and who had also been con-tributors themselves, might be satisfied of the good use of their contributions, the president was annually, or when required, to transmit to them an account of the progress of the institution, and the disbursements of its funds, so long as they should continue to act in that trust. These letters patent are to be good and effectual in law, *against the king, his heirs and suc-cessors forever,* without further grant or confirmation; and the trustees are to hold all and singular these privileges, advantages, liberties, and immunities, to them and to their successors forever. No funds are given to the college by this charter. A corporate existence and capacity are given to the trustees, with the privileges and immunities which have been men-tioned, to enable the founder and his associates the better to manage the funds which they themselves had contributed, and such others as they might afterwards obtain.

After the institution, thus created and constituted, had existed, uninterruptedly and usefully, nearly fifty years, the legislature of New-Hampshire passed the acts in question. The first act makes the twelve trustees under the charter, and nine other individuals to be appointed by the governor and council, a corporation, by a new name; and to this new corporation transfers all the *property, rights, powers, liberties, and privileges* of the old corporation; with further power to establish NEW COLLEGES AND AN INSTITUTE, and to apply all or any part of the funds to these purposes, subject to the power and control of a board of twenty-five overseers, to be appointed by the governor and council. The second act makes further provisions for executing the objects of the first, and the last act authorizes the defendant, the treasurer of the plaintiffs, to retain and hold their property, against their will.

If these acts are valid, the old corporation is abolished, and a new one created. The first act does, in fact, if it can have effect, *create a new corporation*, and transfer to it all the property and franchises of the old. The two corporations are not the same, in any thing which essentially belongs to the existence of a corporation. They have different names, and different powers, rights and duties. Their organization is wholly different. The powers of the corporation are not vested in the same, or similar hands. In one, the trustees are twelve, and no more. In the other, they are twenty-one. In one, the power is a single board. In the other, it is divided between two boards. Although the act professes to

include the old trustees in the new corporation, yet that was without their assent, and against their remonstrance; and no person can be compelled to be a member of such a corporation against his will. It was neither expected nor intended, that they should be members of the new corporation. The act itself treats the old corporation as at an end, and going on the ground that all its functions have ceased, it provides *for the first meeting and organization of the new corporation.* It expressly provides, also, that the new corporation shall have and hold all the property of the old; a provision which would be quite unnecessary upon any other ground, than that the old corporation was dissolved. But if it could be contended. that the effect of these acts was not entirely to abolish the old corporation, yet it is manifest that they impair and invade the rights, property, and powers of the trustees under the charter, *as a corporation,* and the legal rights, privileges, and immunities which belong to them, *as individual members* of the corporation. The twelve trustees were the *sole* legal owners of all the property acquired under the charter. By the acts others are admitted, against *their* will, to be joint owners. The twelve individuals, who are trustees, were possessed of all the franchises and immunities conferred by the charter. By the acts, *nine* other trustees, and *twenty-five* overseers, are admitted against their will, to divide these franchises and immunities with them. If, either as a corporation, or as individuals, they have any *legal rights,* this forcible intrusion of others violates those rights, as manifestly as an entire and complete ouster

and dispossession. These acts alter the whole constitution of the corporation. They affect the rights of the whole body, as a corporation, and the rights of the individuals who compose it. They revoke corporate powers and franchises. They alienate and transfer the property of the College to others. By the charter, the trustees had a right to fill vacancies in their own number. This is now taken away. They were to consist of twelve, and by express provision, of no more. This is altered. They and their successors, appointed by themselves, were forever to hold the property. The legislature has found successors for them, before their seats are vacant. The powers and privileges, which the twelve were to exercise *exclusively*, are now to be exercised by others. By one of the acts, they are subjected to heavy penalties, if they exercise their offices, or any of those powers and privileges granted them by charter, and which they had exercised for fifty years. They are to be *punished* for not accepting the new grant, and taking its benefits. This, it must be confessed, is rather a summary mode of settling a question of constitutional right. Not only are new trustees forced into the corporation, but new trusts and uses are created. The College is turned into a University. Power is given to create new colleges, and to authorize any diversion of the funds, which may be agreeable to the new boards, sufficient latitude is given by the undefined power of establishing an *Institute*. To these new Colleges, and this *Institute*, the funds contributed by the founder, Dr. Wheelock, and by the original donors, the Earl of Dartmouth

and others, are to be applied, in plain and manifest disregard of the uses to which they were given. The president, one of the old trustees, had a right to his office, salary, and emoluments, subject to the twelve trustees alone. His title to these is now changed, and he is made accountable to new masters. So also all the professors and tutors. If the legislature can at pleasure make these alterations and changes, in the rights and privileges of the plaintiffs, it may, with equal propriety, abolish these rights and privileges altogether. The same power which can do any part of this work, can accomplish the whole. And, indeed, the argument, on which these acts have been hitherto defended, goes altogether on the ground, that this is such a corporation as the legislature may abolish at pleasure ; and that its members have no *rights, liberties, franchises, property or privileges,* which the legislature may not revoke, annul, alienate or transfer to others whenever it sees fit.

It will be contended by the plaintiffs, *that these acts are not valid and binding on them without their assent.* 1. Because they are against common right, and the constitution of New-Hampshire. 2. Because they are repugnant to the constitution of the United States. I am aware of the limits which bound the jurisdiction of the Court in this case; and that on this record nothing can be decided, but the single question, whether these acts are repugnant to the constitution of the United States. Yet it may assist in forming an opinion of their true nature and character, to compare them with those fundamental principles, introduced into the State govern-

ments for the purpose of limiting the exercise of the legislative power, and which the constitution of New-Hampshire expresses with great fullness and accuracy.

It is not too much to assert, that the legislature of New-Hampshire would not have been competent to pass the acts in question, and to make them binding on the plaintiffs without their assent, even if there had been, in the constitution of New-Hampshire, or of the United States, no special restriction on their power; because these acts are not the exercise of a power properly legislative.[a] Their object and effect is to take away from one, rights, property, and franchises, and to grant them to another  This is not the exercise of a legislative power.  To justify the taking away of vested rights, there must be a forfeiture; to adjudge upon and declare which, is the proper province of the judiciary.  Attainder and confiscation are acts of sovereign power, not acts of legislation.  The British parliament, among other unlimited powers, claims that of altering and vacating charters; not as an act of ordinary legislation, but of uncontrolled authority.  It is theoretically omnipotent.  Yet, in modern times, it has attempted the exercise of this power very rarely.  In a celebrated instance, those who asserted this power in parliament, vindicated its exercise only in a case, in which it could be shown, 1st. That the charter in question was a charter of political power. 2d. That there was a great and overruling state necessity, justifying the

a Calder *et ux.* v. Bull, 3 *Dall.* 386.

violation of the charter. 3d That the charter had been abused, and justly forfeited.[a] The bill affecting this charter did not pass. Its history is well known. The act w' ich afterwards did pass, passed *with the assent of the corporation.* Even in the worst times, this power of parliament to repeal and rescind charters has not often been exercised. The illegal proceedings in the reign of Charles II. were under colour of law. Judgments of forfeiture were obtained in the Courts. Such was the case of the *quo warranto* against the city of London, and the proceedings by which the charter of Massachusetts was vacated. The legislature of New-Hampshire has no more power over the rights of the plaintiffs than existed, somewhere, in some department of government, before the revolution. The British parliament could not have annulled or revoked this grant as an act of ordinary legislation. If it had done it at all, it could only have been in virtue of that sovereign power, called omnipotent, which does not belong to any legislature in the United States. The legislature of New-Hampshire has the same power over this charter, which belonged to the king, who granted it, and no more. By the law of England, the power to create corporations is a part of the royal prerogative.[b] By the revolution, this power may be considered as having devolved on the legislature of

1819.

Dartmouth
College
v.
Woodward.

---

*a Annual Reg.* 1784, p. 160. *Parlia. Reg.* 1783. Mr. *Burke's Speech on Mr. Fox's E. I. Bill. Burke's Works,* Vol. III. p. 414. 417. 467, 468. 486.

*b* 1 *Bl. Com.* 472.

the State, and it has accordingly been exercised by the legislature. But the king cannot abolish a corporation, or new model it, or alter its powers, without its assent. This is the acknowledged and well-known doctrine of the common law. " Whatever might have been the notion in former times," says Lord Mansfield, " it is most certain now, that the corporations of the universities are lay corporations; and that the crown cannot take away from them any rights that have been formerly subsisting in them under old charters or prescriptive usage."[a] After forfeiture duly found, the king may regrant the franchises; but a grant of franchises already granted, and of which no forfeiture has been found, is void. Corporate franchises can only be forfeited by trial and judgment.[b] In case of a new charter or grant to an existing corporation, it may accept or reject it as it pleases.[c] It may accept such part of the grant as it chooses, and reject the rest.[d] In the very nature of things, a charter cannot be forced upon any body. No one can be compelled to accept a grant; and without acceptance the grant is necessarily void.[e] It cannot be pretended that the legislature, as successor to the king in this part of his prerogative, has any power to revoke, vacate, or alter this charter. If, therefore, the legislature has not this power by any

a  3 Burr. 1656.

b  3 T. R. 244.  King v. Passmore.

c  The King v. Vice Chancellor of Cambridge, 3 Burr. 1656. 3 T. R. 240. per Lord Kenyon.

d  Idem, 1661. and King v. Passmore, ubi supra.

e  Ellis v. Marshall, 2 Mass. R. 277.  1 Kyd on Corp. 65, 66.

specific grant contained in the constitution; nor as included in its ordinary legislative powers; nor by reason of its succession to the prerogatives of the crown in this particular; on what ground would the authority to pass these acts rest, even if there were no special prohibitory clauses in the constitution, and the bill of rights?

But there are prohibitions in the constitution and bill of rights of New-Hampshire, introduced for the purpose of limiting the legislative power, and of protecting the rights and property of the citizens. One prohibition is, " that no person shall be deprived of his property, immunities or privileges, put out of the protection of the law, or deprived of his life, liberty, or estate, but by judgment of his peers, or the law of the land." In the opinion, however, which was given in the Court below, it is denied that the trustees, under the charter, had any property, immunity, liberty or privilege, in this corporation, within the meaning of this prohibition in the bill of rights. It is said, that it is a *public corporation*, and *public property*. That the trustees have no greater interest in it than any other individuals. That it is not private property, which they can sell, or transmit to their heirs; and that, *therefore*, they have no interest in it. That their office is a public trust like that of the governor, or a judge; and that they have no more concern in the property of the college, than the governor in the property of the State, or than the judges in the fines which they impose on the culprits at their bar. That it is nothing to them whether their powers shall be extended or lessened, any more than it is

to the Courts, whether their jurisdiction shall be enlarged or diminished. It is necessary, therefore, to inquire into the true nature and character of the corporation, which was created by the charter of 1769.

There are divers sorts of corporations; and it may be safely admitted, that the legislature has more power over some, than over others.[a] Some corporations are for government and political arrangement; such for example as cities, counties, and the towns in New England. These may be changed and modified as public convenience may require, due regard being always had to the rights of property. Of such corporations, all who live within the limits are of course obliged to be members, and to submit to the duties which the law imposes on them as such. Other civil corporations are for the advancement of trade, and business, such as banks, insurance companies, and the like. These are created, not by general law, but usually by grant. Their constitution is special. It is such as the legislature sees fit to give, and the grantees to accept.

The corporation in question is not a *civil*, although it is a *lay* corporation. It is an *eleemosynary* corporation. It is a *private charity*, originally founded and endowed by an individual, with a charter obtained for it at *his* request, for the better administration of *his* charity. "The eleemosynary sort of corporations are such as are constituted for the perpetual distributions of the free alms or bounty of the founder of them, to such persons as he has directed. Of this

---

[a] 1 *Wooddes.* 474.   1 *Bl. Com.* 467.

are all hospitals for the maintenance of the poor, sick, and impotent; and all colleges both in our universities and out of them."[a]   Eleemosynary corporations are for the management of private property, according to the will of the donors.   They are private corporations.   A college is as much a private corporation as a hospital; especially a college founded as this was, by private bounty.   A college is a charity.   " The establishment of learning," says Lord Hardwicke, " is a charity, and so considered in the statute of Elizabeth.   A devise to a college, for their benefit, is a laudable *charity*, and deserves encouragement."[b]   The legal signification of *a charity* is derived chiefly from the statute 43 Eliz. c. 4.   " Those purposes," says Sir W. Grant, " are considered *charitable* which that statute enumerates."[c]   *Colleges* are enumerated as *charities* in that statute.   The government, in these cases, lends its aid to perpetuate the beneficent intention of the donor, by granting a charter, under which his private charity shall continue to be dispensed, after his death.   This is done either by incorporating the *objects* of the charity, as, for instance, the scholars in a college, or the poor in a hospital; or by incorporating those who are to be governors, or trustees, of the charity.[d]   In cases of the first sort, the *founder* is, by the common law, *visitor*.   In early times it became a maxim, that he who gave the property might regulate it in future. *Cujus est dare, ejus est disponere.*   This right of *visitation* descended from the founder to his heir, as

1819.
Dartmouth
College
v.
Woodward.

a 1 *Bl. Com.* 471.          b 1 *Ves.* 537.
c 9 *Ves.* 405.              d 1 *Wooddes.* 474.

a right of property, and precisely as his other property went to his heir; and in default of heirs, it went to the King, as all other property goes to the King, for the want of heirs. The right of visitation arises from the property. It grows out of the endowment. The founder may, if he please, part with it, at the time when he establishes the charity, and may vest it in others. Therefore, if he chooses that governors, trustees, or overseers, should be appointed in the charter, he may cause it to be done, *and his power of visitation will be transferred to them*, instead of descending to his heirs. The persons thus assigned or appointed by the founder will be visitors, with all the powers of the founder, in exclusion of his heir.[a] The right of visitation then accrues to them as a matter of property, by the gift, transfer, or appointment of the founder. This is a private right which they can assert in all legal modes, and in which they have the same protection of the law as in all other rights. As visitors, they may make rules, ordinances, and statutes, and alter and repeal them, as far as permitted so to do by the charter.[b] Although the charter proceeds from the crown, or the government, it is considered as the will of the donor. It is obtained at his request. He imposes it as the rule which is to prevail in the dispensation of his bounty in all future times. The king, or government, which grants the charter, is not thereby the founder, but he who furnishes the funds. The gift of the revenues is the foundation.[c] The leading

a 1 *Bl. Com.* 471.    b 2 *T. R.* 350, 351.    c 1 *Bl. Com.* 480.

case on this subject is Phillips v. Bury.[a] This was an ejectment brought to recover the rectory house, &c. of Exeter College, in Oxford. The question was, whether the plaintiff or defendant was legal rector. Exeter College was founded by an individual, and incorporated by a charter granted by Queen Elizabeth. The controversy turned upon the power of the visitor, and, in the discussion of the cause, the nature of College charters and corporations was very fully considered; and it was determined that the college was a *private* corporation, and that the founder had a right to appoint a visitor, and give him such power as he thought fit.[b] The learned Bishop Stillingfleet's argument in the same cause, as a member of the House of Lords, when it was there heard, exhibits very clearly the nature of colleges and similar corporations.[c] These opinions received the sanction of the House of Lords, and they seem to be settled and undoubted law. Where there is a charter, vesting proper powers of government in *trustees*, or *governors*, they are *visitors*; and there is no control in any body else; except only that the Courts of Equity or of law will interfere so far as to preserve the revenues and prevent the perversion of the funds, and to keep the visitors within their prescribed bounds.[d]

*a* Reported in 1 *Lord Raymond*, 5. *Comb.* 265. *Holt*, 715. 1 *Show.* 360. 4 *Mod.* 106. *Skinn.* 447.

*b* Lord Holt's judgment, copied from his own manuscript, is in 2 *T. R.* 346.

*c* 1 *Burns' Eccles. Law*, 443.

*d* Green v. Rutherforth, 1 *Ves.* 472. Attorney General v. Foundling Hospital, 2 *Ves. jr.* 47. *Kyd on Corp.* 195. *Coop. Eq. Pl.* 292.

1819.

Dartmouth
College
v.
Woodward.

" The foundations of colleges," says Lord Mansfield, " are to be considered in two views, viz. as they are *corporations*, and as they are *eleemosynary*. As eleemosynary, they are the creatures of the founder; he may delegate his power, either generally or specially; he may prescribe particular modes and manners, as to the exercise of part of it. If he makes a general visitor, (as by the general words *visitator sit*) the person so constituted has all incidental power; but he may be restrained as to particular instances. The founder may appoint a special visitor for a particular purpose and no further. The founder may make a general visitor; and yet appoint an inferior particular power, to be executed without going to the visitor in the first instance." [a] And even if the king be founder, if he grant a charter incorporating trustees and governors, *they are visitors*, and the king cannot visit.[b] A subsequent donation, or engrafted fellowship, falls under the same general visitatorial power, if not otherwise specially provided.[c] In New-England, and perhaps throughout the United States, eleemosynary corporations have been generally established in the latter mode, that is, by incorporating *governors* or *trustees*, and vesting in them the right of visitation. Small variations may have been in some instances adopted; as in the case of Harvard College, where some power of inspection is given to the overseers, but

a St. John's College, Cambridge v. Todington, 1 *Burr.* 200.
b Attorney General v. Middleton, 2 *Ves.* 328.
c Green v. Rutherforth, *ubi supra.* St. John's College v. Todington, *ubi supra.*

not, strictly speaking, a visitatorial power, which still belongs, it is apprehended, to the fellows, or members of the corporation. In general, there are many donors. A charter is obtained, comprising them all, or some of them, and such others as they choose to include, with the right of appointing their successors. They are thus the visitors of their own charity, and appoint others, such as they may see fit, to exercise the same office in time to come. All such corporations are private. The case before the Court is clearly that of an eleemosynary corporation. It is, in the strictest legal sense, a private charity. In King v. St. Catherine's Hall,[a] that college is called *a private eleemosynary lay corporation.* It was endowed by a private founder, and incorporated by letters patent. And in the same manner was Dartmouth College founded and incorporated. Dr. Wheelock is declared by the charter to be its founder. It was established by him, on funds contributed and collected by himself. As such founder, he had a right of visitation, which he assigned to the trustees, and they received it by his consent and appointment, and held it under the charter.[b] He appointed these trustees visitors, and in that respect to take place of his heir; as he might have appointed devisees to take his estate, instead of his heir. Little, probably, did he think, at that time, that the legislature would ever take away this property and these privileges, and give them to others. Little did he suppose, that this charter secured to him and his successors no legal rights. Little did

---

a 4 *Term Rep.* 233.          b *Bl. Com. ub. supr*

the other donors think so. If they had, the college would have been, what the university is now, a thing upon paper, existing only in name. The numerous academies in New-England have been established substantially in the same manner. They hold their property by the same tenure, and no other. Nor has Harvard College any surer title than Dartmouth College. It may, to-day, have more friends; but to-morrow it may have more enemies. Its legal rights are the same. So also of Yale College; and indeed of all the others. When the legislature gives to these institutions, it may, and does, accompany its grants with such conditions as it pleases. The grant of lands by the legislature of New-Hampshire to Dartmouth College, in 1789, was accompanied with various conditions. When donations are made, by the legislature, or others, to a charity already existing, without any condition, or the specification of any new use, the donation follows the nature of the charity. Hence the doctrine, that all eleemosynary corporations are private bodies. They are founded by private persons, and on private property. The public cannot be charitable in these institutions. It is not the money of the public, but of private persons, which is dispensed. It may be public, that is general, in its uses and advantages; and the State may very laudably add contributions of its own to the funds; but it is still private in the tenure of the property, and in the right of administering the funds. If the doctrine laid down by Lord Holt, and the House of Lords, in Phillips v. Bury, and recognized and established in all the other cases, be cor-

rect, the property of this college was private proper-ty; it was vested in the trustees by the charter, and to be administered by them, according to the will of the founder and donors, as expressed in the charter. They were also *visitors* of the charity, in the most ample sense. *They* had, therefore, as they contend, *privileges, property,* and *immunities,* within the true meaning of the bill of rights. They had rights, and still have them, which they can assert against the legislature, as well as against other wrongdoers. It makes no difference, that the estate is holden for certain trusts. The legal estate is still theirs. They have a right in the property, and they have a right of visiting and superintending the trust; and this is an object of legal protection, as much as any other right. The charter declares, that the powers conferred on the trustees, are " privileges, advantages, liberties, and immunities;" and that they shall be forever holden by them and their successors. The New-Hampshire bill of rights declares, that no one shall be deprived of his " property, privileges, or immunities," but by judgment of his peers, or the law of the land. The argument on the other side is, that although these terms may mean something in the bill of rights, they mean nothing in this charter. But they are terms of legal signification, and very properly used in the charter. They are equivalent with *franchises.* Blackstone says that *franchise* and *liberty* are used as synonymous terms. And after enumerating other *liberties* and *franchises,* he says, " it is likewise a franchise for a number of persons to be incorporated and subsist as a body politic, with a power to main-

1819.

Dartmouth College v. Woodward.

tain perpetual succession, and do other corporate acts; *and each individual member of such corporation is also said to have a franchise or freedom.*"[a] Liberties is the term used in *magna charta,* as including franchises, privileges, immunities, and all the rights which belong to that class. Professor Sullivan says, the term signifies the " *privileges* that some of the subjects, whether single persons or bodies corporate, have above others by the lawful grant of the king; as the chattels of felons or outlaws, and the lands *and privileges of corporations.*"[b] The privilege, then, of being a member of a corporation, under a lawful grant, and of exercising the rights and powers of such member, is such a privilege, *liberty,* or *franchise,* as has been the object of legal protection, and the subject of a legal interest, from the time of *magna charta* to the present moment. The plaintiffs have such an interest in this corporation, individually, as they could assert and maintain in a court of law, not as agents of the public, but in their own right. Each trustee has a *franchise,* and if he be disturbed in the enjoyment of it, he would have redress, on appealing to the law, as promptly as for any other injury. If the other trustees should conspire against any one of them, to prevent his equal right and voice in the appointment of a president or professor, or in the passing of any statute or ordinance of the college, he would be entitled to his action, for depriving him of his franchise. It makes no difference, that this property is to be holden and administered, and these franchises exer-

*a 2 Bl. Com.* 37.                    *b Sull.* 41*st Lec.*

vised, for the purpose of diffusing learning. No principle and no case establishes any such distinction. The public may be benefited by the use of this property. But this does not change the nature of the property, or the rights of the owners. The object of the charter may be public good; so it is in all other corporations; and this would as well justify the resumption or violation of the grant in any other case as in this. In the case of an advowson, the use is public, and the right cannot be turned to any private benefit or emolument. It is, nevertheless a legal private right, and the *property* of the owner, as emphatically as his freehold. The rights and privileges of trustees, visitors, or governors of incorporated colleges, stand on the same foundation. They are so considered, both by Lord Holt and Lord Hardwicke.[a] To contend that the rights of the plaintiffs may be taken away, because they derive from them no pecuniary benefit, or private emolument, or because they cannot be transmitted to their heirs, or would not be assets to pay their debts, is taking an extremely narrow view of the subject. According to this notion, the case would be different, if, in the charter, they had stipulated for a commission on the disbursement of the funds; and they have ceased to have any interest in the property, because they have undertaken to administer it gratuitously. It cannot be necessary to say much in refutation of the idea, that there cannot be a legal interest, or

1819.

Dartmouth College v. Woodward.

a Phillips v. Bury. Green v. Rutherforth, *ubi supra*. Vide also 2 *Black.* 21.

ownership, in any thing which does not yield a pecu-
niary profit.; as if the law regarded no rights but the
rights of money, and of visible tangible property.
Of what nature are all rights of suffrage? No elec-
tor has a particular personal interest; but each has a
legal right, to be exercised at his own discretion, and
it cannot be taken away from him. The exercise of
this right directly and very materially affects the pub-
lic; much more so than the exercise of the privileges
of a trustee of this college. Consequences of the
utmost magnitude may sometimes depend on the ex-
ercise of the right of suffrage by one or a few
electors. Nobody was ever yet heard to contend,
however, that on that account the public might take
away the right or impair it. This notion appears to
be borrowed from no better source than the repudi-
ated doctrine of the three judges in the Aylesbury
case.[a] That was an action against a returning officer,
for refusing the plaintiff's vote, in the election of a
member of parliament. Three of the judges of the
king's bench held, that the action could not be main-
tained, because, among other objections, " *it was not
any matter of profit, either in presenti or in futuro.*"
It would not enrich the plaintiff, *in presenti*, nor
would it, *in futuro*, go to his heirs, or answer to pay
his debts. But Lord Holt and the house of lords
were of another opinion. The judgment of the
three judges was reversed, and the doctrine they held,
having been exploded for a century, seems now for
the first time to be revived. Individuals have a right

a. Ashby v. White, 2 *Ld. Raym.* 938.

1819.

Dartmouth
College
v.
Woodward.

to use their own property for purposes of benevolence, either towards the public, or towards other individuals. They have a right to exercise this benevolence in such lawful manner as they may choose ; and when the government has induced and excited it, *by contracting to give perpetuity to the stipulated manner of exercising it,* to rescind this contract, and seize on the property, is not law, but violence. Whether the State will grant these franchises, and under what conditions it will grant them, it decides for itself. But when once granted, the constitution holds them to be sacred, till forfeited for just cause. That all property, of which the use may be beneficial to the public, belongs therefore to the public, is quite a new doctrine. It has no precedent, and is supported by no known principle. Dr. Wheelock might have answered his purposes, in this case, by executing a private deed of trust. He might have conveyed his property to trustees, for precisely such uses as are described in this charter. Indeed it appears that he had contemplated the establishing of his school in that manner, and had made his will, and devised the property to the same persons who were afterwards appointed trustees in the charter. Many literary and other charitable institutions are founded in that manner, and the trust is renewed, and conferred on other persons, from time to time, as occasion may require. In such a case, no lawyer would or could say, that the legislature might devest the trustees constituted by deed or will, seize upon the property, and give it to other persons, for other purposes. And does the granting of a charter, which is only done to perpetuate the trust

1819.

Dartmouth
College
v.
Woodward.

in a more convenient manner, make any difference? Does or can this change the nature of the charity, and turn it into a public, political corporation? Happily we are not without authority on this point. It has been considered and adjudged. Lord Hardwicke says, in so many words, "The charter of the crown cannot make a CHARITY more or less public, but only more permanent than it would otherwise be."[a] The granting of the corporation is but making the trust perpetual, and does not alter the nature of the charity. The very object sought in obtaining such charter, and in giving property to such a corporation, is to make and keep it private property, and to clothe it with all the security and inviolability of private property. The intent is, that there shall be a legal private ownership, and that the legal owners shall maintain and protect the property, for the benefit of those for whose use it was designed. Who ever endowed the public? Who ever appointed a legislature to administer his charity? Or who ever heard, before, that a gift to a *College*, or *Hospital*, or an *Asylum*, was, in reality, nothing but a gift to the State? The State of Vermont is a principal donor to Dartmouth College. The lands given lie in that State. This appears in the special verdict. Is Vermont to be considered as having intended a gift to the State of New-Hampshire in this case; as it has been said is to be the reasonable construction of all donations to the College? The legislature of New-Hampshire affects to represent the *public*, and therefore claims a right to con-

[a] Attorney General v. Pearce, 2 *Atk*. 87.

trol all property destined to public use. What hinders Vermont from considering herself equally the representative of the *public*, and from resuming her grants, at her own pleasure? Her right to do so is less doubtful than the power of New-Hampshire to pass the laws in question. In University v. Foy,[a] the Supreme Court of North-Carolina pronounced unconstitutional and void, a law repealing a grant to the University of North-Carolina; although that University was originally erected and endowed by a statute of the State. That case was a grant of *lands*, and the Court decided that it could not be resumed. This is the grant of a power and capacity *to hold lands.* Where is the difference of the cases, upon principle? In Terret v. Taylor,[b] this Court decided, that a legislative grant or confirmation of lands for the purposes of moral and religious instruction could no more be rescinded than other grants. The nature of the use was not holden to make any difference. A grant to a parish or church, for the purposes which have been mentioned, cannot be distinguished, in respect to the title it confers, from a grant to a College for the promotion of piety and learning. To the same purpose may be cited, the case of Pawlett v. Clark. The State of Vermont, by statute, in 1794, granted to the respective towns in that State, certain glebe lands lying within those towns, *for the sole use and support of religious worship.* In 1799, an act was passed to *repeal the act of* 1794; but this Court declared, that the act of 1794, " so far as it

*a* 2 *Heywood's R.*       *b* 9 *Cranch,* 43.

1819.

Dartmouth
College
v.
Woodward.

granted the glebes to the towns, *could not afterwards be repealed by the legislature, so as to devest the rights of the towns under the grant.*[a]   It will be for the other side to show, that the nature of the *use* decides the question, whether the legislature has power to resume its grants.   It will be for those who maintain such a doctrine, to show the *principles and cases* upon which it rests.   It will be for them also, to fix the limits and boundaries of their doctrine, and to show what are, and what are not, such uses as to give the legislature this power of resumption and revocation.   And to furnish an answer to the cases cited, it will be for them further to show, that a grant for the *use and support of religious worship*, stands on other ground than a grant for *the promotion of piety and learning.*

I hope enough has been said to show, that the trustees possessed vested liberties, privileges, and immunities, under this charter; and that such liberties, privileges, and immunities, being once lawfully obtained and vested, are as inviolable as any vested rights of property whatever.   Rights to do certain acts, such, for instance, as the visitation and superintendence of a college, and the appointment of its officers, may surely be *vested rights*, to all legal intents, as completely as the right to possess property.   A late learned Judge of this Court has said, " when I say, that a *right* is vested in a citizen, I mean, that he has the power to do *certain actions*, or to possess *certain things*, according to the law of the land.[b]

a  9 *Cranch*, 292.          b  3 *Dal*, 394.

1819.

Dartmouth
College
v.
Woodward.

If such be the true nature of the plaintiffs' interests under this charter, what are the articles in the New-Hampshire bill of rights which these acts infringe?

They infringe the *second article*; which says, that the citizens of the State have a right to *hold and possess property*. The plaintiffs had a legal property *in* this charter; and they had acquired property *under* it. The acts deprive them of both. They impair and take away the charter; and they appropriate the property to new uses, against their consent. The plaintiffs cannot now *hold* the property acquired by themselves, and which this article says, they have a right to hold. They infringe the *twentieth article*. By that article it is declared, that in questions of property, *there is a right to trial*. The plaintiffs are devested, without trial or judgment. They infringe the *twenty-third article*. It is therein declared, that *no retrospective laws shall be passed*. This article bears directly on the case. These acts must be deemed *retrospective*, within the settled construction of that term. What a *retrospective law* is, has been decided, on the construction of this very article, in the Circuit Court for the first circuit. The learned Judge of that circuit, says, " every statute which takes away, or impairs, vested rights, acquired under existing laws, must be deemed retrospective."[a] That all such laws are retrospective, was decided also in the case of Dash v. Van Kleek,[b] where a most learn-

*a* Society v. Wheeler, 2 *Gal.* 103.
*b* 7 *Johns. R.* 477.

1819.

Dartmouth
College
v.
Woodward.

ed Judge quotes this article from the constitution of New-Hampshire, with manifest approbation, as a plain and clear expression of those fundamental and unalterable principles of justice, which must lie at the foundation of every free and just system of laws. Can any man deny, that the plaintiffs had *rights*, under the charter, which were legally *vested*, and that by these acts, those rights are *impaired?*[a] These

*a* " It is a principle in the English law, as ancient as the law itself," says Chief Justice Kent, in the case last cited, " that a statute, even of its omnipotent parliament, is not to have a retrospective effect. *Nova constitutio futuris formam imponere debet, et non praeteritis.* (*Bracton, lib.* 4, *fol.* 228. 2 *Inst.* 292.) The maxim in *Bracton* was probably taken from the civil law, for we find in that system the same principle, that the law-giver cannot alter his mind to the prejudice of a vested right. *Nemo potest mutare consilium suum in alterius injuriam.* (*Dig.* 50. 17. 75.) This maxim of Papinian is general in its terms ; but Dr. Taylor (*Elements of the Civil Law*, 168.) applies it directly as a restriction upon the law-giver ; and a declaration in the *code* leaves no doubt as to the sense of the civil law. *Leges et constitutiones futuris certum est dare formam negotiis, non ad facta praeterita revocari, nisi nominatim, et de praeterito tempore, et adhuc pendentibus negotiis cautum sit.* (*Cod.* 1. 14. 7.) This passage, according to the best interpretation of the civilians, relates not merely to future suits, but to future as contradistinguished from past contracts and vested rights. (*Perezii Praelec. t.*) It is, indeed, admitted, that the prince may enact a retrospective law, provided it be done *expressly;* for the will of the prince, under the despotism of the Roman emperors, was paramount to every obligation. Great latitude was anciently allowed to legislative expositions of statutes ; for the separation of the judicial, from the legislative power, was not then distinctly known or prescribed. The prince was in the habit of interpreting his own laws for particular occasions. This was

acts infringe also, the *thirty-seventh article* of the constitution of New-Hampshire ; which says, that the powers of government shall be kept separate. By these acts, the legislature assumes to exercise a *judicial power.* It declares a *forfeiture,* and resumes franchises, once granted, without trial or hearing. If the constitution be not altogether waste paper, it has restrained the power of the legislature, in these particulars. If it has any meaning, it is, that the legislature shall pass no act directly and manifestly impairing private property, and private privileges. It shall not judge, by *act.* It shall not decide, by *act.* It shall not deprive, by *act.* But it shall leave all these things to be tried and adjudged by the law of the land. The *fifteenth article* has been referred

1819.

Dartmouth
College
v.
Woodward.

called the *interlocutio principis ;* and this, according to Huber's definition, was, *quando principes inter partes loquuntur, et jus dicunt.* (*Praelec. Juris. Rom. Vol.* 2. 545.) No correct civilian, and especially no proud admirer of the ancient republic, (if any such then existed,) could have reflected on this interference with private rights, and pending suits, without disgust and indignation ; and we are rather surprised to find, that under the violent and irregular genius of the Roman government, the principle before us should have been acknowledged and obeyed to the extent in which we find it. The fact shows, that it must be founded in the clearest justice. Our case is happily very different from that of the subjects of Justinian. With us, the power of the law-giver is limited and defined ; the judicial is regarded as a distinct independent power ; private rights have been better understood, and more exalted in public estimation, as well as secured by provisions dictated by the spirit of freedom, and unknown to the civil law. Our constitutions do not admit the power assumed by the Roman prince ; and the principle we are considering, is now to be regarded as sacred."

to before. It declares, that no one shall be " deprived of his property, immunities, or privileges, but by the judgment of his peers, or the law of the land." Notwithstanding the light in which the learned Judges in New-Hampshire viewed the rights of the plaintiffs under the charter, and which has been before adverted to, it is found to be admitted, in their opinion, that those rights are *privileges* within the meaning of this *fifteenth article* of the bill of rights. Having quoted that article, they say : " that the right to manage the affairs of this college is a privilege, within the meaning of this clause of the bill of rights, is not to be doubted." In my humble opinion, this surrenders the point. To resist the effect of this admission, however, the learned judges add, " But how a privilege can be protected from the operation of the law of the land, by a clause in the constitution, declaring that it shall not be taken away but by the law of the land, is not very easily understood." This answer goes on the ground, that the acts in question *are laws of the land*, within the meaning of the constitution. If they be so, the argument drawn from this article is fully answered. If they be not so, it being admitted that the plaintiffs' rights are "*privileges*," within the meaning of the article, the argument is not answered, and the article is infringed by the acts. Are then these acts of the legislature, which affect only particular persons and their particular privileges, laws of the land ? Let this question be answered by the text of Blackstone : " And first, it (i. e. law) is a *rule :* not a transient sudden order from a superior, to, or concerning, a par-

ticular person; but something permanent, uniform, and universal. Therefore, a particular act of the legislature to confiscate the goods of Titius, or to attaint him of high treason, does not enter into the idea of a municipal law: for the operation of this act is spent upon Titius only, and has no relation to the community in general; it is rather a sentence than a law."[a] Lord Coke is equally decisive and emphatic. Citing and commenting on the celebrated 29th chap. of *Magna Charta*, he says, "no man shall be disseized, &c. unless it be by the lawful judgment, that is, verdict of equals, or by the *law of the land*, that is, (to speak it once for all,) *by the due course and process of law*."[b] Have the plaintiffs lost their franchises by "due course and process of law?" On the contrary, are not these acts "particular acts of the legislature, which have no relation to the community in general, and which are rather sentences than laws?" By the law of the land is most clearly intended the general law; a law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is, that every citizen shall hold his life, liberty, property, and immunities, under the protection of the general rules which govern society. Every thing which may pass under the form of an enactment, is not, therefore, to be considered the law of the land. If this were so, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's

1819.

Dartmouth College
v.
Woodward.

a 1 *Bl. Com.* 44.          b *Co. Ins.* 46.

estate to another, legislative judgments, decrees, and forfeitures, in all possible forms, would be the law of the land. Such a strange construction would render constitutional provisions of the highest importance completely inoperative and void. It would tend directly to establish the union of all powers in the legislature. There would be no general permanent law for courts to administer, or for men to live under. The administration of justice would be an empty form, an idle ceremony. Judges would sit to execute legislative judgments and decrees; not to declare the law, or to administer the justice of the country. "Is that the law of the land," said Mr. Burke, "upon which, if a man go to Westminster-Hall, and ask counsel by what title or tenure he holds his privilege or estate *according to the law of the land,* he should be told, that the law of the land is not yet known; that no decision or decree has been made in his case; that when a decree shall be passed, he will then know *what the law of the land is?* Will this be said to be the law of the land, by any lawyer who has a rag of a gown left upon his back, or a wig with one tie upon his head?" That the power of electing and appointing the officers of this college is not only a right of the trustees as a corporation generally, and in the aggregate, but *that each individual trustee has also his own individual franchise in such right of election and appointment,* is according to the language of all the authorities. Lord Holt says, "it is agreeable to reason and the rules of law, that a franchise should be vested in the corporation aggregate, and yet the benefit of it to redound to the

particular members, and to be enjoyed by them in their private capacity. Where the privilege of election is used by particular persons, *it is a particular right, vested in every particular man.*[a]

It is also to be considered, that the president and professors of this college have rights to be affected by these acts. Their interest is similar to that of *fellows* in the English colleges; because they derive their living wholly, or in part, from the founder's bounty. The president is one of the trustees, or corporators. The professors are not necessarily members of the corporation; but they are appointed by the trustees, are removable only by them, and have fixed salaries, payable out of the general funds of the college. Both president and professors have *freeholds* in their offices; subject only to be removed, by the trustees, as their legal visitors, for good cause. All the authorities speak of fellowships in colleges as *freeholds*, notwithstanding the fellows may be liable to be suspended or removed, for misbehaviour, by their constituted visitors. Nothing could have been less expected, in this age, than that there should have been an attempt, by acts of the legislature, to take away these college livings, the inadequate, but the only support of literary men, who have devoted their lives to the instruction of youth. The president and professors were appointed by the twelve trustees. They were accountable to nobody else, and could be removed by nobody else. They accepted their offices on this tenure. Yet the legislature has appointed

*a 2 Lord Raym. 952.*

other persons, with power to remove these officers, and to deprive them of their livings ; and those other persons have exercised that power. No description of private property has been regarded as more sacred than college livings. They are the estates and freeholds of a most deserving class of men ; of scholars who have consented to forego the advantages of professional and public employments, and to devote themselves to science and literature, and the instruction of youth, in the quiet retreats of academic life. Whether, to dispossess and oust them ; to deprive them of their office, and turn them out of their livings ; to do this, not by the power of their legal visitors, or governors, but by acts of the legislature; and to do it without forfeiture, and without fault ; whether all this be not in the highest degree an indefensible and arbitrary proceeding, is a question, of which there would seem to be but one side fit for a lawyer or a scholar to espouse. Of all the attempts of James II. to overturn the law, and the rights of his subjects, none was esteemed more arbitrary or tyranical, than his attack on *Magdalen College*, Oxford : And, yet, that attempt was nothing but to put out one president and put in another. The president of that college, according to the charter and statutes, is to be chosen by the fellows, who are the corporators. There being a vacancy, the king chose to take the appointment out of the hands of the fellows, the legal electors of a president, into his own hands. He therefore sent down his mandate *commanding* the fellows to admit, for president, a person of his nomination ; and in as much as this was directly against

the charter and constitution of the college, he was pleased to add a *non obstante* clause of sufficiently comprehensive import.    The fellows were command-ed to admit the person mentioned in the mandate, *" any statute, custom or constitution to the contrary notwithstanding, wherewith we are graciously pleased to dispense, in this behalf."*   The fellows refused obedience to this mandate, and Dr. Hough, a man of independence and character, was chosen president by the fellows, according to the charter and statutes. The king then assumed the power, in virtue of his prerogative, to send down certain *commissioners* to turn him out; which was done accordingly; and Par-ker, a creature suited to the times put in his place. And because the president, who was rightfully and legally elected, *would not deliver the keys, the doors were broken open.*   " The nation, as well as the university," says Bishop Burnet,[a] " looked on all these proceedings with just indignation.   It was thought *an open piece of robbery and burglary, when men, authorized by no legal commission, came and forcibly turned men out of their possession and free-hold."*   Mr. Hume, although a man of different temper, and of other sentiments, in some respects, than Dr. Burnet, speaks of this arbitrary attempt of prerogative, in terms not less decisive.   " The pre-sident, and all the fellows," says he, " *except two, who complied*, were expelled the college; and Par-ker was put in possession of the office.   This act of violence, of all those which were committed during

---

*a* Hist. of his own times, *vol. 3. p.* 119.

1819.

Dartmouth
College
v.
Woodward.

the reign of James, is perhaps the most illegal and arbitrary. When the dispensing power was the most strenuously insisted on by court lawyers, it had still been allowed, that the statutes which regard *private property* could not legally be infringed by that prerogative. Yet, in this instance, it appeared that even these were not now secure from invasion. The privileges of a college are attacked; men are illegally dispossessed of their property for adhering to their duty, to their oaths, and to their religion." This measure king James lived to repent, after repentance was too late. When the charter of London was restored, and other measures of violence retracted, to avert the impending revolution, the expelled president and fellows of Magdalen college were permitted to resume their rights. It is evident that this was regarded as an arbitrary interference with *private property.* Yet private property was no otherwise attacked, than as a person was appointed to administer and enjoy the revenues of a college, in a manner and by persons *not authorized by the constitution of the college.* A majority of the members of the corporation would not comply with the king's wishes. A minority would. The object was, therefore, to make this minority, a majority. To this end, the king's commissioners were directed to interfere in the case, and they united with the *two complying fellows*, and expelled the rest; and thus effected a change in the government of the college. The language in which Mr. Hume, and all other writers, speak of this abortive attempt of oppression, shows that colleges were esteemed to be, as

they truly are, private corporations, and the property and privileges which belong to them, *private* property, and *private* privileges.   Court lawyers were found to justify the king in dispensing with the laws; that is, in assuming and exercising a Legislative authority.   But no lawyer, not even a court lawyer, in the reign of king James the second, as far as appears, was found to say, that even by this high authority, he could infringe the franchises of the fellows of a college, and take away their livings. Mr. Hume gives the reason; it is, that such franchises were regarded, in a most emphatic sense, *as private property.*[a]   If it could be made to appear, that the trustees and the president and professors held their offices and franchises during the pleasure of the legislature, and that the property holden belonged to the State, then indeed the legislature have done no more than they had a right to do.    But this is not so. The charter is a charter of *privileges* and *immunities;* and these are holden by the trustees expressly *against* the State forever.   It is admitted, that the State, by its Courts of law, can enforce the will of the donor, and compel a faithful execution of the trust.   The plaintiffs claim no exemption from legal responsibility.   They hold themselves at all times answerable to the law of the land, for their conduct in the trust committed to them.   They ask only to hold the property of which they are owners, and the franchises which belong to them, until they shall be found by due course and process of law to have forfeited them.   It can make no difference,

a Vide a full account of this case in State Trials, 4 *Ed.* *vol.* 4. *p.* 262.

1819.

Dartmouth
College
v.
Woodward.

whether the legislature exercise the power it has assumed, by removing the trustees and the president and professors, directly, and by name, or by appointing others to expel them.   The principle is the same, and, in point of fact, the result has been the same. If the entire franchise cannot be taken away, neither can it be essentially impaired.   If the trustees are legal owners of the property, they are *sole* owners. If they are visitors, they are *sole* visitors.   No one will be found to say, that if the legislature may do what it has done, it may not do any thing and every thing which it may choose to do, relative to the property of the corporation, and the privileges of its members and officers.

If the view which has been taken of this question be at all correct, this was an eleemosynary corporation ; a private charity.   The property was private property.   The trustees were visitors, and their right to hold the charter, administer the funds, and visit and govern the college, was a *franchise* and *privilege*, solemnly granted to them.   The use being public, in no way diminishes their legal estate in the property, or their title to the franchise.   There is no principle, nor any case, which declares that a gift to such a corporation is a gift to the public.   The acts in question violate property.   They take away privileges, immunities, and franchises.   They deny to the trustees the protection of the law ; and they are retrospective in their operation.   In all which respects, they are against the constitution of New-Hampshire.

2. The plaintiffs contend, in the second place, that the acts in question are repugnant to the 10th section

of the 1st article of the constitution of the United States. The material words of that section are: "no State shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts."

The object of these most important provisions in the national constitution has often been discussed, both here and elsewhere. It is exhibited with great clearness and force by one of the distinguished persons who framed that instrument. "Bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation. The two former are expressly prohibited by the declarations prefixed to some of the State constitutions, and all of them are prohibited by the spirit and scope of these fundamental charters. Our own experience has taught us, nevertheless, that additional fences against these dangers ought not to be omitted. Very properly, therefore, have the Convention added this constitutional bulwark in favour of personal security and private rights; and I am much deceived if they have not, in so doing, as faithfully consulted the genuine sentiments as the undoubted interests of their constituents. The sober people of America are weary of the fluctuating policy which has directed the public councils. They have seen with regret, and with indignation, that sudden changes, and legislative interferences, in cases affecting personal rights, become jobs in the hands of enterprising and influential speculators; and snares to the more industrious and less informed part of the

community. They have seen, too, that one legislative interference is but the link of a long chain of repetitions; every subsequent interference being naturally produced by the effects of the preceding."[a] It has already been decided in this Court, that a *grant* is a contract, within the meaning of this provision; and that a grant by a State is also a contract as much as the grant of an individual.[b]

a *Letters of Publius, or The Federalist,* (No. 44., by Mr. MADISON.)

b In Fletcher v. Peck, 6 *Cranch* 87. this Court says, " a contract is a compact between two or more parties, and is either executory or executed. An executory contract is one in which a party binds himself to do, or not to do, a particular thing; such was the law under which the conveyance was made by the government. A contract executed is one in which the object of contract is performed; and this, says Blackstone, differs in nothing from a grant. The contract between Georgia and the purchasers was executed by the grant. A contract executed, as well as one which is executory, contains obligations binding on the parties. A grant, in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right. If under a fair construction of the constitution, grants are comprehended under the term contracts, is a grant from the State excluded from the operation of the provision ? Is the clause to be considered as inhibiting the State from impairing the obligation of contracts between two individuals, but as excluding from that inhibition contracts made with itself? The words themselves contain no such distinction. They are general, and are applicable to contracts of every description. If contracts made with the State are to be exempted from their operation, the exception must arise from the character of the contracting party, not from the words which are employed. Whatever respect might have been felt for the State sovereignties, it is not

It has also been decided, that a grant by a State before the revolution, is as much to be protected as a grant since.[a]  But the case of Terret v. Taylor, before cited, is of all others most pertinent to the present argument.  Indeed, the judgment of the Court in that case seems to leave little to be argued or decided in this.[b]  This Court, then, does not admit the doc-

to be disguised, that the framers of the constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment; and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves, and their property, from the effects of those sudden and strong passions to which men are exposed.  The restrictions on the legislative power of the States, are obviously founded in this sentiment; and the constitution of the United States contains what may be deemed a bill of rights, for the people of each State."

a New-Jersey v. Wilson, 7 *Cranch,* 164.

b " A private corporation," says the Court, " created by the legislature, may lose its franchises by a *misuser* or a *nonuser* of them; and they may be resumed by the government under a judicial judgment upon a *quo warranto* to ascertain and enforce the forfeiture  This is the common law of the land, and is a tacit condition annexed to the creation of every such corporation.  Upon a change of government, too, it may be admitted that such exclusive privileges attached to a private corporation as are inconsistent with the new government, may be abolished.  In respect, also, to *public* corporations which exist only for public purposes, such as counties, towns, cities, &c. the legislature may, under proper limitations, have a right to change modify, enlarge, or restrain them, securing, however, the property for the use of those for whom and at whose expense it was originally purchased.  But that the legislature can repeal statutes creating private corporations, or confirming to them property already acquired under the faith of previous

trine, that a legislature can repeal statutes creating private corporations.  If it cannot repeal them altogether, of course it cannot repeal any part of them, or impair them, or essentially alter them, without the consent of the corporators.  If, therefore, it has been shown that this college is to be regarded as a private charity, this case is embraced within the very terms of that decision.  A grant of corporate powers and privileges is as much a *contract* as a grant of land.  What proves all charters of this sort to be *contracts*, is, that they must be accepted, to give them force and effect.  If they are not accepted they are void.  And in the case of an existing corporation, if a new charter is given it, it may even accept part, and reject the rest.  In Rex v. Vice Chancellor of Cambridge,[a] Lord Mansfield says, " there is a vast deal of difference between a new charter granted to a new corporation, (who must take it as it is given,) and a new charter given to a *corporation* already in being, and acting either under a former charter, or under prescriptive usage.  The *latter*, a corporation already existing, are *not* obliged to accept the new charter *in toto*, and to receive either all or none of it; they may act *partly* under it, and

laws, and by such repeal can vest the property of such corporations exclusively in the State, or dispose of the same to such purposes as they please, without the consent or default of the corporators, we are not prepared to admit ; and we think ourselves standing upon the principles of natural justice, upon the fundamental laws of every free government, upon the spirit and letter of the constitution of the United States, and upon the decisions of most respectable judicial tribunals, in resisting such a doctrine."

a *3 Burr.* 1656.

*partly* under their old charter or prescription. The validity of these new charters must turn upon the *acceptance* of them." In the same case, Mr. Justice Wilmot says, " It is the *concurrence* and *acceptance* of the university that gives the *force* to the charter of the crown." In the King v. Passmore,[a] Lord Kenyon observes, " some things are clear : when a corporation exists, capable of discharging its functions, the crown cannot obtrude another charter upon them ; they may either accept or reject it."[b] In all cases relative to charters, the *acceptance* of them is uniformly alleged in the pleadings. This shows the general understanding of the law, that they are grants, or contracts ; and that *parties* are necessary to give them force and validity. In King v. Dr. Askew,[c] it is said, " The crown *cannot oblige* a man to be a corporator without his consent ; he shall not be subject to the inconveniences of it, without *accepting* it and *assenting* to it." These terms, " *acceptance*," and " *assent*," are the very language of contract. In Ellis v. Marshall,[d] it was expressly adjudged, that the naming of the defendant, among others, in an act of incorporation did not, of itself, make him a corporator ; and that his *assent* was necessary to that end. The Court speak of the act of incorporation as a *grant*, and observe, " that a man may refuse a *grant*, whether from the government or an individual, seems to be a principle too clear to require the support of authorities." But Mr. Justice Buller, in King

1819.

Dartmouth
College
v.
Woodward.

*a* 3 T. R. 240.      *b* Vide also, 1 Kyd. on Cor. 65.
*c* 4 Burr. 2200.      *d* 2 Mass. R. 279.

v. Passmore, furnishes, if possible, a still more direct and explicit authority. Speaking of a corporation for government, he says, " I do not know how to reason on this point better than in the manner urged by one of the relator's counsel, who considered the grant of incorporation to be *a compact* between the crown and a certain number of the subjects, the latter of whom undertake, in consideration of the privileges which are bestowed, to exert themselves for the good government of the place." This language applies, with peculiar propriety and force, to the case before the Court. It was in consequence of the " privileges bestowed," that Dr. Wheelock and his associates, undertook to exert themselves for the instruction and education of youth in this college; and it was on the same consideration that the founder endowed it with his property. And because charters of incorporation are of the nature of contracts, they cannot be altered or varied, but by consent of the original *parties.* If a charter be granted by the king, it may be altered by a new charter granted by the king, and accepted by the corporators  But if the first charter be granted by parliament, the consent of parliament must be obtained to any alteration. In King v. Miller,[a] Lord Kenyon says, " Where a corporation takes its rise from the king's charter, the king by granting, and the corporation by accepting, another charter, may alter it, because it is done with the consent of all the parties who are competent to consent to the alteration."[b] There are, in this

a 6 T. R. 277.

b Vide also, 2 Bro. Ch. R. 662. *Ex parte* Bolton School.

case, all the essential constituent parts of a contract.

There is something to be contracted about; there are
parties, and there are plain terms in which the agree-
ment of the parties, on the subject of the contract, is
expressed.    There are mutual considerations and in-
ducements.    The charter recites, that the founder,
on his part, has agreed to establish his seminary in
New-Hampshire, and to enlarge it, beyond its origi-
nal design, among other things, for the benefit of that
province; and thereupon a charter is given to him and
his associates, designated by himself, promising and
assuring to them, under the plighted faith of the State,
the right of governing the college, and administering
its concerns, in the manner provided in the charter.
There is a complete and perfect grant to them of all
the power of superintendance, visitation, and govern-
ment.   Is not this a contract? If lands or money had
been granted to him and his associates, for the same
purposes, such grant could not be rescinded.    And is
there any difference, in legal contemplation, between
a grant of corporate franchises, and a grant of tangi-
ble property?   No such difference is recognized in
any decided case, nor does it exist in the common
apprehension of mankind.

It is therefore contended, that this case falls within
the true meaning of this provision of the constitution,
as expounded in the decisions of this Court; that the
charter of 1769, is a contract, a stipulation, or agree-
ment; mutual in its considerations, express and for-
mal in its terms, and of a most binding and solemn
nature.   That the acts in question *impair* this con-

tract, has already been sufficiently shown. They repeal and abrogate its most essential parts.

Much has heretofore been said on the *necessity* of admitting such a power in the legislature as has been assumed in this case. Many cases of possible evil have been imagined, which might otherwise be without remedy. Abuses, it is contended, might arise in the management of such institutions, which the ordinary courts of law would be unable to correct. But this is only another instance of that habit of supposing extreme cases, and then of reasoning from them, which is the constant refuge of those who are obliged to defend a cause which, upon its merits, is indefensible. It would be sufficient to say, in answer, that it is not pretended, that there was here any such case of necessity. But a still more satisfactory answer is, that the apprehension of danger is groundless, and, therefore, the whole argument fails. Experience has not taught us that there is danger of great evils or of great inconvenience from this source. Hitherto, neither in our own country nor elsewhere, have such cases of necessity occurred. The judicial establishments of the State are presumed to be competent to prevent abuses and violations of trust, in cases of this kind, as well as in all others. If they be not, they are imperfect, and their amendment would be a most proper subject for legislative wisdom. Under the government and protection of the general laws of the land, those institutions have always been found safe, as well as useful. They go on with the progress of society, accomodating themselves easily, without sudden change or

violence, to the alterations which take place in its condition; and in the knowledge, the habits, and pursuits of men. The English colleges were founded in Catholic ages. Their religion was reformed with the general reformation of the nation; and they are suited perfectly well to the purpose of educating the protestant youth of modern times. Dartmouth College was established under a charter granted by the provincial government; but a better constitution for a college, or one more adapted to the condition of things under the present government, in all material respects, could not now be framed. Nothing in it was found to need alteration at the revolution. The wise men of that day saw in it one of the best hopes of future times, and commended it, as it was, with parental care, to the protection and guardianship of the government of the State. A charter of more liberal sentiments, of wiser provisions, drawn with more care, or in a better spirit, could not be expected at any time, or from any source. The college needed no change in its organization or government. That which it did need was the kindness, the patronage, the bounty of the legislature; not a mock elevation to the character of a university, without the solid benefit of a shilling's donation to sustain the character; not the swelling and empty authority of establishing *institutes* and *other colleges*. This unsubstantial pageantry would seem to have been in derision of the scanty endowment and limited means of an unobtrusive, but useful and growing seminary. Least of all was there a necessity, or pretence of necessity, to infringe its legal rights, violate its fran-

1819.

Dartmouth College
v.
Woodward.

1819.

Dartmouth
College
v.
Woodward.

chises and privileges, and pour upon it these over-
whelming streams of litigation.    But this argument,
from *necessity*, would equally apply in all other cases.
If it be well founded, it would prove, that whenever
any inconvenience or evil should be experienced from
the restrictions imposed on the legislature by the
constitution, these restrictions ought to be disregard-
ed.   It is enough to say, that the people have thought
otherwise.   They have, most wisely, chosen to take
the risk of occasional inconvenience from the want
of power, in order that there might be a settled limit
to its exercise, and a permanent security against its
abuse.     They have imposed prohibitions and re-
straints ; and they have not rendered these altogether
vain and nugatory by conferring the power of dis-
pensation.   If inconvenience should arise, which
the legislature cannot remedy under the power con-
ferred upon it, it is not answerable for such incon-
venience.   That which it cannot do within the limits
prescribed to it, it cannot do at all.   No legislature
in this country is able, and may the time never come
when it shall be able, to apply to itself the memora-
ble expression of a Roman pontiff; " *Licet hoc* DE
JURE *non possumus, volumus tamen* DE PLENITUDINE
POTESTATIS."

The case before the Court is not of ordinary im-
portance, nor of every day occurrence.   It affects
not this college only, but every college, and all the
literary institutions of the country.   They have
flourished, hitherto, and have become in a high de-
gree respectable and useful to the community.   They
have all a common principle of existence, the invio-

lability of their charters. It will be a dangerous, a most dangerous experiment, to hold these institutions subject to the rise and fall of popular parties, and the fluctuations of political opinions. If the franchise may be at any time taken away, or impaired, the property also may be taken away, or its use perverted. Benefactors will have no certainty of effecting the object of their bounty; and learned men will be deterred from devoting themselves to the service of such institutions, from the precarious title of their offices. Colleges and halls will be deserted by all better spirits, and become a theatre for the contention of politics. Party and faction will be cherished in the places consecrated to piety and learning. These consequences are neither remote nor possible only. They are certain and immediate.

When the Court in North-Carolina declared the law of the State, which repealed a grant to its university, unconstitutional and void, the legislature had the candour and the wisdom to repeal the law. This example, so honourable to the State which exhibited it, is most fit to be followed on this occasion. And there is good reason to hope, that a State which has hitherto been so much distinguished for temperate councils, cautious legislation, and regard to law, will not fail to adopt a course which will accord with her highest and best interest, and, in no small degree, elevate her reputation. It was for many obvious reasons most anxiously desired, that the question of the power of the legislature over this charter should have been finally decided in the State Court. An earnest hope was entertained

that the judges of that Court might have viewed the case in a light favourable to the rights of the trustees. That hope has failed. It is here that those rights are now to be maintained, or they are prostrated forever. *Omnia alia perfugia bonorum, subsidia, consilia, auxilia, jura ceciderunt. Quem enim alium appellem? quem obtestor? quem implorem? Nisi hoc loco, nisi apud vos, nisi per vos, judices, salutem nostram, quae spe exigua extremaque pendet, temerimus; nihil est praeterea quo confugere possimus.*

Mr. *Holmes*, for the defendant in error, argued, that the prohibition in the constitution of the United States, which alone gives the Court jurisdiction in this case, did not extend to grants of political power; to contracts concerning the internal government and police of a sovereign State. Nor does it extend to contracts which relate merely to matters of civil institution, even of a private nature. Thus marriage is a contract, and a private contract; but relating merely to a matter of civil institution, which every society has an inherent right to regulate as its own wisdom may dictate, it cannot be considered as within the spirit of this prohibitory clause. Divorces unquestionably impair the obligation of the nuptial contract; they change the relations of the marriage state, without the consent of both the parties, and thus come clearly within the letter of the prohibition. But surely, no one will contend, that there is locked up in this mystical clause of the constitution a prohibition to the States to grant divorces, a power

peculiarly appropriate to domestic legislation, and which has been exercised in every age and nation where civilization has produced that corruption of manners, which, unfortunately, requires this remedy. Still less can a contract concerning a public office to be exercised, or duty to be performed, be included within this prohibition. The Convention who framed the constitution, did not intend to interfere in the exercise of the political powers reserved to the State governments. That was left to be regulated by their own local laws and constitutions; with this exception only, that the Union should guarantee to each State a republican form of government, and defend it against domestic insurrection and rebellion. Beyond this, the authorities of the Union have no right to interfere in the exercise of the powers reserved to the State. They are sovereign and independent in their own sphere. If, for example, the legislature of a particular State should attempt to deprive the judges of its Courts (who, by the State constitution, held their places during good behaviour) of their offices without a trial by impeachment; or should arbitrarily and capriciously increase the number of the judges so as to give the preponderancy in judicature to the prevailing political faction, would it be pretended that the minority could resist such a law, upon the ground of its impairing the obligation of a contract? Must not the remedy, if any where existing, be found in the interposition of some State authority to enforce the provisions of the State constitution? The education of youth, and the encouragement of the arts and sciences, is one of the most

1819.

Dartmouth College v. Woodward.

important objects of civil government.[a] By our constitutions, it is left exclusively to the States, with the exception of copy rights and patents. It was in the exercise of this duty of government, that this charter was originally granted to Dartmouth College. Even when first granted under the colonial government, it was subject to the notorious authority of the British parliament over all charters containing grants of political power. It might have been revoked or modified by act of parliament.[b] The revolution, which separated the colony from the parent country, dissolved all connexion between this corporation and the crown of Great Britain. But it did not destroy that supreme authority which every political society has over its public institutions. That still remained, and was transferred to the people of New-Hampshire. They have not relinquished it to the government of the United States, or to any department of that government. Neither does the constitution of New-Hampshire confirm the charter of Dartmouth College, so as to give it the immutability of the fundamental law. On the contrary, the constitution of the State admonishes the legislature of the duty of encouraging science and literature, and thus seems to suppose its power of control over the scientific and literary institutions of the State. The legislature had, therefore, a right to modify this trust, the original object of which, was the education of the Indian and English youth of the province. It is not necessary to contend, that it had the right of wholly di-

a Vattel, L. 1. c. 11. s. 112, 113.     b 1 Bl. Com. 485.

verting the fund from the original object of its pious and benevolent founders.  Still it must be insisted, that a regal grant, with a regal and colonial policy, necessarily became subject to the modification of a republican legislature, whose right, and whose duty it was, to adapt the education of the youth of the country to the change in its political institutions.   It is a corollary from the right of self-government. The ordinary remedies which are furnished in the Court for a misuser of the corporate franchises, are not adapted to the great exigencies of a revolution in government.   They pre-suppose a permanently established order of things, and are intended only to correct occasional deviations, and minor mischiefs. But neither a reformation in religion, nor a revolution in government, can be accomplished or confirmed by a writ of *quo warranto* or *mandamus*.   We do not say, that the corporation has forfeited its charter for *misuser;* but that it has become *unfit for use* by a change of circumstances.   Nor does the lapse of time from 1776 to 1816, infer an acquiescence on the part of the legislature, or a renunciation of its right to abolish or reform an institution, which being of a public nature, cannot hold its privileges by prescription.   Our argument is, that it is, at all times, liable to be new modelled by the legislative wisdom, instructed by the lights of the age.

The conclusion then is, that this charter is not such a contract as is contemplated by the constitution of the United States; that it is not a contract of a private nature, concerning property or other private interests: but that it is a grant of a public na-

ture, for public purposes, relative to the internal government and police of a State, and, therefore, liable to be revoked or modified by the supreme power of that State.

Supposing, however, this to be a contract such as was meant to be included in the constitutional prohibition, is its obligation impaired by these acts of the legislature of New-Hampshire?

The title of the acts of the 27th of June, and the 18th of December, 1816, shows that the legislative will and intention was to *amend* the charter, and *enlarge* and *improve* the corporation. If by a technical fiction the grant of the charter can be considered as a contract between the king (or the State) and the corporators, the obligation of that contract is not *impaired*; but is rather *enforced*, by these acts, which continue the same corporation, for the same objects, under a new name. It is well settled, that a mere change of the name of a corporation will not affect its identity. An addition to the number of the colleges, the creation of new fellowships, or an increase of the number of the trustees, do not impair the franchises of the corporate body. Nor is the franchise of any individual corporator impaired. In the words of Mr. Justice Ashurst, in the case of the King v. Passmore,[a] "the members of the old body have no injury or injustice to complain of, for they are all included in the new charter of incorporation; and if any of them do not become members of the new incorporation, but refuse to accept, it is their

[a] 3 *T. R.* 244.

own fault." What rights which are secured by this alleged contract are invaded by the acts of the legislature? Is it the right of *property*, or of *privileges?* It is not the former, because the corporate body is not deprived of the least portion of its property. If it be the personal privileges of the corporators that are attacked, these must be either a common and universal privilege, such as the right of suffrage, for interrupting the exercise of which an action would lie; *or* they must be monopolies and exclusive privileges, which are always subject to be regulated and modified by the supreme power of the State. Where a private proprietary interest is coupled with the exercise of political power or a public trust, the charters of corporations have frequently been amended by legislative authority.[a] In charters creating artificial persons for purposes exclusively private, and not interfering with the common rights of the citizens, it may be admitted that the legislature cannot interfere to amend without the consent of the grantees. The grant of such a charter might perhaps be considered as analogous to a contract between the State and private individuals, affecting their private rights, and might thus be regarded as within the spirit of the constitutional prohibition. But this charter is merely a mode of exercising one of the great powers of civil government. Its amendment, or even repeal, can no more be considered as the breach of a contract, than the amendment or repeal of any other law. Such repeal or amendment is an ordinary act of public

1819.<br>Dartmouth<br>College<br>v.<br>Woodward.

a. Gray v. The Portland Bank, 3 *Mass. R.* 364. The Commonwealth v. Bird, 12 *Mass. R.* 443.

legislation, and not an act impairing the obligation of a contract between the government and private citizens, under which personal immunities or proprietary interests are vested in them.

The *Attorney-General*, on the same side, stated, that the only question properly before the Court was, whether the several acts of the legislature of New-Hampshire, mentioned in the special verdict, are repugnant to that clause of the constitution of the United States, which provides, that no State shall " pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts."

Beside its intrinsic difficulty, the extreme delicacy of this question is evinced by the sentiments expressed by the Court, whenever it has been called to act on such a question.[a] In the case of Fletcher v. Peck, the Court says, " The question whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The Court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligation which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts are to be considered as void. The opposition between the constitution and the law should be such,

a Calder *et ux.* v. Bull *et ux.* 3 *Dall.* 392, 394, 395. Fletcher v. Peck, 6 *Cranch*, 87. New-Jersey v. Wilson, 7 *Cranch*, 164. Terret v. Taylor, 9 *Cranch*, 43.

that the judge feels a clear and strong conviction of their incompatibility with each other."[a] In Calder *et ux.* v. Bull *et ux.*[b] Mr. Justice Chace expressed himself with his usual emphatic energy, and said, " I will not decide any law to be void, *but in a very clear case.*" Is it, then, *a very clear case* that these acts of New-Hampshire are repugnant to the constitution of the United States?

1. Are they bills of attainder? The elementary writers inform us, that an *attainder* is " the stain or corruption of the blood of a criminal capitally condemned."[c] True it is, that the Chief Justice says, in Fletcher v. Peck,[d] that a bill of attainder may affect the life of an individual, or may confiscate his estate, or both. But the cause did not turn upon this point, and the Chief Justice was not called upon to weigh with critical accuracy his expressions in this part of the case. In England, most certainly, the first idea presented is that of corruption of blood, and consequent forfeiture of the entire property of the criminal, as the regular and inevitable consequences of a capital conviction at common law. Statutes sometimes pardon the attainder, and merely forfeit the estate. But this forfeiture is always complete and entire. In the present case, however, it cannot be pretended that any part of the estate of the trustees is forfeited, and, if a part, certainly not the whole.

2. Are these acts " laws impairing the obligation

---

[a] 6 *Cranch,* 128.  [b] 3 *Dall.* 395.
[c] 4 *Bl. Com.* 380.  [d] 6 *Cranch,* 138.

of contracts?" The mischiefs actually existing at the time the constitution was established, and which were intended to be remedied by this prohibitory clause, will show the nature of the contracts contemplated by its authors. It was the inviolability of private contracts, and private rights acquired under them, which was intended to be protected;[a] and not contracts which are in their nature matters of civil police, nor grants by a State of power, and even property, to individuals, in trust to be administered for purposes merely public. "The prohibitions not to make any thing but gold and silver coin a tender in payment of debts, and not to pass any law impairing the obligation of contracts," says Mr. Justice Chace, "were inserted to secure *private rights*."[b] The cases determined in this Court, illustrate the same construction of this clause of the constitution. Fletcher v. Peck was a case where a State legislature attempted to revoke its grant, so as to devest a beneficial estate in lands; a vested estate; an actual conveyance to individuals as their private property.[c] In the case of New-Jersey v. Wilson, there was an express contract contained in a public treaty of cession with the Indians, by which the privilege of perpetual exemption from taxation was indelibly impressed upon the lands, and could not be taken away without a violation of the public faith

a  *The Federalist*, No. 44.  1 *Tucker's Bl. Com.* part 1. Appendix, 312.

b  Calder *et ux.* v. Bull *et ux.* 3 *Dall.* 390.

c  6 *Cranch*, 87.

OF THE UNITED STATES.

solemnly pledged.[a]  Terret v. Taylor was also a case of an attempt to devest an interest in lands actually vested under an act amounting to a contract.[b]  In all those instances, the property was held by the grantees, and those to whom they had conveyed, beneficially, and under the sanction of *contracts*, in the ordinary and popular signification of that term.  But this is an attempt to extend its obvious and natural meaning, and to apply it by a species of legal fiction to a class of cases which have always been supposed to be within the control of the sovereign power. Charters to public corporations for purposes of public policy are necessarily subject to the legislative discretion, which may revoke or modify them as the continually fluctuating exigencies of the society may require.  Incorporations for the purposes of education and other literary objects, in one age, or under one form of government, may become unfit for their office in another age, or under another government.

This charter is said to be a contract between Doctor Wheelock and the king ; a contract founded on a donation of private property by Doctor Wheelock. It is hence inferred, that it is a private eleemosynary corporation ; and the right of visitation is said to be in the founder and his heirs ; and that the State can have no right to interfere, because it is neither the founder of this charity, nor contributor to it.

But if the basis of this argument is removed, what becomes of the superstructure?  The fact that Doctor Wheelock was a contributor, is not found by the

1819.

Dartmouth
College
v.
Woodward.

a 7 *Cranch*, 164.        b 9 *Cranch*, 43.

special verdict; and not having been such in truth, it cannot be added under the agreement to amend the special verdict. The jury find the charter, and that does not recite that the college was a private foundation by Doctor Wheelock. On the contrary, the real state of the case is, that he was the projector; that he had a school on his own plantation, for the education of Indians; and through the assistance of others had been employed for several years in cloathing, maintaining, and educating them. He solicited contributions, and appointed others to solicit. At the foundation of the college, the institution was removed from his estate. The honours paid to him by the charter were the reward of past services, and of the boldness, as well as piety, of the project. The State has been a contributor of funds, and this fact is found. It is, therefore, not a private charity, but a public institution; subject to be modified, altered, and regulated, by the supreme power of the State.

This charter is not a contract within the true intent of the constitution. The acts of New-Hampshire, varying in some degree the forms of the charter, do not impair the obligation of a contract.

In a case which is really a case of contract, there is no difficulty in ascertaining who are the contracting parties. But here they cannot be fixed. Doctor Wheelock can only be said to be a party, on the ground of his contributing funds, and thus being the founder and visitor. That ground being removed, he ceases to be a party to the contract. Are the other contributors alluded to in the charter, and enume-

rated by Belknap in his history of New-Hampshire, are they contracting parties? They are not, before the Court; and even if they were, with whom did they contract? With the King of Great Britain? He, too, is not before the Court; and has declared, by his Chancellor, in the case of the Attorney General v. The City of London,[a] that he has no longer any connexion with these corporations in America. Has the State of New-Hampshire taken his place? Neither is that State before the Court, nor can it be as a party, originally defendant. But suppose this to be a contract between the trustees, and the people of New-Hampshire. A contract is always for the benefit and advantage of some person. This contract cannot be for the benefit of the trustees. It is for the use of the people. The *cestui que use* is always the contracting party; the trustee has nothing to do with stipulating the terms. The people then grant powers for their own use. It is a contract with themselves!

But if the trustees are parties on one side, what do they give, and what do they receive? They give their time and labour. Every society has a right to the services of its members in places of public trust and duty. A town appoints, under the authority of the State, an overseer of the poor, or of the highways. He gives, reluctantly, his labour and services; he receives nothing in return but the privilege of giving his labour and services. Such appointments to offices of public trust have never been considered

1819.

Dartmouth College v. Woodward.

*a* The Attorney General v. The City of London, 3 *Bro. Ch.* *Cas.* 171. 1 *Ves. jun.* 243.

as contracts which the sovereign authority was not competent to rescind or modify. There can be no contract in which the party does not receive some personal, private, individual benefit. To make this charter a contract, and a private contract, there must be a private beneficial interest vested in the party who pays the consideration. What is the private beneficial interest vested in the party in the present case? The right of appointing the president and professors of the college, and of establishing ordinances for its government, &c. But to make these rights an interest which will constitute the end and object of a contract, the exercise of these rights must be for the private individual advantage of the trustees. Here, however, so far from that being the fact, it is solely for the advantage of the public; for the interests of piety and learning. It was upon these principles that Lord Kenyon determined, in the case of Weller v. Foundling Hospital,[a] that the governor and members of the corporation were competent witnesses, because they were trustees of a public charity, and had no private personal interest. It is not meant to deny that mere right—a franchise—an incorporeal hereditament, may be the subject of a contract; but it must always be a direct, individual, beneficial interest to the party who takes that right. The rights of municipal corporators are of this nature. The right of suffrage there belongs beneficially to the individual elector, and is to be exercised for his own exclusive advantage. It is in relation to these town

a  Peake's N. P. Cas. 154.

corporations that Lord Kenyon speaks, when he says, that the king cannot force a new charter upon them.[a] This principle is established for the benefit of all the corporators. It is accompanied by another principle, without which it would never have been adopted: the power of proposing amendments at the desire of those for whose benefit the charter was granted. These two principles work together for the good of the whole. By the one, these municipal corporations are saved from the tyranny of the crown ; and by the other, they are preserved from the infinite perpetuity of inveterate errors. But in the present case there is no similar qualification of the immutability of the charter, which is contended for in the argument on the other side. But in truth, neither the original principle, nor its qualification, apply to this case; for there is here no such beneficial interest and individual property as are enjoyed by town corporators.

3. But even admitting it to be a case of contract, its obligation is not impaired by these legislative acts. What vested right has been devested ? None! The former trustees are continued. It is true, that new trustees are added, but this affords no reasonable ground of complaint. The privileges of the House of Lords in England are not impaired by the introduction of new members. The old corporation is not abolished, for the foundation as now regulated is substantially the same. It is identical in all its essential constituent parts, and all its former rights are

1819.

Dartmouth College v. Woodward.

[a] Rex v. Passmore, 3 T. R. 244.

1819.

Dartmouth
College
v.
Woodward.

preserved and confirmed.[a] The change of name does not change its original rights and franchises.[b] By the revolution which separated this country from the British empire, all the powers of the British government devolved on the States. The legislature of New-Hampshire then became cloathed with all the powers, both of the king and parliament, over these public institutions. On whom, then, did the title to the property of this college fall? If before the revolution it was *beneficially* vested in any private individuals, or corporate body, I do not contend that the revolution devested it, and gave it to the State. But it was not before vested *beneficially* in the trustees. The *use* unquestionably belonged to the people of New-Hampshire, who were the *cestuy que trusts*. The *legal* estate was indeed vested in the trustees before the revolution by virtue of the royal charter of 1769. But that charter was destroyed by the revolution,[c] and the legal estate, of course, fell upon those who held the *equitable* estate—upon the people. If those who were trustees, carried on the duties of the trust after the revolution, it must have been subject to the power of the people. If it be said, that the State gave its implied assent to the terms of the old charter, then it must be subject to all the terms on which it was granted ; and among these, to the oath of allegiance to the king. But if to avoid

*a* See the Mayor of Colchester v. Seaber, 3 *Burr.* 1866.
*b* 1 *Sand.* 344. n. 1. Luttrel's Case, 4 *Co. Rep.* 87.
*c* Attorney General v. City of London, 3 *Bro. Ch. Cas.* 171.
S. C. 1 *Ves. jun.* 143.'

this concession, it be said, that the charter must have been so far modified as to adapt it to the character of the new government, and to the change in our civil institutions; that is precisely what we contend for. These civil institutions must be modified, and adapted to the mutations of society and manners. They belong to the people, are established for their benefit, and ought to be subject to their authority.

Mr. *Hopkinson*, in reply, insisted, that the whole argument on the other side proceeded on an assumption which was not warranted, and could not be maintained. The corporation created by this charter is called a *public* corporation. Its members are said to be *public officers*, and agents of government. They were officers of the king, it is said, before the revolution, and they are officers of the State since. But upon what authority is all this taken? What is the acknowledged principle which decides thus of this corporation? Where are the cases in which such a doctrine has ever prevailed? No case, no book of authority, has been, or can be, cited to this purpose. Every writer on the law of corporations, all the cases in law and equity, instruct us that colleges are regarded in law as private eleemosynary corporations, especially colleges founded, as this was, by a private founder. If this settled principle be not overthrown, there is no foundation for the defendant's argument. We contend that this charter is a contract between the government and the members of the corporation created by it. It is a contract, because it is a grant of valuable rights and privileges; and every grant im-

1819.

Dartmouth
College
v.
Woodward.

plies a contract not to resume the thing granted. Public offices are not created by contract or by charter. They are provided for by general laws. Judges and magistrates do not hold their offices under charters. These offices are created by public laws, for public political purposes, and filled by appointments made in the exercise of political power. There is nothing like this in the origin of the powers of the plaintiffs. Nor is there in their duties, any more than in their origin, any thing which likens them to public political agents. Their duties are such as they themselves have chosen to assume, in relation to a fund created by private benefaction, for charitable uses. These duties relate to the instruction of youth: but instructors of youth are not public officers. The argument on the other side, if it proves any thing, will prove that professors, masters, preceptors, and tutors, are all political persons and public officers; and that all education is necessarily and exclusively the business of the State. The confutation of such an argument lies in stating it. The trustees of this college perform no duties, and have no responsibility in any way connected with the civil government of the State. They derive no compensation for their services from the public treasury. They are the gratuitous administrators of a private bounty; the trustees of a literary establishment, standing, in contemplation of law, on the same foundation as hospitals, and other charities. It is true, that a college, in a popular sense, is a public institution, because its uses are public, and its benefits may be enjoyed by all who choose to enjoy them.

But in a legal and technical sense, they are not public institutions, but private charities. Corporations may, therefore, be very well said to be for public use, of which the property and privileges are yet private. Indeed, there may be supposed to be an ultimate reference to the public good, in granting all charters of incorporation; but this does not change the property from private to public. If the property of this corporation be public property, that is, property belonging to the State, when did it become so? It was once private property; when was it surrendered to the public? The object in obtaining the charter, was not surely to transfer the property to the public, but to secure it forever in the hands of those with whom the original owners saw fit to entrust it. Whence, then, that right of ownership and control over this property, which the legislature of New-Hampshire has undertaken to exercise? The distinction between public, political, or civil corporations, and corporations for the distribution of private charity, is fully explained, and broadly marked, in the cases which have been cited, and to which no answer has been given. The hospital of Pennsylvania is quite as much a public corporation, as this college. It has great funds, most wisely and beneficently administered. Is it to be supposed, that the legislature might rightfully lay its hands on this institution, violate its charter, and direct its funds to any purpose which its pleasure might prescribe? The property of this college was private property before the charter; and the charter has wrought no change in the nature or title of this property. The school had existed as a charity school,

1819.

Dartmouth
College
v.
Woodward.

for years before the charter was granted. During this time it was manifestly a private charity. The case cited from Atkyns, shows, that a charter does not make a charity more public, but only more permanent. Before he accepted the charter, the founder of this college possessed an absolute right to the property with which it was endowed, and also the right flowing from that, of administering and applying it to the purposes of the charity by him established. By taking the charter, he assented that the right to the property, and the power of administering it, should go to the corporation of which he and others were members. The beneficial purpose to which the property was to be used, was the consideration on the part of the government for granting the charter. The perpetuity which it was calculated to give to the charity, was the founder's inducement to solicit it. By this charter, the public faith is solemnly pledged, that the arrangement thus made shall be perpetual. In consideration that the founder would devote his property to the purposes beneficial to the public, the government has solemnly covenanted with him to secure the administration of that property in the hands of trustees appointed in the charter. And yet the argument now is, that *because* he so devoted his property to uses beneficial to the public, the government may, *for that reason*, assume the control of it, and take it out of those hands to which it was confided by the charter. In other words, *because* the founder has strictly performed the contract on his part, the government, on its part, is at liberty to violate it. This argument is equally unsound in morality and in law.

The founder proposed to appropriate his property, and to render his services, upon condition of receiving a charter which should secure to him and his associates certain privileges and immunities. He undertook the discharge of certain duties, in consideration of obtaining certain rights. There are rights and duties on both sides. On the part of the founder, there is the duty of appropriating the property, and of rendering the services imposed on him by the charter, and the right of having secured to him and his associates the administration of the charity, according to the terms of the charter, forever. On the part of the government, there is the duty of maintaining and protecting all the rights and privileges conferred by the charter, and the right of insisting on the compliance of the trustees with the obligations undertaken by them, and of enforcing that compliance by all due and regular means. There is a plain, manifest, reasonable stipulation, mixed up of rights and duties, which cannot be separated but by the hand of injustice and violence. Yet the attempt now is to break the mutuality of this stipulation ; to hold the founder's property, and yet take away that which was given him as the consideration upon which he parted with his property. The charter was a grant of valuable powers and privileges. The State now claims the right of revoking this grant, without restoring the consideration which it received for making the grant. Such a pretence may suit despotic power. It may succeed where the authority of the legislature is limited by no rule, and bounded only by its will. It may prevail in those systems in which injustice is

1819.

Dartmouth
College
v.
Woodward.

1819.

Dartmouth
College
v.
Woodward.

not always unlawful, and where neither the fundamental constitution of the government sets any limits to power, nor any just sentiment or moral feeling affords a practical restraint against a power which in its theory is unlimited. But it cannot prevail in the United States, where power is restrained by constitutional barriers, and where no legislature is, even in theory, invested with all sovereign powers. Suppose Dr. Wheelock had chosen to establish and perpetuate this charity by his last will, or by a deed, in which he had given the property, appointed the trustees, provided for their succession, and prescribed their duties. Could the legislature of New-Hampshire have broken in upon this gift, changed its parties, assumed the appointment of the trustees, abolished its stipulations and regulations, or imposed others? This will hardly be pretended, even in this bold and hardy argument—and why not? Because the gift, with all its restrictions and provisions, would be under the general and implied protection of the law. How is it in our case? Why, in addition to the general and implied protection afforded to all rights and all property, it has an express, specific, covenanted assurance of protection and inviolability, given on good and sufficient considerations, in the usual manner of contracts between individuals. There can be no doubt that, in contemplation of law, a charter, such as this, is a contract. It takes effect only with the assent of those to whom it is granted. Laws enjoin duties, without or against the will of those who are to perform them. But the duties of the trustees, under this charter, are binding upon them

only because they have accepted the charter, and assented to its terms.

But taking this to be a contract, the argument of the defendant is, that it is *not such a contract* as the constitution of the United States protects. But why not? The constitution speaks of contracts, and ought to include all contracts for property or valuable privileges. There is no distinction or discrimination made by the constitution itself, which will exclude this case from its protection. The decisions which have already been made in this Court are a complete answer to the defendant's argument.

The Attorney General has insisted, that Dr. Wheelock was not the founder of this college; that other donors have better title to that character; and that, therefore, the plaintiff's argument, so far as it rests on the supposed fact of Dr. Wheelock's being the founder, fails. The first answer to this is, that the charter itself declares Dr. Wheelock to be the founder, in express terms. It also recites facts, which would show him to be the founder, and on which the law would invest him with that character, if the charter itself had not declared him so. But if all this were otherwise, it would not help the defendant's argument. The foundation was still private; and whether Dr. Wheelock, or Lord Dartmouth, or any other person, possessed the greatest share of merit in establishing the college, the result is the same, so far as it bears on the present question. Whoever was founder, the visitatorial power was assigned to the trustees, by the charter; and it, therefore, is of no importance whether the founder was one individual or another. It

is narrowing the ground of our argument to suppose, that we rest it on the particular fact of Dr. Wheelock's being founder; although the fact is fully established by the charter itself. Our argument is, that this is a private corporation; that the founder of the charity, before the charter, had a right of visiting and governing it, a right growing out of the property of the endowment; that by the charter, this visitatorial power is vested in the trustees, as assignees of the founder; and that it is a privilege, right, and immunity, originally springing from property, and which the law regards and protects, as much as it regards and protects property and privileges of any other description. By the charter, all proper powers of government are given to the trustees, and this makes them visitors; and from the time of the acceptance of the charter, no visitatorial power remained in the founder or his heirs. This is the clear doctrine of the case of Green v. Rutherforth, which has been cited, and which is supported by all the other cases. Indeed we need not stop here in the argument. We might go farther, and contend, that if there were no private founder, the trustees would possess the visitatorial power. Where there are charters, vesting the usual and proper powers of government in the trustees, they thereby become the visitors, and the founder retains no visitatorial power, although that founder be the king.[a] Even then, if this college had originated with the government, and had been founded by it; still, if the government had given a charter to

a 2 Ves. 328.   1 Ves. 78.

trustees, and conferred on them the powers of visitation, and control, which this charter contains, it would by no means follow, that the government might revoke the grant, merely because it had itself established the institution. Such would not be the legal consequence. If the grant be of privileges and immunities, which are to be esteemed objects of value, it cannot be revoked. But this case is much stronger than that. Nothing is plainer, than that Dr. Wheelock, from the recitals of this charter, was the founder of this institution. It is true, that others contributed; but it is to be remembered, that they contributed to Dr. Wheelock, and to the funds while under his private administration and control, and before the idea of a charter had been suggested. These contributions were obtained on *his* solicitation, and confided to *his* trust.

If we have satisfied the Court that this charter must be regarded as a contract, and such a contract as is protected by the constitution of the United States, it will hardly be seriously denied, that the acts of the legislature of New-Hampshire impair this contract. They impair the rights of the corporation as an aggregate body, and the rights and privileges of individual members. New duties are imposed on the corporation; the funds are directed to new purposes; a controlling power over all the proceedings of the trustees, is vested in a board of overseers unknown to the charter. Nine new trustees are added to the original number, in direct hostility with the provision of the charter. There are radical and essential al-

terations, which go to alter the whole organization and frame of the corporation.

If we are right in the view which we have taken of this case, the result is, that before, and at the time of, the granting of this charter, Dr. Wheelock had a legal interest in the funds with which the institution was founded; that he made a contract with the then existing government of the State, in relation to that interest, by which he devoted, to uses beneficial to the public, the funds which he had collected, in consideration of the stipulations and covenants, on the part of the government, contained in the charter; and that these stipulations are violated, and the contract impaired, by the acts of the legislature of New-Hampshire.

The opinion of the Court was delivered by Mr. Chief Justice MARSHALL.

This is an action of trover, brought by the Trustees of Dartmouth College against William H. Woodward, in the State Court of New-Hampshire, for the book of records, corporate seal, and other corporate property, to which the plaintiffs allege themselves to be entitled.

A special verdict, after setting out the rights of the parties, finds for the defendant, if certain acts of the legislature of New-Hampshire, passed on the 27th of June, and on the 18th of December, 1816, be valid, and binding on the trustees without their assent, and not repugnant to the constitution of the United States; otherwise, it finds for the plaintiffs.

The Superior Court of Judicature of New-Hamp-
shire rendered a judgment upon this verdict for the
defendant, which judgment has been brought before
this Court by writ of error. The single question
now to be considered is, do the acts to which the
verdict refers violate the constitution of the United
States ?

This Court can be insensible neither to the magni-
tude nor delicacy of this question. The validity of
a legislative act is to be examined ; and the opinion
of the highest law tribunal of a State is to be re-
vised : an opinion which carries with it intrinsic evi-
dence of the diligence, of the ability, and the inte-
grity, with which it was formed. On more than one
occasion, this Court has expressed the cautious cir-
cumspection with which it approaches the considera-
tion of such questions ; and has declared, that, in no
doubtful case, would it pronounce a legislative act
to be contrary to the constitution. But the American
people have said, in the constitution of the United
States, that " no State shall pass any bill of attainder,
*ex post facto* law, or law impairing the obligation of
contracts." In the same instrument they have also
said, " that the judicial power shall extend to all
cases in law and equity arising under the constitu-
tion." On the judges of this Court, then, is im-
posed the high and solemn duty of protecting, from
even legislative violation, those contracts which the
constitution of our country has placed beyond legis-
lative control ; and, however irksome the task may
be, this is a duty from which we dare not shrink.

The title of the plaintiffs originates in a charter dated the 13th day of December, in the year 1769, incorporating twelve persons therein mentioned, by the name of " The Trustees of Dartmouth College," granting to them and their successors the usual corporate privileges and powers, and authorizing the trustees, who are to govern the college, to fill up all vacancies which may be created in their own body.

The defendant claims under three acts of the legislature of New-Hampshire, the most material of which was passed on the 27th of June, 1816, and is entitled, " an act to amend the charter, and enlarge and improve the corporation of Dartmouth College." Among other alterations in the charter, this act increases the number of trustees to twenty-one, gives the appointment of the additional members to the executive of the State, and creates a board of overseers, with power to inspect and control the most important acts of the trustees. This board consists of twenty-five persons. The president of the senate, the speaker of the house of representatives, of New-Hampshire, and the governor and lieutenant governor of Vermont, for the time being, are to be members ex officio. The board is to be completed by the governor and council of New-Hampshire, who are also empowered to fill all vacancies which may occur. The acts of the 18th and 26th of December, are supplemental to that of the 27th of June, and are principally intended to carry that act into effect.

The majority of the trustees of the college have refused to accept this amended charter, and have

brought this suit for the corporate property, which is in possession of a person holding by virtue of the acts which have been stated.

It can require no argument to prove, that the circumstances of this case constitute a contract. An application is made to the crown for a charter to incorporate a religious and literary institution. In the application, it is stated that large contributions have been made for the object, which will be conferred on the corporation, as soon as it shall be created. The charter is granted, and on its faith the property is conveyed. Surely in this transaction every ingredient of a complete and legitimate contract is to be found.

The points for consideration are,

1. Is this contract protected by the constitution of the United States?

2. Is it impaired by the acts under which the defendant holds?

1. On the first point it has been argued, that the word " contract," in its broadest sense, would comprehend the political relations between the government and its citizens, would extend to offices held within a State for State purposes, and to many of those laws concerning civil institutions, which must change with circumstances, and be modified by ordinary legislation ; which deeply concern the public, and which, to preserve good government, the public judgment must control. That even marriage is a contract, and its obligations are affected by the laws respecting divorces. That the clause in the constitution, if construed in its greatest latitude,

1819.

Dartmouth College v. Woodward.

The Charter of Dartmouth College is a contract

What species of contracts are included in the constitutional prohibition of State laws impairing the obligation of contracts.

would prohibit these laws.    Taken in its broad unlimited sense, the clause would be an unprofitable and vexatious interference with the internal concerns of a State, would unnecessarily and unwisely embarrass its legislation, and render immutable those civil institutions, which are established for purposes of internal government, and which, to subserve those purposes, ought to vary with varying circumstances. That as the framers of the constitution could never have intended to insert in that instrument a provision so unnecessary, so mischievous, and so repugnant to its general spirit, the term " *contract*" must be understood in a more limited sense.    That it must be understood as intended to guard against a power of at least doubtful utility, the abuse of which had been extensively felt; and to restrain the legislature in future from violating the right to property.    That anterior to the formation of the constitution, a course of legislation had prevailed in many, if not in all, of the States, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful performance of engagements.    To correct this mischief, by restraining the power which produced it, the State legislatures were forbidden " to pass any law impairing the obligation of contracts," that is,  of contracts respecting property, under  which  some individual could claim a right to something beneficial to himself; and that since the clause in the constitution must in construction receive some limitation, it may be confined, and ought to be confined, to cases of this

description; to cases within the mischief it was intended to remedy.

The general correctness of these observations cannot be controverted. That the framers of the constitution did not intend to retrain the States in the regulation of their civil institutions, adopted for internal goverment, and that the instrument they have given us, is not to be so construed, may be admitted. The provision of the constitution never has been understood to embrace other contracts, than those which respect property, or some object of value, and confer rights which may be asserted in a court of justice. It never has been understood to restrict the general right of the legislature to legislate on the subject of divorces. Those acts enable some tribunal, not to impair a marriage contract, but to liberate one of the parties because it has been broken by the other. When any State legislature shall pass an act annulling all marriage contracts, or allowing either party to annul it without the consent of the other, it will be time enough to inquire, whether such an act be constitutional.

The parties in this case differ less on general principles, less on the true construction of the constitution in the abstract, than on the application of those principles to this case, and on the true construction of the charter of 1769. This is the point on which the cause essentially depends. If the act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, or if the funds of the college be

1819.

Dartmouth
College
v.
Woodward.

public property, or if the State of New-Hampshire, as a government, be alone interested in its transactions, the subject is one in which the legislature of the State may act according to its own judgment, unrestrained by any limitation of its power imposed by the constitution of the United States.

But if this be a private eleemosynary institution, endowed with a capacity to take property for objects unconnected with government, whose funds are bestowed by individuals on the faith of the charter ; if the donors have stipulated for the future disposition and management of those funds in the manner prescribed by themselves; there may be more difficulty in the case, although neither the persons who have made these stipulations, nor those for whose benefit they were made, should be parties to the cause. Those who are no longer interested in the property, may yet retain such an interest in the preservation of their own arrangements, as to have a right to insist, that those arrangements shall be held sacred. Or, if they have themselves disappeared, it becomes a subject of serious and anxious inquiry, whether those whom they have legally empowered to represent them forever, may not assert all the rights which they possessed, while in being ; whether, if they be without personal representatives who may feel injured by a violation of the compact, the trustees be not so completely their representatives in the eye of the law, as to stand in their place, not only as respects the government of the college, but also as respects the maintenance of the college charter.

It becomes then the duty of the Court most

seriously to examine this charter, and to ascertain its true character.

From the instrument itself, it appears, that about the year 1754, the Rev. Eleazer Wheelock established at his own expense, and on his own estate, a charity school for the instruction of Indians in the christian religion. The success of this institution inspired him with the design of soliciting contributions in England for carrying on, and extending, his undertaking. In this pious work he employed the Rev. Nathaniel Whitaker, who, by virtue of a power of attorney from Dr. Wheelock, appointed the Earl of Dartmouth and others, trustees of the money, which had been, and should be, contributed; which appointment Dr. Wheelock confirmed by a deed of trust authorizing the trustees to fix on a site for the college. They determined to establish the school on Connecticut river, in the western part of New-Hampshire; that situation being supposed favourable for carrying on the original design among the Indians, and also for promoting learning among the English; and the proprietors in the neighbourhood having made large offers of land, on condition, that the college should there be placed. Dr. Wheelock then applied to the crown for an act of incorporation; and represented the expediency of appointing those whom he had, by his last will, named as trustees in America, to be members of the proposed corporation. " In consideration of the premises," " for the education and instruction of the youth of the Indian tribes," &c. " and also of English youth, and any others," the charter was granted, and the trustees of Dartmouth College were by that name created a body

1819.

Dartmouth College v. Woodward.

Dartmouth College is a private eleemosynary corporation.

corporate, with power, *for the use of the said college*, to acquire real and personal property, and to pay the president, tutors, and other officers of the college, such salaries as they shall allow.

The charter proceeds to appoint Eleazer Wheelock, " the founder of said college," president thereof, with power by his last will to appoint a successor, who is to continue in office until disapproved by the trustees. In case of vacancy, the trustees may appoint a president, and in case of the ceasing of a president, the senior professor or tutor, *being one of the trustees*, shall exercise the office, until an appointment shall be made. The trustees have power to appoint and displace professors, tutors, and other officers, and to supply any vacancies which may be created in their own body, by death, resignation, removal, or disability ; and also to make orders, ordinances, and laws, for the government of the college, the same not being repugnant to the laws of Great Britain, or of New-Hampshire, and not excluding any person on account of his speculative sentiments in religion, or his being of a religious profession different from that of the trustees.

This charter was accepted, and the property both real and personal, which had been contributed for the benefit of the college, was conveyed to, and vested in, the corporate body.

From this brief review of the most essential parts of the charter, it is apparent, that the funds of the college consisted entirely of private donations. It is, perhaps, not very important, who were the donors. The probability is, that the Earl of Dartmouth, and the other trustees in England, were, in fact, the largest

contributors. Yet the legal conclusion, from the facts recited in the charter, would probably be, that Dr. Wheelock was the founder of the college.

The origin of the institution was, undoubtedly, the Indian charity school, established by Dr. Wheelock, at his own expense. It was at his instance, and to enlarge this school, that contributions were solicited in England. The person soliciting these contributions was his agent; and the trustees, who received the money, were appointed by, and act under, his authority. It is not too much to say, that the funds were obtained by him, in trust, to be applied by him to the purposes of his enlarged school. The charter of incorporation was granted at his instance. The persons named by him in his last will, as the trustees of his charity school, compose a part of the corporation, and he is declared to be the founder of the college, and its president for life. Were the inquiry material, we should feel some hesitation in saying, that Dr. Wheelock was not, in law, to be considered as the founder* of this institution, and as possessing all the rights appertaining to that character. But be this as it may, Dartmouth College is really endowed by private individuals, who have bestowed their funds for the propagation of the christian religion among the Indians, and for the promotion of piety and learning generally. From these funds the salaries of the tutors are drawn; and these salaries lessen the expense of education to the students. It

*a* 1 *Bl. Com.* 481.

is then an eleemosynary,[a] and, as far as respects its funds, a private corporation.

Do its objects stamp on it a different character? Are the trustees and professors public officers, invested with any portion of political power, partaking in any degree in the administration of civil government, and performing duties which flow from the sovereign authority?

That education is an object of national concern, and a proper subject of legislation, all admit. That there may be an institution founded by government, and placed entirely under its immediate control, the officers of which would be public officers, amenable exclusively to government, none will deny. But is Dartmouth College such an institution? Is education altogether in the hands of government? Does every teacher of youth become a public officer, and do donations for the purpose of education necessarily become public property, so far that the will of the legislature, not the will of the donor, becomes the law of the donation? These questions are of serious moment to society, and deserve to be well considered.

Doctor Wheelock, as the keeper of his charity school, instructing the Indians in the art of reading, and in our holy religion; sustaining them at his own expense, and on the voluntary contributions of the charitable, could scarcely be considered as a public officer, exercising any portion of those duties which belong to government; nor could the legislature have

a 1 *Bl. Com.* 471.

supposed, that his private funds, or those given by
others, were subject to legislative management, be-
cause they were applied to the purposes of education.
When, afterwards, his school was enlarged, and the
liberal contributions made in England, and in Ame-
rica, enabled him to extend his cares to the education
of the youth of his own country, no change was
wrought in his own character, or in the nature of his
duties.   Had he employed assistant tutors with the
funds contributed by others, or had the trustees in
England established a school with Dr. Wheelock at
its head, and paid salaries to him and his assistants,
they would still have been private tutors; and the
fact, that they were employed in the education of
youth, could not have converted them into public offi-
cers, concerned in the administration of public du-
ties, or have given the legislature a right to interfere
in the management of the fund.   The trustees, in
whose care that fund was placed by the contributors,
would have been permitted to execute their trust un-
controlled by legislative authority.

Whence, then, can be derived the idea, that Dart-
mouth College has become a public institution, and
its trustees public officers, exercising powers con-
ferred by the public for public objects? Not from
the source whence its funds were drawn; for its
foundation is purely private and eleemosynary—Not
from the application of those funds; for money may
be given for education, and the persons receiving it do
not, by being employed in the education of youth,
become members of the civil government.   Is it from

the act of incorporation? Let this subject be considered.

A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created. Among the most important are immortality, and, if the expression may be allowed, individuality; properties, by which a perpetual succession of many persons are considered as the same, and may act as a single individual. They enable a corporation to manage its own affairs, and to hold property without the perplexing intricacies, the hazardous and endless necessity, of perpetual conveyances for the purpose of transmitting it from hand to hand. It is chiefly for the purpose of clothing bodies of men, in succession, with these qualities and capacities, that corporations were invented, and are in use. By these means, a perpetual succession of individuals are capable of acting for the promotion of the particular object, like one immortal being. But this being does not share in the civil government of the country, unless that be the purpose for which it was created. Its immortality no more confers on it political power, or a political character, than immortality would confer such power or character on a natural person. It is no more a State instrument, than a natural person exercising the same powers would be. If, then, a natural person, em-

ployed by individuals in the education of youth, or for the government of a seminary in which youth is educated, would not become a public officer, or be considered as a member of the civil government, how is it, that this artificial being, created by law, for the purpose of being employed by the same individuals for the same purposes, should become a part of the civil government of the country? Is it because its existence, its capacities, its powers, are given by law? Because the government has given it the power to take and to hold property in a particular form, and for particular purposes, has the government a consequent right substantially to change that form, or to vary the purposes to which the property is to be applied? This principle has never been asserted or recognized, and is supported by no authority. Can it derive aid from reason?

The objects for which a corporation is created are universally such as the government wishes to promote. They are deemed beneficial to the country; and this benefit constitutes the consideration, and, in most cases, the sole consideration of the grant. In most eleemosynary institutions, the object would be difficult, perhaps unattainable, without the aid of a charter of incorporation. Charitable, or public spirited individuals, desirous of making permanent appropriations for charitable or other useful purposes, find it impossible to effect their design securely, and certainly, without an incorporating act. They apply to the government, state their beneficent object, and offer to advance the money necessary for its accom-

1819.
Dartmouth
College
v.
Woodward.

plishment, provided the government will confer on the instrument which is to execute their designs the capacity to execute them. The proposition is considered and approved. The benefit to the public is considered as an ample compensation for the faculty it confers, and the corporation is created. If the advantages to the public constitute a full compensation for the faculty it gives, there can be no reason for exacting a further compensation, by claiming a right to exercise over this artificial being a power which changes its nature, and touches the fund, for the security and application of which it was created. There can be no reason for implying in a charter, given for a valuable consideration, a power which is not only not expressed, but is in direct contradiction to its express stipulations.

From the fact, then, that a charter of incorporation has been granted, nothing can be inferred which changes the character of the institution, or transfers to the government any new power over it. The character of civil institutions does not grow out of their incorporation, but out of the manner in which they are formed, and the objects for which they are created. The right to change them is not founded on their being incorporated, but on their being the instruments of government, created for its purposes. The same institutions, created for the same objects, though not incorporated, would be public institutions, and, of course, be controllable by the legislature. The incorporating act neither gives nor prevents this control. Neither, in reason, can the incorporating act

1819.

Dartmouth
College
v.
Woodward.

change the character of a private eleemosynary institution.

We are next led to the inquiry, for whose benefit the property given to Dartmouth College was secured? The counsel for the defendant have insisted, that the beneficial interest is in the people of New-Hampshire. The charter, after reciting the preliminary measures which had been taken, and the application for an act of incorporation, proceeds thus: "Know ye, therefore, that we, considering the premises, and being willing to encourage the laudable and charitable design of spreading christian knowledge among the savages of our American wilderness, and, also, that the best means of education be established, in our province of New-Hampshire, for the benefit of said province, do, of our special grace," &c. Do these expressions bestow on New-Hampshire any exclusive right to the property of the college, any exclusive interest in the labours of the professors? Or do they merely indicate a willingness that New-Hampshire should enjoy those advantages which result to all from the establishment of a seminary of learning in the neighbourhood? On this point we think it impossible to entertain a serious doubt. The words themselves, unexplained by the context, indicate, that the "benefit intended for the province" is that which is derived from "establishing the best means of education therein;" that is, from establishing in the province Dartmouth College, as constituted by the charter. But, if these words, considered alone, could admit of doubt, that

doubt is completely removed by an inspection of the entire instrument.

The particular interests of New-Hampshire never entered into the mind of the donors, never constituted a motive for their donation. The propagation of the christian religion among the savages, and the dissemination of useful knowledge among the youth of the country, were the avowed and the sole objects of their contributions. In these, New-Hampshire would participate; but nothing particular or exclusive was intended for her. Even the site of the college was selected, not for the sake of New-Hampshire, but because it was " most subservient to the great ends in view," and because liberal donations of land were offered by the proprietors, on condition that the institution should be there established. The real advantages from the location of the college, are, perhaps, not less considerable to those on the west, than to those on the east side of Connecticut river. The clause which constitutes the incorporation, and expresses the objects for which it was made, declares those objects to be the instruction of the Indians, " and also of English youth, and any others." So that the objects of the contributors, and the incorporating act, were the same; the promotion of christianity, and of education generally, not the interests of New-Hampshire particularly.

From this review of the charter, it appears, that Dartmouth College is an eleemosynary institution, incorporated for the purpose of perpetuating the application of the bounty of the donors, to the specified objects of that bounty; that its trustees or governors

were originally named by the founder, and invested with the power of perpetuating themselves; that they are not public officers, nor is it a civil institution, participating in the administration of government; but a charity school, or a seminary of education, incorporated for the preservation of its property, and the perpetual application of that property to the objects of its creation.

1819.

Dartmouth
College
v.
Woodward.

Yet a question remains to be considered, of more real difficulty, on which more doubt has been entertained than on all that have been discussed. The founders of the college, at least those whose contributions were in money, have parted with the property bestowed upon it, and their representatives have no interest in that property. The donors of land are equally without interest, so long as the corporation shall exist. Could they be found, they are unaffected by any alteration in its constitution, and probably regardless of its form, or even of its existence. The students are fluctuating, and no individual among our youth has a vested interest in the institution, which can be asserted in a Court of justice. Neither the founders of the college, nor the youth for whose benefit it was founded, complain of the alteration made in its charter, or think themselves injured by it. The trustees alone complain, and the trustees have no beneficial interest to be protected. Can this be such a contract, as the constitution intended to withdraw from the power of State legislation? Contracts, the parties to which have a vested beneficial interest, and those only, it has been said, are the objects about

The charter
of Dartmouth
College, is a
contract, the
obligation of
which cannot
be impaired by
a State law.

1819.

Dartmouth
College
v.
Woodward.

which the constitution is solicitous, and to which its protection is extended,

The Court has bestowed on this argument the most deliberate consideration, and the result will be stated. Dr. Wheelock, acting for himself, and for those who, at his solicitation, had made contributions to his school, applied for this charter, as the instrument which should enable him, and them, to perpetuate their beneficent intention. It was granted. An artificial, immortal being, was created by the crown, capable of receiving and distributing forever, according to the will of the donors, the donations which should be made to it. On this being, the contributions which had been collected were immediately bestowed. These gifts were made, not indeed to make a profit for the donors, or their posterity, but for something in their opinion of inestimable value; for something which they deemed a full equivalent for the money with which it was purchased. The consideration for which they stipulated, is the perpetual application of the fund to its object, in the mode prescribed by themselves. Their descendants may take no interest in the preservation of this consideration. But in this respect their descendants are not their representatives. They are represented by the corporation. The corporation is the assignee of their rights, stands in their place, and distributes their bounty, as they would themselves have distributed it, had they been immortal. So with respect to the students who are to derive learning from this source. The corporation is a trustee for them also. Their potential rights, which, taken distributively,

are imperceptible, amount collectively to a most important interest. These are, in the aggregate, to be exercised, asserted and protected, by the corporation. They were as completely out of the donors, at the instant of their being vested in the corporation, and as incapable of being asserted by the students, as at present.

According to the theory of the British constitution, their parliament is omnipotent. To annul corporate rights might give a shock to public opinion, which that government has chosen to avoid; but its power is not questioned. Had parliament, immediately after the emanation of this charter, and the execution of those conveyances which followed it, annulled the instrument, so that the living donors would have witnessed the disappointment of their hopes, the perfidy of the transaction would have been universally acknowledged. Yet then, as now, the donors would have had no interest in the property; then, as now, those who might be students would have had no rights to be violated; then, as now, it might be said, that the trustees, in whom the rights of all were combined, possessed no private, individual, beneficial interest in the property confided to their protection. Yet the contract would at that time have been deemed sacred by all. What has since occurred to strip it of its inviolability? Circumstances have not changed it. In reason, in justice, and in law, it is now what it was in 1769.

This is plainly a contract to which the donors, the trustees, and the crown, (to whose rights and obligations New-Hampshire succeeds,) were the original

1819.

Dartmouth
College
v.
Woodward.

parties.  It is a contract made on a valuable consideration.  It is a contract for the security and disposition of property.  It is a contract, on the faith of which, real and personal estate has been conveyed to the corporation.  It is then a contract within the letter of the constitution, and within its spirit also, unless the fact, that the property is invested by the donors in trustees for the promotion of religion and education, for the benefit of persons who are perpetually changing, though the objects remain the same, shall create a particular exception, taking this case out of the prohibition contained in the constitution.

It is more than possible, that the preservation of rights of this description was not particularly in the view of the framers of the constitution, when the clause under consideration was introduced into that instrument.  It is probable, that interferences of more frequent recurrence, to which the temptation was stronger, and of which the mischief was more extensive, constituted the great motive for imposing this restriction on the State legislatures.  But although a particular and a rare case may not, in itself, be of sufficient magnitude to induce a rule, yet it must be governed by the rule, when established, unless some plain and strong reason for excluding it can be given.  It is not enough to say, that this particular case was not in the mind of the Convention, when the article was framed, nor of the American people, when it was adopted.  It is necessary to go farther, and to say that, had this particular case been suggested, the language would have been so varied, as to exclude it, or it would have been made a special exception.  The

case being within the words of the rule, must be within its operation likewise, unless there be something in the literal construction so obviously absurd, or mischievous, or repugnant to the general spirit of the instrument, as to justify those who expound the constitution in making it an exception.

On what safe and intelligible ground can this exception stand. There is no expression in the constitution, no sentiment delivered by its contemporaneous expounders, which would justify us in making it. In the absence of all authority of this kind, is there, in the nature and reason of the case itself, that which would sustain a construction of the constitution, not warranted by its words? Are contracts of this description of a character to excite so little interest, that we must exclude them from the provisions of the constitution, as being unworthy of the attention of those who framed the instrument? Or does public policy so imperiously demand their remaining exposed to legislative alteration, as to compel us, or rather permit us to say, that these words, which were introduced to give stability to contracts, and which in their plain import comprehend this contract, must yet be so construed, as to exclude it?

Almost all eleemosynary corporations, those which are created for the promotion of religion, of charity, or of education, are of the same character. The law of this case is the law of all. In every literary or charitable institution, unless the objects of the bounty be themselves incorporated, the whole legal interest is in trustees, and can be asserted only by them. The donors, or claimants of the bounty, if

they can appear in Court at all, can appear only to complain of the trustees. In all other situations, they are identified with, and personated by, the trustees; and their rights are to be defended and maintained by them. Religion, Charity, and Education, are, in the law of England, legatees or donees, capable of receiving bequests or donations in this form. They appear in Court, and claim or defend by the corporation. Are they of so little estimation in the United States, that contracts for their benefit must be excluded from the protection of words, which in their natural import include them? Or do such contracts so necessarily require new modelling by the authority of the legislature, that the ordinary rules of construction must be disregarded in order to leave them exposed to legislative alteration?

All feel, that these objects are not deemed unimportant in the United States. The interest which this case has excited, proves that they are not. The framers of the constitution did not deem them unworthy of its care and protection. They have, though in a different mode, manifested their respect for science, by reserving to the government of the Union the power "to promote the progress of science and useful arts, by securing for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries." They have so far withdrawn science, and the useful arts, from the action of the State governments. Why then should they be supposed so regardless of contracts made for the advancement of literature, as to intend to exclude them from provisions, made for the security

1819.

Dartmouth
College
v.
Woodward.

of ordinary contracts between man and man? No reason for making this supposition is perceived.

If the insignificance of the object does not require that we should exclude contracts respecting it from the protection of the constitution; neither, as we conceive, is the policy of leaving them subject to legislative alteration so apparent, as to require a forced construction of that instrument in order to effect it. These eleemosynary institutions do not fill the place, which would otherwise be occupied by government, but that which would otherwise remain vacant. They are complete acquisitions to literature. They are donations to education; donations, which any government must be disposed rather to encourage than to discountenance. It requires no very critical examination of the human mind to enable us to determine, that one great inducement to these gifts is the conviction felt by the giver, that the disposition he makes of them is immutable. It is probable, that no man ever was, and that no man ever will be, the founder of a college, believing at the time, that an act of incorporation constitutes no security for the institution; believing, that it is immediately to be deemed a public institution, whose funds are to be governed and applied, not by the will of the donor, but by the will of the legislature. All such gifts are made in the pleasing, perhaps delusive hope, that the charity will flow forever in the channel which the givers have marked out for it. If every man finds in his own bosom strong evidence of the universality of this sentiment, there can be but little reason to imagine, that the framers of our constitution were

strangers to it, and that, feeling the necessity and policy of giving permanence and security to contracts, of withdrawing them from the influence of legislative bodies, whose fluctuating policy, and repeated interferences, produced the most perplexing and injurious embarrassments, they still deemed it necessary to leave these contracts subject to those interferences. The motives for such an exception must be very powerful, to justify the construction which makes it.

The motives suggested at the bar grow out of the original appointment of the trustees, which is supposed to have been in a spirit hostile to the genius of our government, and the presumption, that, if allowed to continue themselves, they now are, and must remain forever, what they originally were. Hence is inferred the necessity of applying to this corporation, and to other similar corporations, the correcting and improving hand of the legislature.

It has been urged repeatedly, and certainly with a degree of earnestness which attracted attention, that the trustees deriving their power from a regal source, must, necessarily, partake of the spirit of their origin; and that their first principles, unimproved by that resplendent light which has been shed around them, must continue to govern the college, and to guide the students. Before we inquire into the influence which this argument ought to have on the constitutional question, it may not be amiss to examine the fact on which it rests. The first trustees were undoubtedly named in the charter by the crown; but at whose suggestion were they named? By whom were they

selected ? The charter informs us. Dr. Wheelock had represented, " that, for many weighty reasons, it would be expedient, that the gentlemen whom he had already nominated, in his last will, to be trustees in America, should be of the corporation now proposed." When, afterwards, the trustees are named in the charter, can it be doubted that the persons mentioned by Dr. Wheelock in his will were appointed ? Some were probably added by the crown, with the approbation of Dr. Wheelock. Among these is the Doctor himself. If any others were appointed at the instance of the crown, they are the governor, three members of the council, and the speaker of the house of representatives, of the colony of New-Hampshire. The stations filled by these persons ought to rescue them from any other imputation than too great a dependence on the crown. If in the revolution that followed, they acted under the influence of this sentiment, they must have ceased to be trustees ; if they took part with their countrymen, the imputation, which suspicion might excite, would no longer attach to them. The original trustees, then, or most of them, were named by Dr. Wheelock, and those who were added to his nomination, most probably with his approbation, were among the most eminent and respectable individuals in New-Hampshire.

The only evidence which we possess of the character of Dr. Wheelock is furnished by this charter. The judicious means employed for the accomplishment of his object, and the success which attended his endeavours, would lead to the opinion, that he united a sound understanding to that humanity and

1819.

Dartmouth
College
v.
Woodward.

benevolence which suggested his undertaking. It surely cannot be assumed, that his trustees were selected without judgment. With as little probability can it be assumed, that, while the light of science, and of liberal principles, pervades the whole community, these originally benighted trustees remain in utter darkness, incapable of participating in the general improvement; that, while the human race is rapidly advancing, they are stationary. Reasoning *a priori*, we should believe, that learned and intelligent men, selected by its patrons for the government of a literary institution, would select learned and intelligent men for their successors; men as well fitted for the government of a college as those who might be chosen by other means. Should this reasoning ever prove erroneous in a particular case, public opinion, as has been stated at the bar, would correct the institution. The mere possibility of the contrary would not justify a construction of the constitution, which should exclude these contracts from the protection of a provision whose terms comprehend them.

The opinion of the Court, after mature deliberation, is, that this is a contract, the obligation of which cannot be impaired, without violating the constitution of the United States. This opinion appears to us to be equally supported by reason, and by the former decisions of this Court.

2. We next proceed to the inquiry, whether its obligation has been impaired by those acts of the legislature of New-Hampshire, to which the special verdict refers.

From the review of this charter, which has been taken, it appears, that the whole power of governing the college, of appointing and removing tutors, of fixing their salaries, of directing the course of study to be pursued by the students, and of filling up vacancies created in their own body, was vested in the trustees. On the part of the crown it was expressly stipulated, that this corporation, thus constituted, should continue forever; and that the number of trustees should forever consist of twelve, and no more. By this contract the crown was bound, and could have made no violent alteration in its essential terms, without impairing its obligation.

By the revolution, the duties, as well as the powers, of government devolved on the people of New-Hampshire. It is admitted, that among the latter was comprehended the transcendent power of parliament, as well as that of the executive department. It is too clear to require the support of argument, that all contracts, and rights, respecting property, remained unchanged by the revolution. The obligations then, which were created by the charter to Dartmouth College, were the same in the new, that they had been in the old government. The power of the government was also the same. A repeal of this charter at any time prior to the adoption of the present constitution of the United States, would have been an extraordinary and unprecedented act of power, but one which could have been contested only by the restrictions upon the legislature, to be found in the constitution of the State. But the constitution of the United States has imposed this additional li-

*1819.*

*Dartmouth College v. Woodward.*

The acts of New-Hampshire, of the 27th of June, and 13th and 26th of December, 1816, impair the obligation of the charter of Dartmouth College.

1819.

Dartmouth
College
v.
Woodward.

mitation, that the legislature of a State shall pass no act " impairing the obligation of contracts."

It has been already stated, that the act " to amend the charter, and enlarge and improve the corporation of Dartmouth College," increases the number of trustees to twenty-one, gives the appointment of the additional members to the executive of the State, and creates a board of overseers, to consist of twenty-five persons, of whom twenty-one are also appointed by the executive of New-Hampshire, who have power to inspect and control the most important acts of the trustees.

On the effect of this law, two opinions cannot be entertained. Between acting directly, and acting through the agency of trustees and overseers, no essential difference is perceived. The whole power of governing the college is transferred from trustees appointed according to the will of the founder, expressed in the charter, to the executive of New-Hampshire. The management and application of the funds of this eleemosynary institution, which are placed by the donors in the hands of trustees named in the charter, and empowered to perpetuate themselves, are placed by this act under the control of the government of the State. The will of the State is substituted for the will of the donors, in every essential operation of the college. This is not an immaterial change. The founders of the college contracted, not merely for the perpetual application of the funds which they gave, to the objects for which those funds were given; they contracted also, to secure that application by the constitution of the cor-

poration. They contracted for a system, which should, as far as human foresight can provide, retain forever the government of the literary institution they had formed, in the hands of persons approved by themselves. This system is totally changed. The charter of 1769 exists no longer. It is reorganized; and reorganized in such a manner, as to convert a literary institution, moulded according to the will of its founders, and placed under the control of private literary men, into a machine entirely subservient to the will of government. This may be for the advantage of this college in particular, and may be for the advantage of literature in general; but it is not according to the will of the donors, and is subversive of that contract, on the faith of which their property was given.

In the view which has been taken of this interesting case, the Court has confined itself to the rights possessed by the trustees, as the assignees and representatives of the donors and founders, for the benefit of religion and literature. Yet it is not clear, that the trustees ought to be considered as destitute of such beneficial interest in themselves, as the law may respect. In addition to their being the legal owners of the property, and to their having a freehold right in the powers confided to them, the charter itself countenances the idea, that trustees may also be tutors with salaries. The first president was one of the original trustees; and the charter provides, that in case of vacancy in that office, " the senior professor or tutor, *being one of the trustees*, shall exercise the office of president, until the trustees shall make choice

*1819.*

*Dartmouth College v. Woodward.*

*It seems, that the trustees of Dartmouth College have a beneficial interest therein.*

1819.

Dartmouth
College
v.
Woodward.

of, and appoint a president." According to the tenor of the charter, then, the trustees might, without impropriety, appoint a president and other professors from their own body. This is a power not entirely unconnected with an interest  Even if the proposition of the counsel for the defendant were sustained ; if it were admitted, that those contracts only are protected by the constitution, a beneficial interest in which is vested in the party, who appears in Court to assert that interest ; yet it is by no means clear, that the trustees of Dartmouth College have no beneficial interest in themselves.

But the Court has deemed it unnecessary to investigate this particular point, being of opinion, on general principles, that in these private eleemosynary institutions, the body corporate, as possessing the whole legal and equitable interest, and completely representing the donors, for the purpose of executing the trust, has rights which are protected by the constitution.

It results from this opinion, that the acts of the legislature of New-Hampshire, which are stated in the special verdict found in this cause, are repugnant to the constitution of the United States ; and that the judgment on this special verdict ought to have been for the plaintiffs. The judgment of the State Court must, therefore, be reversed.

Mr. Justice WASHINGTON.—This cause turns upon the validity of certain laws of the State of New-Hampshire, which have been stated in the case, and which, it is contended by the counsel for the plaintiffs

1819.

Dartmouth
College
v.
Woodward.

in error, are void, being repugnant to the constitution of that State, and also to the constitution of the United States. Whether the first objection to these laws be well founded or not, is a question with which this Court, in this case, has nothing to do : because it has no jurisdiction, as an appellate Court, over the decisions of a State Court, except in cases where is drawn in question the validity of a treaty, or statute of, or an authority exercised under, the United States, and the decision is against their validity ; or where is drawn in question the validity of a statute of, or an authority exercised under, any State, on the ground of their being repugnant to the constitution, treaties, or laws of the United States, and the decision is in *favour* of their validity ; or where is drawn in question the construction of any clause of the constitution, or of a treaty, or statute of, or commission held under, the United States, and the decision is *against* the title, right, privilege, or exemption specially set up or claimed by either party, under such clause of the said constitution, treaty, statute, or commission.

The clause in the constitution of the United States which was drawn in question in the Court from whence this transcript has been sent, is that part of the tenth section of the first article, which declares, that "no State shall pass any bill of attainder, ex post facto law, or any law *impairing the obligation of contracts.*" The decision of the State Court is against the title specially claimed by the plaintiffs in error, under the above clause, because they contend, that the laws of New-Hampshire, above referred to,

1819.

Dartmouth
College
v.
Woodward.

impair the obligation of a contract, and are, conse-quently, repugnant to the above clause of the consti-tution of the United States, and void.

There are, then, two questions for this court to decide :

1st. Is the charter granted to Dartmouth College on the 13th of December, 1769, to be considered as a contract ? If it be, then, 2dly. Do the laws in ques-tion impair its obligation ?

A grant is a contract.

1. What is a contract ? It may be defined to be a transaction between two or more persons, in which each party comes under an obligation to the other, and each reciprocally acquires a right to whatever is promised by the other.[a] Under this definition, says Mr. Powell, it is obvious, that every feoffment, gift, grant, agreement, promise, &c. may be included, be-cause in all there is a mutual consent of the minds of the parties concerned in them, upon an agreement between them respecting some property or right that is the object of the stipulation. He adds, that the ingredients requisite to form a contract, are, parties, consent, and an obligation to be created or dissolved : these must all concur, because the regular effect of all contracts is on one side to acquire, and on the other to part with, some property or rights ; or to abridge, or to restrain natural liberty, by binding the parties to do, or restraining them from doing, some-thing which before they might have done, or omitted. If a doubt could exist that a grant is a contract, the point was decided in the case of Fletcher v. Peck,[b]

a. *Powell on Contr.* 6.      b  *6 Cranch,* 87.

in which it was laid down, that a contract is either executory or executed; by the former, a party binds himself to do or not to do a particular thing; the latter is one in which the object of the contract is performed, and this differs in nothing from a grant; but whether executed or executory, they both contain obligations binding on the parties, and both are equally within the provisions of the constitution of the United States, which forbids the State governments to pass laws impairing the obligation of contracts.

If, then, a grant be a contract, within the meaning of the constitution of the United States, the next inquiry is, whether the creation of a corporation by charter, be such a grant, as includes an obligation of the nature of a contract, which no State legislature can pass laws to impair?

A corporation is defined by Mr. Justice Blackstone[a] to be a franchise. It is, says he, " a franchise for a number of persons, to be incorporated and exist as a body politic, with a power to maintain perpetual succession, and to do corporate acts, and each individual of such corporation is also said to have a franchise, or freedom." This franchise, like other franchises, is an incorporeal hereditament, issuing out of something real or personal, or concerning or annexed to, and exercisable within a thing corporate. To this grant, or this franchise, the parties are, the king, and the persons for whose benefit it is created, or trustees for them. The assent of both is neces-

1819.

Dartmouth College v. Woodward.

The creation of a private corporation by charter, is such a grant as includes the obligation of a contract, which no State legislature can pass laws to impair.

a 2 Bl. Com. 37.

sary. The subjects of the grant are not only privi-leges and immunities, but property, or, which is the same thing, a capacity to acquire and to hold property in perpetuity. Certain obligations are created, binding both on the grantor and the grantees. On the part of the former, it amounts to an extinguishment of the king's prerogative to bestow the same identical franchise on another corporate body, because it would prejudice his prior grant.[a] It implies, therefore, a contract not to reassert the right to grant the franchise to another, or to impair it. There is also an implied contract, that the founder of a private charity, or his heirs, or other persons appointed by him for that purpose, shall have the right to visit, and to govern the corporation, of which he is the acknowledged founder and patron, and also, that in case of its dissolution, the reversionary right of the founder to the property, with which he had endowed it, should be preserved inviolate.

The rights acquired by the other contracting party are those of having perpetual succession, of suing and being sued, of purchasing lands for the benefit of themselves and their successors, and of having a common seal, and of making bye-laws. The obligation imposed upon them, and which forms the consideration of the grant, is that of acting up to the end or design for which they were created by their founder. Mr. Justice Buller, in the case of the King v. Passmore,[b] says, that the grant of incorporation is a compact between the crown and a number of persons, the latter of whom undertake, in consideration

---

*a* 2 *Bl. Com.* 37.          *b* 3 *T. R.* 246.

of the privileges bestowed, to exert themselves for the good government of the place. If they fail to perform their part of it, there is an end of the compact. The charter of a corporation, says Mr. Justice Blackstone,[a] may be forfeited through negligence, or abuse of its franchises, in which case the law judges, that the body politic has broken the condition upon which it was incorporated, and thereupon the corporation is void.

It appears to me, upon the whole, that these principles and authorities prove, incontrovertibly, that a charter of incorporation is a contract.

2. The next question is, do the acts of the legislature of New-Hampshire of the 27th of June, and 18th and 26th of December, 1816, impair this contract, within the true intent and meaning of the constitution of the United States?

Previous to the examination of this question, it will be proper clearly to mark the distinction between the different kinds of lay aggregate corporations, in order to prevent any implied decision by this Court of any other case, than the one immediately before it.

We are informed, by the case of Philips v. Bury,[b] which contains all the doctrine of corporations connected with this point, that there are two kinds of corporations aggregate, viz. such as are for public government, and such as are for private charity. The first are those for the government of a town, city, or the like; and being for public advantage, are

1819.<br>Dartmouth College v. Woodward.

Distinction between public and private corporations.

a 2 Bl. Com. 484.    b 1 Ld. Raym. 5. S. C. 2 T. R. 346.

to be governed according to the law of the land. The validity and justice of their private laws and constitutions are examinable in the king's Courts. Of these there are no particular founders, and consequently no particular visitor. There are no patrons of these corporations. But private and particular corporations for charity, founded and endowed by private persons, are subject to the private government of those who erect them, and are to be visited by them or their heirs, or such other persons as they may appoint. The only rules for the government of these private corporations are the laws and constitutions assigned by the founder. This right of government and visitation arises from the property which the founder had in the lands assigned to support the charity; and, as he is the author of the charity, the law invests him with the necessary power of inspecting and regulating it. The authorities are full to prove, that a college is a private charity, as well as a hospital, and that there is, in reality, no difference between them, except in degree; but they are within the same reason, and both eleemosynary.

These corporations, civil and eleemosynary, which differ from each other so especially in their nature and constitution, may very well differ in matters which concern their rights and privileges, and their existence and subjection to public control. The one is the mere creature of public institution, created exclusively for the public advantage, without other endowments than such as the king or government may bestow upon it, and having no other founder or visitor than the king or government, the *fundator incipiens*.

The validity and justice of its laws and constitution
are examinable by the Courts having jurisdiction over
them ; and they are subject to the general law of the
land. It would seem reasonable, that such a corpo-
ration may be controlled, and its constitution altered
and amended by the government, in such manner as
the public interest may require. Such legislative
interferences cannot be said to impair the contract
by which the corporation was formed, because there
is in reality but one party to it, the trustees or go-
vernors of the corporation being merely the trustees
for the public, the *cestui que trust* of the foundation.
These trustees or governors have no interest, no pri-
vileges or immunities, which are violated by such in-
terference, and can have no more right to complain of
them, than an ordinary trustee, who is called upon in
a Court of Equity to execute the trust. They accept-
ed the charter for the public benefit alone, and there
would seem to be no reason why the government,
under proper limitations, should not alter or modify
such a grant at pleasure. But the case of a private cor-
poration is entirely different. That is the creature of
private benefaction for a charity or private purpose. It
is endowed and founded by private persons, and sub-
ject to their control, laws, and visitation, and not to
the general control of the government ; and all these
powers, rights and privileges, flow from the property
of the founder in the funds assigned for the support
of the charity. Although the king, by the grant of
the charter, is in some sense the founder of all
eleemosynary corporations, because without his
grant they cannot exist ; yet the patron or endower
is the perficient founder, to whom belongs, as of

1819.

Dartmouth
College
v.
Woodward.

right, all the powers and privilege, which have been described. With such a corporation, it is not competent for the legislature to interfere. It is a franchise, or incorporeal hereditament, founded upon private property, devoted by its patron to a private charity of a peculiar kind, the offspring of his own will and pleasure, to be managed and visited by persons of his own appointment, according to such laws and regulations as he, or the persons so selected, may ordain.

It has been shown, that the charter is a contract on the part of the government, that the property with which the charity is endowed, shall be for ever vested in a certain number of persons, and their successors, to subserve the particular purposes designated by the founder, and to be managed in a particular way. If a law increases or diminishes the number of the trustees, they are not the persons which the grantor agreed should be the managers of the fund. If it appropriate the fund intended for the support of a particular charity to that of some other charity, or to an entirely different charity, the grant is in effect set aside, and a new contract substituted in its place; thus disappointing completely the intentions of the founder, by changing the objects of his bounty. And can it be seriously contended, that a law, which changes so materially the terms of a contract, does not impair it? In short, does not every alteration of a contract, however unimportant, even though it be manifestly for the interest of the party objecting to it, impair its obligation? If the assent of all the parties to be bound by a contract be of its essence, how

is it possible that a new contract, substituted for, or engrafted on another, without such assent, should not violate the old charter?

This course of reasoning, which appears to be perfectly manifest, is not without authority to support it. Mr. Justice Blackstone lays it down,[a] that the same identical franchise, that has been before granted to one, cannot be bestowed on another; and the reason assigned is, that it would prejudice the former grant. In the King v. Passmore,[b] Lord Kenyon says, that an existing corporation cannot have another charter obtruded upon it by the crown. It may reject it, or accept the whole, or any part of the new charter. The reason is obvious. A charter is a contract, to the validity of which the consent of both parties is essential, and, therefore, it cannot be altered or added to without such consent.

But the case of Terrett v. Taylor,[c] fully supports the distinction above stated, between civil and private corporations, and is entirely in point. It was decided in that case, that a private corporation, created by the legislature, may lose its franchises by misuser, or nonuser, and may be resumed by the government under a judicial judgment of forfeiture. In respect to public corporations which exist only for public purposes, such as towns, cities, &c. the legislature may, under proper limitations, change, modify, enlarge, or restrain them, securing, however, the property for the use of those for whom, and at whose expense, it was purchased. But it is denied, that it has power to repeal

a 2. Bl. Com. 37.    b 3 T. R. 246.    c 9 Cranch, 43.

1819.

Dartmouth
College
v.
Woodward.

statutes creating private corporations, or confirming to them property already acquired under the faith of previous laws; and that it can, by such repeal, vest the property of such corporations in the State, or dispose of the same to such purposes as it may please, without the consent or default of the corporators. Such a law, it is declared, would be repugnant both to the spirit and the letter of the constitution of the United States.

The obligations of the charter of Dartmouth College, are impaired by the laws in question.

If these principles, before laid down, be correct, it cannot be denied, that the obligations of the charter to Dartmouth College are impaired by the laws under consideration. The name of the corporation, its constitution and government, and the objects of the founder, and of the grantor of the charter, are totally changed. By the charter, the property of this founder was vested in twelve trustees, and no more, to be disposed of by them, or a majority, for the support of a college, for the education and instruction of the Indians, and also of English youth, and others. Under the late acts, the trustees and visitors are different; and the property and franchises of the college are transferred to different and new uses, not contemplated by the founder. In short, it is most obvious, that the *effect* of these laws is to abolish the old corporation, and to create a new one in its stead. The laws of Virginia, referred to in the case of Terrett v. Taylor, authorized the overseers of the poor to sell the glebes belonging to the Protestant Episcopal Church, and to appropriate the proceeds to other uses. The laws in question devest the trustees of Dartmouth College of the property vested in them

by the founder, and vest it in other trustees, for the support of a different institution, called Dartmouth University. In what respects do they differ? Would the difference have been greater in principle, if the law had appropriated the funds of the college to the making of turnpike roads, or to any other purpose of a public nature? In all respects, in which the contract has been altered without the assent of the corporation, its obligations have been impaired; and the degree can make no difference in the construction of the above provision of the constitution.

It has been insisted in the argument at the bar, that Dartmouth College was a mere civil corporation, created for a public purpose, the public being deeply interested in the education of its youth; and that, consequently, the charter was as much under the control of the government of New-Hampshire, as if the corporation had concerned the government of a town or city. But it has been shown, that the authorities are all the other way. There is not a case to be found which contradicts the doctrine laid down in the case of Philips v. Bury, viz. that a college founded by an individual, or individuals, is a private charity, subject to the government and visitation of the founder, and not to the unlimited control of the government.

It is objected, in this case, that Dr. Wheelock is not the founder of Dartmouth College. Admit he is not. How would this alter the case? Neither the king, nor the province of New-Hampshire was the founder; and if the contributions made by the governor of New-Hampshire, by those persons who

granted lands for the college, in order to induce its location in a particular part of the State, by the other liberal contributors in England and America, bestow upon them claims equal with Dr. Wheelock, still it would not alter the nature of the corporation, and convert it into one for public government. It would still be a private eleemosynary corporation, a private charity endowed by a number of persons, instead of a single individual. But the fact is, that whoever may mediately have contributed to swell the funds of this charity, they were bestowed at the solicitation of Dr. Wheelock, and vested in persons appointed by him, for the use of a charity, of which he was the immediate founder, and is so styled in the charter.

Upon the whole, I am of opinion, that the above acts of New-Hampshire, not having received the assent of the corporate body of Dartmouth College, are not binding on them, and, consequently, that the judgment of the State Court ought to be reversed.

Mr. Justice JOHNSON concurred, for the reasons stated by the Chief Justice.

Mr. Justice LIVINGSTON concurred, for the reasons stated by the Chief Justice, and Justices WASHINGTON and STORY.

Mr. Justice STORY. This is a cause of great importance, and as the very learned discussions, as well here, as in the State Court, show, of no inconsiderable difficulty. There are two questions, to which the appellate jurisdiction of this Court properly applies.

1. Whether the original charter of Dartmouth College is a contract within the prohibitory clause of the constitution of the United States, which declares, that no State shall pass any " law impairing the obligation of contracts." 2. If so, whether the legislative acts of New-Hampshire of the 27th of June, and of the 18th and 27th of December, 1816, or any of them, impair the obligations of that charter.

It will be necessary, however, before we proceed to discuss these questions, to institute an inquiry into the nature, rights, and duties of aggregate corporations at common law; that we may apply the principles, drawn from this source, to the exposition of this charter, which was granted emphatically with reference to that law.

An aggregate corporation at common law is a collection of individuals united into one collective body, under a special name, and possessing certain immunities, privileges, and capacities in its collective character, which do not belong to the natural persons composing it. Among other things it possesses the capacity of perpetual succession, and of acting by the collected vote or will of its component members, and of suing and being sued in all things touching its corporate rights and duties. It is, in short, an artificial person, existing in contemplation of law, and endowed with certain powers and franchises which, though they must be exercised through the medium of its natural members, are yet considered as subsisting in the corporation itself, as distinctly as if it were a real personage. Hence, such a corporation may sue and be sued by its own members; and

may contract with them in the same manner as with any strangers.[a] A great variety of these corporations exist in every country governed by the common law; in some of which the corporate existence is perpetuated by new elections, made from time to time; and in others by a continual accession of new members, without any corporate act. Some of these corporations are, from the particular purposes to which they are devoted, denominated spiritual, and some lay; and the latter are again divided into civil and eleemosynary corporations. It is unnecessary, in this place, to enter into any examination of civil corporations. Eleemosynary corporations are such as are constituted for the perpetual distribution of the free alms and bounty of the founder, in such manner as he has directed; and in this class are ranked hospitals for the relief of poor and impotent persons, and colleges for the promotion of learning and piety, and the support of persons engaged in literary pursuits.[b]

Another division of corporations is into public and private. Public corporations are generally esteemed such as exist for public political purposes only, such as towns, cities, parishes, and counties; and in many respects they are so, although they involve some private interests; but strictly speaking, public corpora-

a 1 Bl. Com. 469. 475. 1 Kyd Corp. 13. 69. 189. 1 Woodes. 471. &c. &c.

b 1 Bl. Com. 469. 470. 471. 482. 1 Kyd Corp. 25. 1 Woodes. 474. Attorney General v. Whorwood, 1 Ves. 534. St. John's College v. Todington, 1 Bl. Rep. 84. S. C. 1 Bur. 200. Phillips v. Bury, 1 Ld. Raym. 5. S. C. 2 T. R. 346. Porter's Case, 1 Co. 22. b. 23.

1819.

Dartmouth
College
v.
Woodward.

tions are such only as are founded by the government for public purposes, where the whole interests belong also to the government. If, therefore, the foundation be private, though under the charter of the government, the corporation is private, however extensive the uses may be to which it is devoted, either by the bounty of the founder, or the nature and objects of the institution. For instance, a bank created by the government for its own uses, whose stock is exclusively owned by the government, is, in the strictest sense, a public corporation. So a hospital created and endowed by the government for general charity. But a bank, whose stock is owned by private persons, is a private corporation, although it is erected by the government, and its objects and operations partake of a public nature. The same doctrine may be affirmed of insurance, canal, bridge, and turnpike companies. In all these cases, the uses may, in a certain sense, be called public, but the corporations are private; as much so, indeed, as if the franchises were vested in a single person.

This reasoning applies in its full force to eleemosynary corporations. A hospital founded by a private benefactor is, in point of law, a private corporation, although dedicated by its charter to general charity. So a college, founded and endowed in the same manner, although, being for the promotion of learning and piety, it may extend its charity to scholars from every class in the community, and thus acquire the character of a public institution. This is the unequivocal doctrine of the authorities; and cannot be

shaken but by undermining the most solid founda-- tions of the common law.[a]

It was indeed supposed at the argument, that if the uses of an eleemosynary corporation be for general charity, this alone would constitute it a public corporation. But the law is certainly not so. To be sure, in a certain sense, every charity, which is extensive in its reach, may be called a public charity, in contradistinction to a charity embracing but a few definite objects. In this sense the language was unquestionably used by Lord Hardwicke in the case cited at the argument;[b] and, in this sense, a private corporation *may well enough be denominated a public charity.* So it would be, if the endowment, instead of being vested in a corporation, were assigned to a private trustee; yet in such a case no one would imagine that the trust ceased to be private, or the funds became public property. That the mere act of incorporation will not change the charity from a private to a public one, is most distinctly asserted in the authorities. Lord Hardwicke, in the case already alluded to, says, " the charter of the crown cannot make a charity more or less public, but only more permanent than it would otherwise be; but it is the extensiveness, which will constitute it a public one. A devise to the poor of the parish is a public charity. Where testators leave it to the discretion of a trustee to choose out the objects, though each particular

---

*a* Phillips v. Bury, 1 *Ld. Ray.* 5. 9. S. C. 2 *T. R.* 346.

*b* Attorney General v. Pearse, 2 *Atk.* 87. 1 *Bac. Abr. tit. Charitable Uses,* E. 589.

object may be said to be private, yet in the extensiveness of the benefit accruing from them, they may properly be called public charities. A sum to be disposed of by A. B. and his executors, at their discretion, among poor house-keepers, is of this kind." The charity, then, may, in this sense, be public, although it may be administered by private trustees; and, for the same reason, it may thus be public, though administered by a private corporation. The fact, then, that the charity is public, affords no proof that the corporation is also public; and, consequently, the argument, so far as it is built on this foundation, falls to the ground. If, indeed, the argument were correct, it would follow, that almost every hospital and college would be a public corporation; a doctrine utterly irreconcilable with the whole current of decisions since the time of Lord Coke.[a]

When, then, the argument assumes, that because the charity is public, the corporation is public, it manifestly confounds the popular, with the strictly legal sense of the terms. And if it stopped here, it would not be very material to correct the error. But it is on this foundation, that a superstructure is erected, which is to compel a surrender of the cause. When the corporation is said at the bar to be public, it is not merely meant, that the whole community may be the proper objects of the bounty, but that the government have the sole right, as trustees of the public interests, to regulate, control, and direct the corporation, and its funds and its franchises, at its own good will and pleasure. Now, such

---

[a] The case of Sutton's Hospital, 10 Co. 23.

1819.

Dartmouth
College
v.
Woodward.

an authority does not exist in the government, except where the corporation is in the strictest sense public; that is, where its whole interests and franchises are the exclusive property and domain of the government itself. If it had been otherwise, Courts of law would have been spared many laborious adjudications in respect to eleemosynary corporations, and the visitatorial powers over them, from the time of Lord Holt down to the present day.[a] Nay, more, private trustees for charitable purposes would have been liable to have the property confided to their care taken away from them without any assent or default on their part, and the administration submitted, not to the control of law and equity, but to the arbitrary discretion of the government. Yet, who ever thought before, that the munificent gifts of private donors for general charity became instantaneously the property of the government; and that the trustees appointed by the donors, whether corporate or unincorporated, might be compelled to yield up their rights to whomsoever the government might appoint to administer them? If we were to establish such a principle, it would extinguish all future eleemosynary endowments; and we should find as little of public policy, as we now find of law to sustain it.

An eleemosynary corporation, then, upon a private foundation, being a private corporation, it is next to be considered, what is deemed a foundation,

a Rex v. Bury, 1 Ld. Ray. 5. S. C. Comb. 265. Holt, 715. 1 Show. 360. 4 Mod. 106. Skin. 447. and Ld. Holt's opinion from his own MS. in 2 T. R. 346.

and who is the founder. This cannot be stated with more brevity and exactness than in the language of the elegant commentator upon the laws of England: " The founder of all corporations (says Sir William Blackstone,) in the strictest and original sense, is the king alone, for he only can incorporate a society; and in civil corporations, such as mayor, commonalty, &c. where there are no possessions or endowments given to the body, there is no other founder but the king; but in eleemosynary foundations, such as colleges and hospitals, where there is an endowment of lands, the law distinguishes and makes two species of foundation, the one *fundatio incipiens*, or the incorporation, in which sense the king is the general founder of all colleges and hospitals; the other *fundatio perficiens*, or the dotation of it, in which sense the first gift of the revenues is the foundation, and he who gives them is, in the law, the founder; and it is in this last sense we generally call a man the founder of a college or hospital." [a]

To all eleemosynary corporations a visitatorial power attaches, as a necessary incident; for these corporations being composed of individuals, subject to human infirmities, are liable, as well as private persons, to deviate from the end of their institution. The law, therefore, has provided, that there shall somewhere exist a power to visit, inquire into, and correct all irregularities and abuses in such corporations, and to compel the original purposes of the charity to be faithfully fulfilled.[b] The nature and extent of this visitatorial power has been expounded

1819.
Dartmouth College v. Woodward.

a 1 *Bl. Com.* 480. 10 *Co.* 33.    b 1 *Bl. Com.* 480.

1819.

Dartmouth
College
v.
Woodward.

with admirable fulness and accuracy by Lord Holt in one of his most celebrated judgments.[a]   And of common right by the dotation the founder and his heirs are the legal visitors, unless the founder has appointed and assigned another person to be visitor. For the founder may, if he please, at the time of the endowment, part with his visitatorial power, and the person to whom it is assigned will, in that case, possess it in exclusion of the founder's heirs.[b] This visitatorial power is, therefore, an hereditament founded in property, and valuable in intendment of law; and stands upon the maxim, that he who gives his property, has a right to regulate it in future. It includes also the legal right of patronage, for as Lord Holt justly observes, " patronage and visitation are necessary consequents one upon another." No technical terms are necessary to assign or vest the visitatorial power; it is sufficient if, from the nature of the duties to be performed by particular persons under the charter, it can be inferred, that the founder meant to part with it in their favour; and he may divide it among various persons, or subject it to any modifications or control, by the fundamental statutes of the corporation.   But where the appointment is given in general terms, the whole power vests in the appointee.[c]   In the construction

a Phillips v. Bury, 1 Ld. Ray. 5.   S. C. 2 T. R. 346.

b 1 Bl. Com. 482.

c Eden v. Foster, 2 P. W. 325.   Attorney General v. Middleton, 2 Ves. 327.   St. Johns College v. Todington, 1 Bl. Rep. 84.   S. C. 2 Bur. 200.   Attorney General v. Clare College, 3 Atk. 662.   S. C. 1 Ves. 78.

1819.

Dartmouth
College
v.
Woodward.

of charters too, it is a general rule, that if the objects of the charity are incorporated, as for instance, the master and fellows of a college, or the master and poor of a hospital, the visitatorial power, in the absence of any special appointment, silently vests in the founder and his heirs. But where trustees or governors are incorporated to manage the charity, the visitatorial power is deemed to belong to them in their corporate character.[a]

When a private eleemosynary corporation is thus created by the charter of the crown, it is subject to no other control on the part of the crown, than what is expressly or implicitly reserved by the charter itself. Unless a power be reserved for this purpose, the crown cannot, in virtue of its prerogative, without the consent of the corporation, alter or amend the charter, or devest the corporation of any of its franchises, or add to them, or add to, or diminish, the number of the trustees, or remove any of the members, or change, or control the administration of the charity, or compel the corporation to receive a new charter. This is the uniform language of the authorities, and forms one of the most stubborn, and well settled doctrines of the common law.[b]

But an eleemosynary, like every other corporation, is subject to the general law of the land. It may forfeit its corporate franchises, by misuser or nonuser

a Phillips v. Bury, 1 *Ld. Ray.* 5. S. C. 2 *T. R.* 346. Green v. Rutherforth, 1 *Ves.* 472. Attorney General v. Middleton, 2 *Ves.* 327. Case of Sutton Hospital, 10 *Co.* 23. 31.

b See Rex v. Passmore, 3 *T. R.* 199. and the cases there cited.

of them. It is subject to the controling authority of its legal visitor, who, unless restrained by the terms of the charter, may amend and repeal its statutes, remove its officers, correct abuses, and generally superintend the management of the trusts. Where indeed the visitatorial power is vested in the trustees of the charity in virtue of their incorporation, there can be no amotion of them from their corporate capacity. But they are not, therefore, placed beyond the reach of the law. As managers of the revenues of the corporation, they are subject to the general superintending power of the Court of Chancery, not as itself possessing a visitatorial power, or a right to control the charity, but as possessing a general jurisdiction in all cases of an abuse of trusts to redress grievances, and suppress frauds.[a] And where a corporation is a mere trustee of a charity, a Court of equity will go yet farther; and though it cannot appoint or remove a corporator, it will yet, in a case of

---

a 2 Fonb. Eq. B. 2. pt. 2. ch. 1. s. 1. note (a.)　Coop. Eq. Pl. 292.　2 Kyd Corp. 195.　Green v. Rutherforth, 1 Ves. 462.　Attorney General v. Foundling Hospital, 4 Bro. Ch. 165. S. C. 2 Ves. jun. 42. Eden v. Foster, 2 P. W. 325. 1 Woodes. 476.　Attorney General v. Price, 3 Atk. 108.　Attorney General v. Lock, 3 Atk. 164.　Attorney General v. Dixie, 13 Ves. 519.　Ex parte Kirkby Ravensworth Hospital, 15 Ves. 304. 314.　Attorney General v. Earl of Clarendon, 17 Ves. 491. 499.　Berkhamsterd Free School, 2 Ves. & Beames, 134.　Attorney General v. Corporation of Carmarthen, Coop. Rep. 30. Mayor, &c. of Colchester v. Lowten, 1 Ves. & Beames, 226. Rex v. Watson, 2 T. R. 199.　Attorney General v. Utica Ins. Co. 2 Johns. Ch. R. 371.　Attorney General v. Middleton, 2 Ves. 327.

gross fraud, or abuse of trust, take away the trust from the corporation, and vest it in other hands.[a]

Thus much it has been thought proper to premise respecting the nature, rights, and duties of eleemosynary corporations, growing out of the common law. We may now proceed to an examination of the original charter of Dartmouth College.

It begins by a recital, among other things, that the Rev. Eleazer Wheelock, of Lebanon, in Connecticut, about the year 1754, at his own expense, on his own estate, set on foot an Indian charity school; and by the assistance of other persons, educated a number of the children of the Indians, and employed them as missionaries and schoolmasters among the savage tribes; that the design became reputable among the Indians, so that more desired the education of their children at the school, than the contributions in the American colonies would support; that the said Wheelock thought it expedient to endeavour to procure contributions in England, and requested the Rev. Nathaniel Whitaker to go to England as his attorney, to solicit contribution, and also solicited the Earl of Dartmouth, and others, to receive the contributions and become trustees thereof, which they cheerfully agreed to, and he constituted them trustees accordingly by a power of attorney, and they testified their acceptance by a sealed instrument; *That the said Wheelock also authorized the trustees to fix and de-*

a Mayor, &c. of Coventry v. Attorney General, 7 *Bro. Parl. Cases,* 235. Attorney General v. Earl of Clarendon, 17 *Ves.* 491. 499.

1819.
Dartmouth
College
v.
Woodward.

*termine upon the place for the said school;* and, to enable them understandingly to give the preference, laid before them, the several offers of the governments in America, inviting the settlement of the school among them ; that a large number of the proprietors of lands, in the western parts of New-Hampshire, to aid the design ; and *considering that the same school might be enlarged and improved to promote learning among the English,* and to supply the churches there with an orthodox ministry, promised large tracts of land for the uses aforesaid, *provided the school should be settled in the western part of said province;* that the trustees thereupon gave a preference to the western part of said province, lying on Connecticut river, as a situation most convenient for said school: *That the said Wheelock further represented the necessity for a legal incorporation, in order to the safety and well-being of said seminary, and its being capable of the tenure and diposal of lands and bequests for the use of the same ;* that in the infancy of said institution, *certain gentlemen whom he had already nominated in his last will* (which he had transmitted to the trustees in England) *to be trustees in America, should be the corporation now proposed ;* and lastly, *that there were already large contributions for said school in the hands of the trustees in England,* and further success might be expected ; for which reason the said Wheelock desired they might be invested with all that power therein, which could consist with their distance from the same. The charter, after these recitals, declares, that the king, *considering the premises,* and being willing to

encourage the charitable design, and that the best means of education might be established in New-Hampshire for the benefit thereof, does, of his *special grace, certain knowledge*, and *mere motion*, ordain and grant, that there be a college erected in New-Hampshire, by the name of Dartmouth College, for the education and instruction of youth of the Indian tribes, *and also of English youth and others ;* that *the trustees of said college shall be a corporation forever, by the name of the trustees of Dartmouth College*: that the then governor of New-Hampshire, the said Wheelock, and ten other persons, specially named in the charter, shall be trustees of the said college, and that *the whole number of trustees shall forever thereafter consist of twelve, and no more ;* that the said corporation shall have power to sue and to be sued by their corporate name, and to acquire and hold for *the use of the said Dartmouth College*, lands, tenements, hereditaments, and franchises; to receive, purchase, and build any houses for *the use of said college*, in such town in the western part of New-Hampshire, as the trustees, or a major part of them, shall by a written instrument agree on ; and to receive, accept, and dispose of any lands, goods, chattels, rents, gifts, legacies, &c. &c. not exceeding the yearly value of 6,000*l*. It further declares, that the trustees, or a major part of them, regularly convened, (*for which purpose seven shall form a quorum*,) shall have authority to appoint and remove the professors, tutors, and other officers of the college, and to pay them, and also such *missionaries* and *schoolmasters* as shall be employed by *the trustees for instructing the Indians*, salaries and

1819.

Dartmouth
College
v.
Woodward.

allowances, as well as other corporate expenses, out of the corporate funds. It further declares, that, *the said trustees,* as often as one or more of the trustees shall die, or, by removal or-otherwise, shall, according to their judgment, become unfit or incapable to serve the interests of the college, shall have power *to elect and appoint other trustees* in their stead, so that when the whole number shall be complete of *twelve trustees, eight* shall be resident freeholders of New-Hampshire, and *seven* of the whole number, laymen. It further declares that the trustees shall have power from time to time to make and establish rules, ordi-nances, and laws for the government of the college not repugnant to the laws of the land, and to confer collegiate degrees. It further appoints the said Whee-lock, whom it denominates "the FOUNDER of the college," to be president of the college, with autho-rity to appoint his successor, who shall be president until disapproved of by the trustees. It then con-cludes with a direction, that it shall be the duty of the president to transmit to the trustees in England, so long as they should perpetuate their board, and as there should be Indian natives remaining to be pro-per objects of the bounty, an annual account of all the disbursements from the donations in England, and of the general plans and prosperity of the in-stitution.

Such are the most material clauses of the charter. It is observable, in the first place, that no endowment whatever is given by the crown; and no power is re-served to the crown or government in any manner to alter, amend, or control the charter. It is also appa-

rent, from the very terms of the charter, that Dr.
Wheelock is recognized as the founder of the college,
and that the charter is granted upon his application,
and that the trustees were in fact nominated by him.
In the next place it is apparent, that the objects of
the institution are purely charitable, for the distribu-
tion of the private contributions of private benefac-
tors.   The charity was, in the sense already ex-
plained, a public charity, that is, for the general pro-
motion of learning and piety; but in this respect it
was just as much public before, as after the incorpo-
ration.   The only effect of the charter was to give
permanency to the design, by enlarging the sphere
of its action, and granting a perpetuity of corporate
powers and franchises the better to secure the ad-
ministration of the benevolent donations.   As foun-
der, too, Dr. Wheelock and his heirs would have
been completely clothed with the visitatorial power;
but the whole government and control, as well of the
officers as of the revenues of the college, being with
his consent assigned to the trustees in their corpo-
rate character, the visitatorial power, which is in-
cluded in this authority, rightfully devolved on the
trustees.   As managers of the property and reve-
nues of the corporation, they were amenable to the
jurisdiction of the judicial tribunals of the State;
but as visitors, their discretion was limited only by
the charter, and liable to no supervision or control,
at least, unless it was fraudulently misapplied.

From this summary examination it follows, that
Dartmouth College was, under its original charter,
a private eleemosynary corporation, endowed with

1819.

Dartmouth
College
v.
Woodward.

The charter
of Dartmouth
College, is a
contract with-
in that clause
of the constitu-
tion which
prohibits the
States from
passing · any
law impairing
the obligation
of contracts.

the usual privileges and franchises of such corpora-
tions, and, among others, with a legal perpetuity,
and was exclusively under the government and con-
trol of *twelve* trustees, who were to be elected and
appointed, from time to time, by the *existing* board,
as vacancies or removals should occur.          ·

We are now led to the consideration of the first
question in the cause, whether this charter is a con-
tract, within the clause of the constitution prohibit-
ing the States from passing any law impairing the
obligation of contracts.   In the case of Fletcher *v.*
Peck,[a] this Court laid down its exposition of the
word " contract" in this clause, in the following man-
ner :  " A contract is a compact between two or
more persons, and is either executory or executed. An
executory contract is one, in which a party binds
himself to do or not to do a particular thing.   A
contract executed is one in which the object of the
contract is performed ; and this, says Blackstone,
differs in nothing from a grant.   A contract executed,
as well as one that is executory, contains obligations
binding on the parties.   A grant in its own nature
amounts to an extinguishment of the right of the
grantor, and implies a contract not to reassert that
right.   A party is always estopped by his own
grant."   This language is perfectly unambiguous,
and was used in reference to a grant of land by the
Governor of a State under a legislative act.   It de-
termines, in the most unequivocal manner, that the
grant of a State is a contract within the clause of

*a* 6 *Cranch*, 87. 136.

the constitution now in question, and that it implies a contract not to reassume the rights granted. *A fortiori*, the doctrine applies to a charter or grant from the king.

But it is objected, that the charter of Dartmouth College is not a contract contemplated by the constitution, because no valuable consideration passed to the king as an equivalent for the grant, it purporting to be granted *ex mero motu*, and further, that no contracts merely voluntary are within the prohibitory clause. It must be admitted, that mere executory contracts cannot be enforced at law, unless there be a valuable consideration to sustain them; and the constitution certainly did not mean to create any new obligations, or give any new efficacy to nude pacts. But it must, on the other hand, be also admitted, that the constitution did intend to preserve all the obligatory force of contracts, which they have by the general principles of law. Now, when a contract has once passed, *bona fide*, into grant, neither the king nor any private person, who may be the grantor, can recal the grant of the property, although the conveyance may have been purely voluntary. A gift, completely executed, is irrevocable. The property conveyed by it becomes, as against the donor, the absolute property of the donee; and no subsequent change of intention of the donor can change the rights of the donee.[a] And a gift by the crown of incorporeal hereditaments, such as corporate franchises, when executed, comes completely

a 2 *Bl. Com.* 441. *Jenk. Cent.* 104.

within the principle, and is, in the strictest sense of the terms, a grant.[a]  Was it ever imagined that land, voluntarily granted to any person by a State, was liable to be resumed at its own good pleasure ?  Such a pretension would, under any circumstances, be truly alarming ; but in a country like ours, where thousands of land titles had their origin in gratuitous grants of 'the States, it would go far to shake the foundations of the best settled estates.   And a grant of franchises is not, in point of principle, distinguishable from a grant of any other property.   If, therefore, this charter were a pure donation, when the grant was complete, and accepted by the grantees, it involved a contract, that the grantees should hold, and the grantor should not reassume the grant, as much as if it had been founded on the most valuable consideration.

But it is not admitted that this charter was not granted for what the law deems a valuable consideration.   For this purpose it matters not how trifling the consideration may be ; a pepper corn is as good as a thousand dollars.   Nor is it necessary that the consideration should be a benefit to the grantor.   It is sufficient if it import damage or loss, or forbearance of benefit, or any act done, or to be done, on the part of the grantee.   It is unnecessary to state cases ; they are familiar to the mind of every lawyer.[b]

With these principles in view, let us now examine

a  2 Bl Com. 317. 346.   Shep. Touch. ch. 12. p. 227.

b  Pillans v. Van Mierop. per Yates, J. 3 Burr. 1663.   Forth v. Staunton, 2 Saund. Rep. 211.   Williams' note 2, and the cases there cited.

the terms of this charter. It purports, indeed, on its face, to be granted " of the special grace, certain knowledge, and *mere motion*" of the king; but these words were introduced for a very different purpose from that now contended for. It is a general rule of the common law, (the reverse of that applied in ordinary cases,) that a grant of the king, at the *suit of the grantee*, is to be construed most beneficially for the king, and most strictly against the grantee. Wherefore, it is usual to insert in the king's grants a clause, that they are made, not at the suit of the grantee, but of the special grace, certain knowledge, and mere motion of the king; and then they receive a more liberal construction. This is the true object of the clause in question, as we are informed by the most accurate authorities.[a] But the charter also, on its face, purports to be granted in *consideration of the premises* in the introductory recitals. Now, among these recitals it appears, that Dr. Wheelock had founded a charity school at his own expense, on his own estate; that divers contributions had been made in the colonies, by others, for its support; that new contributions had been made, and were making, in England for this purpose, and were in the hands of trustees appointed by Dr. Wheelock to act in his behalf; that Dr. Wheelock had consented to have the school established at such other place as the trustees should select; that offers had been made by several of the governments in America, inviting the

1819.

Dartmouth College v. Woodward.

a 2 *Bl. Com.* 347. *Finch's Law*, 100. 10 *Rep*. 112. 1 *Shep. Abridg*. 136. *Bull, N. P*. 136.

1819.

Dartmouth
College
v.
Woodward.

establishment of the school among them; that offers of land had also been made by divers proprietors of lands in the western parts of New-Hampshire, if the school should be established there; that the trustees had finally consented to establish it in New-Hampshire; and that Dr. Wheelock represented that, to effectuate the purposes of all parties, an incorporation was necessary. Can it be truly said that these recitals contain no legal consideration of benefit to the crown, or of forbearance of benefit on the other side? Is there not an implied contract by Dr. Wheelock, if a charter is granted, that the school shall be removed from his estate to New-Hampshire? and that he will relinquish all his control over the funds collected, and to be collected, in England, under his auspices, and subject to his authority? that he will yield up the management of his charity school to the trustees of the college? that he will relinquish all the offers made by other American governments, and devote his patronage to this institution? It will scarcely be denied, that he gave up the right any longer to maintain the charity school already established on his own estate; and that the funds collected for its use, and subject to his management, were yielded up by him as an endowment of the college. The very language of the charter supposes him to be the legal owner of the funds of the charity school, and, in virtue of this endowment, declares him the founder of the college. It matters not whether the funds were great or small; Dr. Wheelock had procured them by his own influence, and they were under his control, to be applied to the

support of his charity school; and when he relinquished this control he relinquished a right founded in property acquired by his labours.    Besides; Dr. Wheelock impliedly agreed to devote his future services to the college, when erected, by becoming president thereof at a period when sacrifices must necessarily be made to accomplish the great design in view. If, indeed, a pepper corn be, in the eye of the law, of sufficient value to found a contract, as upon a valuable consideration, are these implied agreements, and these relinquishments of right and benefit, to be deemed wholly worthless?  It has never been doubted, that an agreement not to exercise a trade in a particular place was a sufficient consideration to sustain a contract for the payment of money.   *A fortiori,* the relinquishment of property which a person holds, or controls the use of, as a trust, is a sufficient consideration; for it is parting with a legal right.    Even a right of patronage *(jus patronatus)* is of great value in intendment of law.    Nobody doubts, that an advowson is a valuable hereditament; and yet, in fact, it is but a mere trust, or right of nomination to a benefice, which cannot be legally sold to the intended incumbent.[a]

In respect to Dr. Wheelock, then, if a consideration be necessary to support the charter as a contract, it is to be found in the implied stipulations on his part in the charter itself.    He relinquished valuable rights, and undertook a laborious office in consideration of the grant of the incorporation.

a  2 *Bl. Com.* 22. note by Christian.

1819.

Dartmouth
College
v.
Woodward.

This is not all. A charter may be granted upon an executory, as well as an executed or present consideration. When it is granted to persons who have not made application for it, until their acceptance thereof, the grant is yet *in fieri*. Upon the acceptance there is an implied contract on the part of the grantees, in consideration of the charter, that they will perform the duties, and exercise the authorities conferred by it. This was the doctrine asserted by the late learned Mr. Justice Buller, in a modern case.[a] He there said, "I do not know how to reason on this point better than in the manner urged by one of the relator's counsel, who considered the grant of incorporation to be a compact between the crown, and a certain number of the subjects, the latter of whom undertake, in consideration of the privileges which are bestowed, to exert themselves for the good government of the place," (i. e. the place incorporated.) It will not be pretended, that if a charter be granted for a bank, and the stockholders pay in their own funds, the charter is to be deemed a grant without consideration, and, therefore, revocable at the pleasure of the grantor. Yet here, the funds are to be managed, and the services performed exclusively for the use and benefit of the stockholders themselves. And where the grantees are mere trustees to perform services without reward, exclusively for the benefit of others, for public charity, can it be reasonably argued, that these services are less valuable to the government, than if performed for the private emolument of

a Rex v. Passmore, 3 *T. R.* 199. 239. 246

the trustees themselves? In respect then to the trustees also, there was a valuable consideration for the charter, the consideration of services agreed to be rendered by them in execution of a charity, from which they could receive no private remuneration.

There is yet another view of this part of the case, which deserves the most weighty consideration. The corporation was expressly created for the purpose of distributing in perpetuity the charitable donations of private benefactors. By the terms of the charter, the trustees, and their successors, in their corporate capacity, were to receive, hold, and exclusively manage, all the funds so contributed. The crown, then, upon the face of the charter, pledged its faith that the donations of private benefactors should be perpetually devoted to their original purposes, without any interference on its own part, and should be forever administered by the trustees of the corporation, unless its corporate franchises should be taken away by due process of law. From the very nature of the case, therefore, there was an implied contract on the part of the crown with every benefactor, that if he would give his money, it should be deemed a charity protected by the charter, and be administered by the corporation according to the general law of the land. As soon, then, as a donation was made to the corporation, there was an implied contract springing up, and founded on a valuable consideration, that the crown would not revoke, or alter the charter, or change its administration, without the consent of the corporation. There was also an implied contract between the corporation itself, and every benefactor

upon a like consideration, that it would administer his bounty according to the terms, and for the objects stipulated in the charter.

In every view of the case, if a consideration were necessary (which I utterly deny) to make the charter a valid contract, a valuable consideration did exist, as to the founder, the trustees, and the benefactors. And upon the soundest legal principles, the charter may be properly deemed, according to the various aspects, in which it is viewed, as a several, contract with each of these parties, in virtue of the foundation, or the endowment of the college, or the acceptance of the charter, or the donations to the charity.

And here we might pause : but there is yet remaining another view of the subject, which cannot consistently be passed over without notice. It seems to be assumed by the argument of the defendant's counsel, that there is no contract whatsoever, in virtue of the charter, between the crown and the corporation itself. But it deserves consideration, whether this assumption can be sustained upon a solid foundation.

If this had been a new charter granted to an existing corporation, or a grant of lands to an existing corporation, there could not have been a doubt, that the grant would have been an executed contract with the corporation ; as much so, as if it had been to any private person. But it is supposed, that as this corporation was not then in existence, but was created and its franchises bestowed, *uno flatu*, the charter cannot be construed a contract, because there was no person *in rerum natura*, with whom it might be made. Is this, however, a just and legal view of the

subject ? If the corporation had no existence so as to become a contracting party, neither had it for the purpose of receiving a grant of the franchises. The truth is, that there may be a priority of operation of things in the same grant; and the law distinguishes and gives such priority, wherever it is necessary to effectuate the objects of the grant.[a] From the nature of things, the artificial person called a corporation, must be created before it can be capable of taking any thing. When, therefore, a charter is granted, and it brings the corporation into existence without any act of the natural persons who compose it, and gives such corporation any privileges, franchises, or property, the law deems the corporation to be first brought into existence, and then clothes it with the granted liberties and property. When, on the other hand, the corporation is to be brought into existence by some future acts of the corporators, the franchises remain in abeyance, until such acts are done, and when the corporation is brought into life, the franchises instantaneously attach to it. There may be, in intendment of law, a priority of time, even in an instant, for this purpose.[b] And if the corporation have an existence before the grant of its other franchises attaches, what more difficulty is there in deeming the grant of these franchises a contract with it, than if granted by another instrument at a subsequent period ? It behooves those also, who hold, that a grant to a corporation, not then in existence, is in-

a Case of Sutton's Hospital, 10 Co. 23. Buckland v. Fowcher, cited 10 Co. 27, 28. ; and recognized in Attorney General v. Bowyer, 3 Ves. jun. 714. 726, 727. S. P. Highmore on Mortm. 300, &c.

b Ib.

capable of being deemed a contract on that account, to consider, whether they do not at the same time establish, that the grant itself is a nullity for precisely the same reason. Yet such a doctrine would strike us all as pregnant with absurdity, since it would prove that an act of incorporation could never confer any authorities, or rights, or property, on the corporation it created. It may be admitted, that two parties are necessary to form a perfect contract; but it is denied that it is necessary, that the assent of both parties must be at the same time. If the legislature were voluntarily to grant land in fee to the first child of A. to be hereafter born; as soon as such child should be born, the estate would vest in it. Would it be contended, that such grant, when it took effect, was revocable, and not an executed contract, upon the acceptance of the estate? The same question might be asked in a case of a gratuitous grant by the king or the legislature to A. for life, and afterwards to the heirs of B., who is then living. Take the case of a bank, incorporated for a limited period, upon the express condition that it shall pay out of *its corporate funds* a certain sum, as the consideration for the charter, and after the corporation is organized a payment duly made of the sum *out of the corporate funds;* will it be contended, that there is not a subsisting contract between the government and the corporation, by the matters thus arising *ex post facto*, that the charter shall not be revoked during the stipulated period? Suppose an act declaring that all persons, who should thereafter pay into the public treasury a stipulated sum, should be tenants in common of cer-

1819.

Dartmouth
College
v.
Woodward.

tain lands belonging to the State in certain proportions; if a person afterwards born, pays the stipulated sum into the treasury, is it less a contract with him, than it would be with a person *in esse* at the time the act passed? We must admit that there may be future springing contracts in respect to persons not now *in esse*, or we shall involve ourselves in inextricable difficulties. And if there may be in respect to natural persons, why not also in respect to artificial persons, created by the law, for the very purpose of being clothed with corporate powers? I am unable to distinguish between the case of a grant of land or of franchises to an existing corporation, and a like grant to a corporation brought into life for the very purpose of receiving the grant. As soon as it is *in esse*, and the franchises and property become vested and executed in it, the grant is just as much an executed contract, as if its prior existence had been established for a century.

Supposing, however, that in either of the views which have been suggested, the charter of Dartmouth College is to be deemed a contract, we are yet met with several objections of another nature.

It is, in the first place, contended, that it is not a contract within the prohibitory clause of the constitution, because that clause was never intended to apply to mere contracts of civil institution, such as the contract of marriage, or to grants of power to State officers, or to contracts relative to their offices, or to grants of trust to be exercised for purposes merely public, where the grantees take no beneficial interest.

It is admitted, that the State legislatures have

1819.

Dartmouth
College
v.
Woodward.

power to enlarge, repeal, and limit the authorities of public officers in their official capacities, in all cases, where the constitutions of the States respectively do not prohibit them; and this, among others, for the very reason, that there is no express or implied contract, that they shall always, during their continuance in office, exercise such authorities. They are to exercise them only during the good pleasure of the legislature. But when the legislature makes a contract with a public officer, as in the case of a stipulated salary for his services, during a limited period, this, during the limited period, is just as much a contract, within the purview of the constitutional prohibition, as a like contract would be between two private citizens. Will it be contended, that the legislature of a State can diminish the salary of a judge holding his office during good behaviour? Such an authority has never yet been asserted to our knowledge. It may also be admitted, that corporations for mere public government, such as towns, cities and counties, may in many respects be subject to legislative control. But it will hardly be contended, that even in respect to such corporations, the legislative power is so transcendant, that it may at its will take away the private property of the corporation, or change the uses of its private funds acquired under the public faith. Can the legislature confiscate to its own use the private funds which a municipal corporation holds under its charter, without any default or consent of the corporators? If a municipal corporation be capable of holding devises and legacies to charitable uses (as many municipal corpora-

tions arc,) does the legislature, under our forms of limited government, possess the authority to seize upon those funds, and appropriate them to other uses, at its own arbitrary pleasure, against the will of the donors and donees? From the very nature of our governments, the public faith is pledged the other way; and that pledge constitutes a valid compact; and that compact is subject only to judicial inquiry, construction, and abrogation. This Court have already had occasion, in other causes, to express their opinion on this subject; and there is not the slightest inclination to retract it.[a]

As to the case of the contract of marriage, which the argument supposes not to be within the reach of the prohibitory clause, because it is matter of civil institution, I profess not to feel the weight of the reason assigned for the exception. In a legal sense, all contracts, recognized as valid in any country, may be properly said to be matters of civil institution, since they obtain their obligation and construction *jure loci contractus.* Titles to land, constituting part of the public domain, acquired by grants under the provisions of existing laws by private persons, are certainly contracts of civil institution. Yet no one ever supposed, that when acquired *bona fide,* they were not beyond the reach of legislative revocation. And so, certainly, is the established doctrine of this Court.[b] A *general* law regulating divorces from the contract of marriage, like a law regulating

---

[a] Terret v. Taylor, 9 *Cranch,* 43. Town of Pawlet v. Clark, 9 *Cranch,* 292.

[b] *Ib.*

remedies in other cases of breaches of contracts, is not necessarily a law impairing *the obligation of such a contract.*[a] It may be the only effectual mode of enforcing the obligations of the contract on both sides. A law punishing a breach of a contract, by imposing a forfeiture of the rights acquired under it, or dissolving it because the mutual obligations were no longer observed, is in no correct sense a law impairing the obligations of the contract. Could a law, compelling a specific performance, by giving a new remedy, be justly deemed an excess of legislative power? Thus far the contract of marriage has been considered with reference to *general* laws regulating divorces upon breaches of that contract. But if the argument means to assert, that the legislative power to dissolve such a contract, without *any breach* on *either side, against the wishes* of the parties, and without any judicial inquiry to ascertain a breach, I certainly am not prepared to admit such a power, or that its exercise would not entrench upon the prohibition of the constitution. If under the faith of existing laws a contract of marriage be duly solemnized, or a marriage settlement be made, (and marriage is always in law a valuable consideration for a contract,) it is not easy to perceive why a dissolution of its obligations, without any default or assent of the parties, may not as well fall within the prohibition, as any other contract for a valuable consideration. A man has just as good a right to his wife, as to *the property* acquired under a marriage

---

a See Holmes v. Lansing, 3 *Johns. Cas.* 73.

contract. He has a legal right to her society and
her fortune; and to devest such right without his de-
fault, and against his will, would be as flagrant a vio-
lation of the principles of justice, as the confiscation
of his own estate. I leave this case, however, to be
settled, when it shall arise. I have gone into it, be-
cause it was urged with great earnestness upon us,
and required a reply. It is sufficient now to say, that
as at present advised, the argument, derived from
this source, does not press my mind with any new
and insurmountable difficulty.

In respect also to grants and contracts, it would
be far too narrow a construction of the constitution, to
limit the prohibitory clause to such only where the
parties take for their own private benefit. A grant
to a private trustee for the benefit of a particular *ces-
tui que trust*, or for any special, private or public
charity, cannot be the less a contract because the
trustee takes nothing for his own benefit. A grant
of the next presentation to a church is still a con-
tract, although it limit the grantee to a mere right of
nomination or patronage.[a] The fallacy of the argu-
ment consists in assuming the very ground in contro-
versy. It is not admitted, that a contract with a trus-
tee is in its own nature revocable, whether it be for
special or general purposes, for public charity or par-
ticular beneficence. A private donation, vested in a
trustee for objects of a general nature, does not there-
by become a public trust, which the government may,
at its pleasure, take from the trustee, and administer

1819.

Dartmouth
College
v.
Woodward.

a 2 Bl. Com. 21.

in its own way. The truth is, that the government has no power to revoke a grant, *even of its own funds,* when given to a private person, or a corporation for special uses. It cannot recal its own endowments granted to any hospital, or college, or city, or town, for the use of such corporations. The only authority remaining to the goverment is judicial, to ascertain the validity of the grant, to enforce its proper uses, to suppress frauds, and, if the uses are charitable, to secure their regular administration through the means of equitable tribunals, in cases where there would otherwise be a failure of justice.

Another objection growing out of, and connected with that which we have been considering, is, that no grants are within the constitutional prohibition, except such as respect *property* in the strict sense of the term ; that is to say, beneficial interests in lands, tenements, and hereditaments, &c. &c. which may be sold by the grantees for their own benefit : and that grants of franchises, immunities, and authorities not valuable to the parties, *as property,* are excluded from its purview. No authority has been cited to sustain this distinction, and no reason is perceived to justify its adoption. There are many rights, franchises, and authorities which are valuable in contemplation of law, where no beneficial interest can accrue to the possessor. A grant of the next presentation to a church, limited to the grantee alone, has been already mentioned. A power of appointment, reserved in a marriage settlement, either to a party or a stranger, to appoint uses in favour of third persons, without compensation, is another in-

stance. A grant of lands to a trustee to raise portions or pay debts, is, in law, a valuable grant, and conveys a legal estate. Even a power given by will to executors to sell an estate for payment of debts is, by the better opinions and authority, coupled with a trust, and capable of survivorship.[a] Many dignities and offices, existing at common law, are merely honorary, and without profit, and sometimes are onerous. Yet a grant of them has never been supposed the less a contract on that account. In respect to franchises, whether corporate or not, which include a pernancy of profits, such as a right of fishery, or to hold a ferry, a market, or a fair, or to erect a turnpike, bank, or bridge, there is no pretence to say that grants of them are not within the constitution. Yet they may, in point of fact, be of no exchangeable value to the owners. They may be worthless in the market. The truth, however, is, that all incorporeal hereditaments, whether they be immunities, dignities, offices, or franchises, or other rights, are deemed valuable in law. The owners have a legal estate and property in them, and legal remedies to support and recover them, in case of any injury, obstruction or disseizin of them. Whenever they are the subjects of a contract or grant, they are just as much within the reach of the constitution as any other grant.

a Co. Lit. 113. a. Harg. and Butler's note 2. Sugden on Powers, 140. Jackson v. Jansen, 6 Johns. Rep. 73. Franklin v. Osgood, 2 Johns. Cas. 1. S. C. 14 Johns. Rep. 527. Zebach v. Smith, 3 Binn. Rep. 69. Lessee of Moody v. Vandyke, 4 Binn. 7. 31. Attorney General v. Gleg, 1 Atk. 356. 1 Bac. Abr. 586. (Gwillim edit.)

Nor is there any solid reason why a contract for the exercise of a mere authority should not be just as much guarded as a contract for the use and dominion of property. Mere naked powers, which are to be exercised for the exclusive benefit of the grantor, are revocable by him *for that very reason.* But it is otherwise where a power is to be exercised in aid of a right vested in the *grantee.* We all know that a power of attorney, forming a part of a security upon the assignment of a chose in action, is not revocable by the grantor. For it then sounds in contract, and is coupled with an interest.[a] So if an estate be conveyed in trust for the grantor, the estate is irrevocable in the grantee, although he can take no beneficial interest for himself. Many of the best settled estates stand upon conveyances of this nature; and there can be no doubt that such grants are contracts within the prohibition in question.

In respect to *corporate franchises,* they are, properly speaking, legal estates vested in the corporation itself as soon as it is *in esse.* They are not mere naked powers granted to the corporation; but powers coupled with an interest. The property of the corporation vests upon the possession of its franchises; and whatever may be thought as to the corporators, it cannot be denied, that the corporation itself has a legal interest in them. It may sue and be sued for them. Nay, more, this very right is one of its or-

---

a Walsh v. Whitcomb, 2 *Esp.* 565. Bergen v. Bennett, 1 *Caines' Cases in Error,* 1. 15. Raymond v. Squire, 11 *Johns. Rep.* 47.

dinary franchises.   " It is likewise a franchise,"
says Mr. Justice Blackstone, " for a number of per-
sons to be incorporated and subsist as a body politic,
with power to maintain perpetual succession, and do
other corporate acts ; and each individual member of
such corporation is also said to have a franchise or
freedom."[a]  In order to get rid of the legal difficulty
of these franchises being considered as valuable here-
ditaments or property, the counsel for the defendant
are driven to contend, that the corporators or trustees
are mere agents of the corporation, in whom no bene-
ficial interest subsists; and so nothing but a naked
power is touched by removing them from the trust ;
and then to hold the corporation itself a mere ideal
being, capable indeed of holding property or fran-
chises, but having no interest in them which can be
the subject of contract.   Neither of these positions
is admissible.   The former has been already suffi-
ciently considered, and the latter may be disposed
of in a few words.   The corporators are not mere
agents, but have vested rights in their character, as
corporators.   The right to be a freeman of a corpo-
ration is a valuable temporal right.   It is a right of
voting and acting in the corporate concerns, which
the law recognizes and enforces, and for a violation
of which it provides a remedy.   It is founded on the
same basis as the right of voting in public elections ;
it is as sacred a right ; and whatever might have been
the prevalence of former doubts, since the time of
Lord Holt, such a right has always been deemed a
valuable franchise or privilege.[b]

a 2 Bl. Com. 37.   1 Kyd on Corp. 14. 16.
b Ashby v. White, 2 Ld. Raym. 938.   1 Kyd on Corp. 16.

This reasoning, which has been thus far urged, applies with full force to the case of Dartmouth College. The franchises granted by the charter were vested in the trustees in their corporate character. The lands and other property, subsequently acquired, were held by them in the same manner. They were the private demesnes of the corporation, held by it, not, as the argument supposes, for the use and benefit of the people of New-Hampshire, but, as the charter itself declares, " for the use of Dartmouth College." There were not, and in the nature of things could not be, any other *cestui que use* entitled to claim those funds. They were indeed to be devoted to the promotion of piety and learning, not at large, but in that *college*, and the establishments connected with it ; and the mode in which the charity was to be applied, and the objects of it, were left solely to the trustees, who were the legal governors and administrators of it. No particular person in New-Hampshire possessed a vested right in the bounty ; nor could he force himself upon the trustees as a proper object. The legislature itself could not deprive the trustees of the corporate funds, or annul their discretion in the application of them, or distribute them among its own favourites. Could the legislature of New-Hampshire have seized the land given by the State of Vermont to the corporation, and appropriated it to uses distinct from those intended by the charity, against the will of the trustees ? This question cannot be answered in the affirmative, until it is established, that the legislature may lawfully take the property of A. and give it to B. ; and if it

could not take away or restrain the corporate *funds*, upon what pretence can it take away or restrain the corporate *franchises?* Without the franchises, the funds could not be used for corporate purposes; but without the funds, the possession of the franchises might still be of inestimable value to the college and to the cause of religion and learning.

Thus far, the rights of the corporation itself, in respect to its property and franchises, have been more immediately considered. But there are other rights and privileges belonging to the trustees collectively, and severally, which are deserving of notice. They are entrusted with the exclusive power to manage the funds, to choose the officers, and to regulate the corporate concerns, according to their own discretion. The *jus patronatûs* is vested in them. The visitatorial power, in its most enlarged extent, also belongs to them. When this power devolves upon the founder of a charity, it is an hereditament, descendible in perpetuity to his heirs, and in default of heirs, it escheats to the government.[a] It is a valuable right founded in property, as much so as the right of patronage in any other case. It is a right which partakes of a judicial nature. May not the founder as justly contract for the possession of this right in return for his endowment, as for any other equivalent? and, if instead of holding it as an hereditament, he assigns it in perpetuity to the trustees of the corporation, is it less a valuable hereditament in their hands? The right is not merely a collective right in all the trus-

1819.

Dartmouth
College
v.
Woodward.

a  Rex v. St. Catherine's Hall, 4 *T. R.* 233.

1819.

Dartmouth
College
v.
Woodward.

tees; each of them also has a franchise in it. Lord Holt says, " it is agreeable to reason, and the rules of law, that a franchise should be vested in the corporation aggregate, and yet the benefit redound to the particular members, and be enjoyed by them in their private capacities. Where the privilege of election is used by particular persons, it is a particular right vested in each particular man."[a] Each of the trustees had a right to vote in all elections. If obstructed in the exercise of it, the law furnished him with an adequate recompense in damages. If ousted unlawfully from his office, the law would, by a mandamus, compel a restoration.

It is attempted, however, to establish, that the trustees have no interest in the corporate franchises, because it is said, that they may be *witnesses* in a suit brought against the corporation. The case cited at the bar certainly goes the length of asserting, that in a suit brought against a charitable corporation for a recompence for services performed for the corporation, the governors, constituting the corporation, (but whether entrusted with its *funds* or not by the act of incorporation does not appear) are competent witnesses against the plaintiff.[b] But assuming this case to have been rightly decided, (as to which upon the authorities there may be room to doubt,) the corpo-

a Ashby v. White, 2 *Ld. Raym.* 938. 952. Attorney General v. Dixie, 13 *Ves.* 519.

b Weller v. The Governor of the Foundling Hospital, *Peake's N. P. Rep.* 153.

rators being technically parties to the record,[a] it does not establish, that in a suit for the corporate property vested in the trustees in their corporate capacity, the trustees are competent witnesses. At all events, it does not establish, that in a suit for the corporate franchises to be exercised by the trustees, or to enforce their visitatorial power, the trustees would be competent witnesses. On a mandamus to restore a trustee to his corporate or visitatorial power, it will not be contended, that the trustee is himself a competent witness to establish his own rights, or the corporate rights. Yet why not, if the law deems that a trustee has no interest in the franchise? The test of interest assumed in the argument proves nothing in this case. It is not enough to establish, that the trustees are sometimes competent witnesses; it is necessary to show, that they are always so in respect to the corporate franchises, and their own. It will not be pretended, that in a suit for damages for obstruction in the exercise of his official powers, a trustee is a disinterested witness. Such an obstruction is not a *damnum absque injuria.* Each trustee has a vested right, and legal interest in his office, and it cannot be devested but by due course of law. The illustration, therefore, lends no new force to the argument; for it does not establish, that when their own rights

---

*a* Attorney General v. City of London, &c. 3 *Bro. Ch. c.* 171. S. C. 1 *Ves. jun.* 243. Burton v. Hinde, 5 *T. R.* 174. Nason v. Thatcher, 7 *Mass. R.* 398. *Phillips on Evid.* 42. 52. 57. and notes. 1 *Kyd on Corp.* 304. &c. *Highmore on Mortm.* 514.

1819.

Dartmouth
 College
    v.
Woodward.

The charter
of Dartmouth
College was
not dissolved
at the revolu-
tion.

are in controversy, the trustees have no legal interest in their offices.

The principal objections having been thus answered satisfactorily, at least to my own mind, it remains only to declare, that my opinion, after the most mature deliberation is, that the charter of Dartmouth College, granted in 1769, is a contract within the purview of the constitutional prohibition.

I might now proceed to the discussion of the second question; but it is necessary previously to dispose of a doctrine which has been very seriously urged at the bar, viz. that the charter of Dartmouth College was dissolved at the revolution, and is, therefore, a mere nullity. A case before Lord Thurlow has been cited in support of this doctrine.[a] The principal question in that case was, whether the corporation of William & Mary's College in Virginia, (which had received its charter from King William, and Queen Mary,) should still be permitted to administer the charity under Mr. Boyle's will, no interest having passed to the college under the will, but it acting as an agent or trustee under a decree in chancery, or whether a new scheme for the administration of the charity should be laid before the Court. Lord Thurlow directed a new scheme, because the college belonging to an independent government, was no longer within the reach of the Court. And he very unnecessarily added, that he could not now consider the college as a corporation, or as another report[a] states,

a Attorney General v. City of London, 3 Bro. Ch. C. 171. S. C. 1 Ves. jun. 243.

b 1 Ves. jun. 243.

that he could not take notice of it as a corporation, it not having proved its existence as a corporation at all. If, by this, Lord Thurlow meant to declare, that all charters acquired in America from the crown, were destroyed by the revolution, his doctrine is not law; and if it had been true, it would equally apply to all other grants from the crown, which would be monstrous. It is a principle of the common law, which has been recognized as well in this, as in other Courts, that the division of an empire, works no forfeiture of previously vested rights of property. And this maxim is equally consonant with the common sense of mankind, and the maxims of eternal justice.[a] This objection, therefore, may be safely dismissed without further comment.

The remaining inquiry is, whether the acts of the legislature of New-Hampshire now in question, or any of them, impair the obligations of the charter of Dartmouth College. The attempt certainly is to force upon the corporation a new charter against the will of the corporators. Nothing seems better settled at the common law, than the doctrine, that the crown cannot force upon a private corporation a new charter; or compel the old members to give-up their own franchises, or to admit new members into the corporation.[b] Neither can the crown compel a man

a Terrett v. Taylor, 9 *Cranch*, 43. 50. Kelly v. Harrison, 2 *Johns. Cas.* 29. Jackson v. Lunn, 3 *Johns. Cas.* 109. Calvin's case, 7 *Co.* 27.

b Rex v. Vice Chancellor of Cambridge, 3 *Bur.* 1656. Rex v. Passmore, 3 *T. R.* 240. 1 *Kyd on Corp.* 65. Rex v. Larwood, *Comb.* 316.

*Margin notes:*
1819.

Dartmouth College v. Woodward.

The acts of New-Hampshire in question impair the obligations of the charter of Dartmouth College.

1819.

Dartmouth
College
v.
Woodward.

to become a member of such corporation against his will.[a] As little has it been supposed, that under our limited governments, the legislature possessed such transcendant authority. On one occasion, a very able Court held, that the State legislature had no authority to compel a person to become a member of a mere private corporation created for the promotion of a private enterprise, because every man had a right to refuse a grant.[b] On another occasion, the same learned Court declared, that they were all satisfied, that the rights legally vested in a corporation, cannot be controled or destroyed by any subsequent statute, unless *a power for that purpose be reserved to the legislature in the act of incorporation.*[c] These principles are so consonant with justice, sound policy, and legal reasoning, that it is difficult to resist the impression of their perfect correctness. The application of them, however, does not, from our limited authority, properly belong to the appellate jurisdiction of this Court in this case.

A very summary examination of the acts of New-Hampshire will abundantly show, that in many materal respects they change the charter of Dartmouth College. The act of the 27th of June, 1816, declares that the corporation known by the name of the Trustees of Dartmouth College shall be called the Trustees of Dartmouth University. That the whole number of trustees shall be *twenty-one,* a ma-

a Rex v. Dr. Askew, 4 *Bur.* 2200.
b Ellis v. Marshall, 2 *Mass. Rep.* 269.
c Wales v. Stetson, 2 *Mass. Rep.* 143. 146.

jority of whom shall form a quorum; that they and their successors shall hold, use, and enjoy forever, all the powers, authorities, rights, property, liberties, privileges, and immunities, heretofore held, &c. by the trustees of Dartmouth College, except where the act otherwise provides; that they shall also have power to determine the times and places of their meetings and manner of notifying the same; to organize colleges in the university; to establish an institute, and elect fellows and members thereof; to appoint and displace officers, and determine their duties and compensation; to delegate the power of supplying vacancies in any of the offices of the university for a limited term; to pass ordinances for the government of the students; to prescribe the course of education; and to arrange, invest, and employ the funds of the university. The act then provides for the appointment of a board of twenty-five overseers, fifteen of whom shall form a quorum, of whom five are to be such *ex officio*, and the residue of the overseers, as well as the new trustees, are to be appointed by the governor and council. The board of overseers are, among other things, to have power, " to *inspect* and *confirm*, or *disapprove* and *negative*, such votes and proceedings of the board of trustees as shall relate to the appointment and removal of president, professors and other permanent officers of the university, and determine their salaries; to the establishment of colleges and professorships, and the erection of new college buildings." The act then provides, that the president and professors shall be *nominated by the trustees*, and *appointed* by *the over-*

*seers,* and shall be liable to be suspended and removed in the same manner; and that *each of the two boards of trustees and overseers shall have power to suspend and remove any member of their respective boards.* The supplementary act of the 18th of December, 1816, declares that *nine* trustees shall form a quorum, and that *six* votes at least shall be necessary for the passage of any act or resolution. The act of the 26th of December, 1816, contains other provisions, not very material to the question before us.

From this short analysis it is apparent, that, in substance, a new corporation is created including the old corporators, with new powers, and subject to a new control; or that the old corporation is newly organized and enlarged, and placed under an authority hitherto unknown to it. The board of trustees are increased from twelve to twenty-one. The college becomes a university. The property vested in the old trustees is transferred to the new board of trustees in their corporate capacities. The quorum is no longer *seven,* but *nine.* The old trustees have no longer the sole right to perpetuate their succession by electing other trustes, but the *nine* new trustees are in the first instance to be appointed by the governor and council, and the new board are then to elect other trustees from time to time as vacancies occur. The new board, too, have the power to suspend or remove any member, so that a *minority* of the old board, co-operating with the new trustees, possess the unlimited power to remove the *majority* of the *old* board. The powers, too, of the corporation are varied. It has authority to organize new colleges in

1819.

Dartmouth College v. Woodward.

"the university, and to establish an institute, and elect fellows and members thereof." A board of overseers is created, (a board utterly unknown to the old charter,) and is invested with a general supervision and negative upon all the most important acts and proceedings of the trustees. And to give complete effect to this new authority, instead of the right to appoint, the trustees are in future only to nominate, and the overseers are to approve, the president and professors of the university.

If these are not essential changes, impairing the rights and authorities of the trustees, and vitally affecting the interests and organization of Dartmouth College under its old charter, it is difficult to conceive what acts, short of an unconditional repeal of the charter, could have that effect. If a grant of land or franchises be made to A., in trust for special purposes, can the grant be revoked, and a new grant thereof be made to A., B., and C., in trust for the same purposes, without violating the obligation of the first grant? If property be vested by grant in A. and B., for the use of a college, or a hospital, of private foundation, is not the obligation of that grant impaired when the estate is taken from their exclusive management, and vested in them in common with ten other persons? If a power of appointment be given to A. and B., is it no violation of their right to annul the appointment, unless it be assented to by five other persons, and then confirmed by a distinct body? If a bank, or insurance company, by the terms of its charter, be under the management of directors, elected by the stockholders, would not the

1819.

Dartmouth
College
v.
Woodward.

rights acquired by the charter be impaired if the legislature should take the right of election from the stockholders, and appoint directors unconnected with the corporation? These questions carry their own answers along with them. The common sense of mankind will teach us, that all these cases would be direct infringements of the legal obligations of the grants to which they refer ; and yet they are, with no essential distinction, the same as the case now at the bar.

In my judgment it is perfectly clear, that any act of a legislature which takes away any powers or franchises vested by its charter in a private corporation or its corporate officers, or which restrains or controls the legitimate exercise of them, or transfers them to other persons, without its assent, is a violation of the obligations of that charter. If the legislature mean to claim such an authority, it must be reserved in the grant. The charter of Dartmouth College contains no such reservation ; and I am, therefore, bound to declare, that the acts of the legislature of New-Hampshire, now in question, do impair the obligations of that charter, and are, consequently, unconstitutional and void.

In pronouncing this judgment, it has not for one moment escaped me how delicate, difficult, and ungracious is the task devolved upon us. The predicament in which this Court stands in relation to the nation at large, is full of perplexities and embarrassments. It is called to decide on causes between citizens of different States, between a State and its citizens, and between different States. It stands, therefore, in the midst of

jealousies and rivalries of conflicting parties, with the most momentous interests confided to its care. Under such circumstances, it never can have a motive to do more than its duty ; and, I trust, it will always be found to possess firmness enough to do that.

1819:
Dartmouth
College
v.
Woodward.

Under these impressions I have pondered on the case before us with the most anxious deliberation. I entertain great respect for the legislature, whose acts are in question. I entertain no less respect for the enlightened tribunal whose decision we are called upon to review. In the examination, I have endeavoured to keep my steps *super antiquas vias* of the law, under the guidance of authority and principle. It is not for judges to listen to the voice of persuasive eloquence or popular appeal. We have nothing to do but to pronounce the law as we find it ; and having done this, our justification must be left to the impartial judgment of our country.

Mr. Justice DUVALL dissented.[a]

[a] In the discussions which arose in France in 1786, upon the new charter then recently granted to the French East India Company, it seems to have been taken for granted by the lawyers on both sides, to whom the questions in controversy were submitted by the Company, and by the merchants who considered themselves injured by its establishment, that if the charter had regularly issued according to the forms of the French law, it was irrevocable, unless forfeited for non-user or misuser. The advocates, (M. M. LACRETELLE and BLONDE,) who were consulted by the merchants of the kingdom opposed to the establishment of the Company, denied its legal existence, on the ground that the king had been surprised in his grant ; that it was not yet perfected by the issuing of letters patent,

1819.

Dartmouth
College
v.
Woodward.

Upon the suggestion of the plaintiff's counsel, that the defendant had died since the last term, the Court ordered the judgment to be entered *nunc pro tunc* as of that term, as follows :

JUDGMENT. This cause came on to be heard on the transcript of the record, and was argued by counsel. And thereupon all and singular the premises being seen, and by the Court now here fully understood, and mature deliberation being thereupon had,

nor duly registered by the parliaments ; and that it both might and ought to be suppressed, as an illegal grant of exclusive privileges, contrary to the true principles of commercial philosophy.

On the other hand it was contended by the Company that their grant was irrevocable ; that it was but a renewal and confirmation of the charter of the old Company which had been suspended in 1769, in consequence of the immense losses of capital sustained in the calamitous war of 1756, (but which suspension was at the time solemnly protested against by the parliament of Paris as illegal ;) that their new grant might still be perfected by letters patent, which the faith of the king was pledged to issue ; and that the privileges thus granted to them were irrevocably vested as a right of property, of which they could not be deprived by any authority in the kingdom. " En effet, quand le roi accorde un privilége exclusif, ce privilége est le prix d'une mise de fonds, dans un commerce hazardeux, dont l'entreprise est jugée avantageuse à l'etat. Delà naît par conséquent un contrat synallagmatique, qui se forme entre le souverain et les actionnaires. Delà naît un droit de propriété qui devient inébranlable pour le souverain lui-même." And of this opinion were the advocates (M. M. HARDOIN, GERBIER, and DE BONNIERES,) consulted by the company. *See a Collection of Tracts on the French East Company, Paris,* 1788, *in the Library of Congress.*

it appears to this Court, that the said acts of the legislature of New-Hampshire, of the twenty-seventh of June and of the eighteenth and twenty-sixth of December, Anno Domini, 1816, in the record mentioned, are repugnant to the constitution of the United States, and so not valid; and, therefore, that the said Superior Court of Judicature of the State of New-Hampshire erred in rendering judgment on the said special verdict in favour of the said plaintiffs; and that the said Court ought to have rendered judgment thereon, that the said trustees recover against the said Woodward, the amount of damages found and assessed, in and by the verdict aforesaid, viz. the sum of twenty thousand dollars: Whereupon it is considered, ordered, and adjudged by this Court, now here, that the aforesaid judgment of the said Superior Court of Judicature of the State of New-Hampshire be, and the same hereby is, reversed and annulled: And this Court proceeding to render such judgment in the premises as the said Superior Court of Judicature ought to have rendered, it is further considered by this Court, now here, that the said trustees of Dartmouth College do recover against the said William Woodward the aforesaid sum of twenty thousand dollars, with costs of suit; and it is by this Court, now here, further ordered, that a special mandate do go from this Court to the said Superior Court of Judicature to carry this judgment into execution.